QUINN EMANUEL URQUHART & SULLIVAN, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Daniel C. Posner (Bar No. 232009)
danposner@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Andrew Schapiro (admitted *Pro Hac Vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1881
Telephone:    (312) 705-7400
Facsimile:    (312) 705-7401

Renita N. Sharma (admitted *Pro Hac Vice*)
renitasharma@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

William Pilon (Bar No. 326487)
williampilon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

Attorneys for Defendant Perplexity AI, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMAZON.COM SERVICES LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>PERPLEXITY AI, INC., a Delaware corporation<br><br>Defendant. | Case No. 3:25-cv-09514-MMC<br><br>**DEFENDANT'S OPPOSITION TO AMAZON'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. Maxine M. Chesney<br>Courtroom 7<br><br>Hearing Date: January 9, 2026<br>Hearing Time:  9:00 a.m. |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION..................................................................................................1

II.    BACKGROUND..................................................................................................2

III.   LEGAL STANDARD .........................................................................................6

IV.   ARGUMENT ......................................................................................................7

    A.    Amazon Has Not Shown A Likelihood Of Success On The Merits .........7

         1.    The CFAA Is Inapplicable To Amazon's Public Website .............7

         2.    Amazon's Conditions Of Use Cannot Establish A CFAA Claim.................9

         3.    Amazon Will Not Prevail On Its § 1030(a)(2) Claim ...................10

             (a)    The Assistant does not "access" Amazon computers......................10

             (b)    The Assistant does not access Amazon.com "without authorization" or by "exceed[ing] authorized access" ....................11

             (c)    The Assistant does not "obtain . . . information" from Amazon .......................................................................................14

             (d)    Amazon cannot show cognizable harm...........................................16

         4.    Amazon Will Not Prevail On Its Section 1030(a)(4) Claim ........17

         5.    Amazon Will Not Prevail On Its CDAFA Claim..........................19

    B.    Amazon Has Not Demonstrated Irreparable Harm ................................19

    C.    Amazon's Requested Injunction Would Harm The Public Interest........................22

    D.    The Balance Of Equities Weighs Strongly In Perplexity's Favor ..........................23

    E.    Amazon's Proposed Injunction Is Fatally Overbroad ............................24

    F.    Amazon Must Post A Bond....................................................................25

V.    CONCLUSION ..................................................................................................25

Case No. 3:25-cv-09514-MMC

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

3

*Active Network, Inc. v. Elec. Arts Inc.*,
    2010 WL 3463378 (S.D. Cal. Aug. 31, 2010) ....................................................... 23

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985) .................................................................... 20

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .................................................................... 22

*Brighton Collectibles, Inc. v. Pedre Watch Co.*,
    2013 WL 5719071 (S.D. Cal. Oct. 21, 2013) ............................................... 23

*Caribbean Marine Services Co., Inc. v. Baldrige*,
    844 F.2d 668 (9th Cir. 1988) ...................................................................... 19

*CDK Glob., LLC v. Tekion Corp.*,
    No. 25-cv-1394, 2025 WL 1939951 (N.D. Cal. July 15, 2025) ................................ 8

*Chegg, Inc. v. Doe*,
    2023 WL 7392290 (N.D. Cal. Nov. 7, 2023) ................................................. 20

*Chegg, Inc. v. Doe*,
    No. 22-cv-7326, 2023 WL 4315540 (N.D. Cal. July 3, 2023) ............................... 9

*ClearOne Advantage, LLC v. Kersen*,
    710 F. Supp. 3d 425 (D. Md. 2024) .............................................................. 21

*CLS Worldwide Servs., LLC v. Cartier Exec. Limo Serv.*,
    2006 WL 8563341 (C.D. Cal. June 15, 2006) ................................................ 22

*Dymo Indus., Inc. v. Tapeprinter, Inc.*,
    326 F.2d 141 (9th Cir. 1964) (per curiam) ...................................................... 6

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) .................................................................................. 25

*Epic Games, Inc. v. Apple Inc.*,
    2021 WL 5205487 (N.D. Cal. Nov. 9, 2021) ................................................. 22

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ...................................................................... 15

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016) .............................................. 8, 9, 11, 12, 13, 14, 18

*Facebook, Inc. v. Power Ventures, Inc.* (*Power Ventures MSJ Ruling*),
    844 F. Supp. 2d 1025 (N.D. Cal. 2012*),
    aff'd in part, vacated in part, rev'd in part*, 844 F.3d 1058 (9th Cir. 2016) .......................... 11

*Facebook, Inc. v. Power Ventures, Inc.* (*Power Ventures Ruling on Pleadings*),
    No. 5:08-cv-5780, 2010 WL 3291750 (N.D. Cal. July 20, 2010) .......................................... 13

*Fla. Atl. Univ. Bd. of Trs. v. Parsont*,
    465 F. Supp. 3d 1279 (S.D. Fla. 2020) ................................................................................... 20

*Garrett v. City of Escondido*,
    465 F. Supp. 2d 1043 (S.D. Cal. 2006) ................................................................................... 25

*Gen. Motors Corp. v. Harry Brown's, LLC*,
    563 F.3d 312 (8th Cir. 2009) ................................................................................................... 22

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) .......................................... 7, 8, 9, 12, 14, 15, 16, 19, 20, 21, 25

*Hoist Fitness Systems, Inc. v. Tuffstuff Fitness Int'l, Inc.*,
    2017 WL 5640562 (C.D. Cal. Oct. 31, 2017) ........................................................................ 22

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
    4 F.3d 819 (9th Cir. 1993) ................................................................................................. 22, 23

*Los Angeles Memorial Coliseum Comm'n v. NFL*,
    634 F.2d 1197 (9th Cir. 1980) ................................................................................................. 24

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009) ......................................................................................... 9, 16, 19

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) ........................................................... 7, 8, 9, 10, 17, 19

*Multiven, Inc. v. Cisco Sys., Inc.*,
    725 F. Supp. 2d 887 (N.D. Cal. 2010) ............................................................................... 17, 18

*Musk v. OpenAI, Inc.*,
    769 F. Supp. 3d 1017 (N.D. Cal. 2025) ................................................................................... 21

*Norton v. Gilliam*,
    2022 WL 20210183 (C.D. Cal. July 21, 2022) ................................................................. 19, 20

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*,
    428 F.3d 504 (3d Cir. 2005) .................................................................................................... 16

*Qualcomm Inc. v. Compal Elecs., Inc.*,
    283 F. Supp. 3d 905 (S.D. Cal. 2017) ..................................................................................... 21

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*,
    119 F. Supp. 2d 1121 (W.D. Wash. 2000) ....................................................... 17, 18

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012) (*en banc*) ..................................................... 10, 18, 19

*Van Buren v. United States*,
    593 U.S. 374 (2021) ............................................................................... 16, 17, 18

*Wagner Aeronautical, Inc. v. Dotzenroth*,
    2022 WL 6837701 (S.D. Cal. Oct. 7, 2022) ............................................................. 23

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ...................................................................................... 6, 7, 24

*X Corp. v. Ctr. for Countering Digital Hate, Inc*.,
    724 F. Supp. 3d 948 (N.D. Cal. 2024) .................................................................. 16, 17

## Statutes

CFAA (18 U.S.C. § 1030) ................................ 1, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 23, 25

18 U.S.C. § 1030(a)(2) ...................................................................... 7, 10, 11, 14, 15, 16

18 U.S.C. § 1030(a)(2) and (a)(4) .............................................................................. 7, 18

18 U.S.C. § 1030(a)(2), (c)(4)(A)(i)(I) ............................................................................. 7

18 U.S.C. § 1030(a)(4) ......................................................................................... 7, 17, 18, 19

18 U.S.C. § 1030(a)(4), (c)(4)(A)(i)(I) ............................................................................. 7

18 U.S.C. § 1030(c)(4)(A)(i)(I) ...................................................................................... 16

18 U.S.C. § 1030(e)(11) ............................................................................................... 16

SCA (18 U.S.C. §§2701 et seq.) .................................................................................. 15, 16

18 U.S.C. § 2701(a) .................................................................................................. 15, 16

CDAFA (Cal. Penal Code § 502) .............................................................. 1, 7, 9, 10, 12, 19

## Other Authorities

Amazon, *About Amazon*, https://www.aboutamazon.com/news/aws/amazon-quick-
    suite-agentic-ai-aws-work; ........................................................................................ 5

Amazon, *AWS News Blog*, https://aws.amazon.com/blogs/aws/reimagine-the-way-
    you-work-with-ai-agents-in-amazon-quick-suite/........................................................ 5

1

Fed. R. Civ. P. 65(c) ............................................................................................ 25

2

FTC, https://www.ftc.gov/legal-library/browse/cases-proceedings/1910129-
    1910130-amazoncom-inc-amazon-ecommerce .......................................... 4

3

4

FTC, https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-secures-
    historic-25-billion-settlement-against-amazon .......................................... 4

5

Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1161 (2016)................. 14

6

7

Reuters, *Amazon's AWS forms new group focused on agentic AI*,
    https://www.reuters.com/technology/artificial-intelligence/amazons-aws-forms-
    new-group-focused-agentic-ai-2025-03-04 ............................................. 5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

The next wave of artificial intelligence innovation is "agentic AI"—AI "agents" that assist users in performing tasks, such as shopping on e-commerce websites.  This lawsuit is a bald attempt by Amazon to block its own customers from using defendant Perplexity's groundbreaking "Comet" AI Assistant (the "Assistant") on Amazon.com.  Why?  Because AI agents don't have eyeballs to see the pervasive advertising Amazon bombards its users with and cannot be upsold to buy more products.  Those are the real reasons Amazon filed this suit and seeks a preliminary injunction—not its claimed altruistic concern about protecting consumer data and the "customer experience."

Instead of acknowledging its true concerns, Amazon strains to shoehorn its gripes into claims under the federal Computer Fraud and Abuse Act ("CFAA") and California Comprehensive Computer Data Access and Fraud Act ("CDAFA").  These criminal anti-hacking statutes have no application here.  Amazon's request for an injunction fails at every step.

**First**, Amazon has not shown it is likely to succeed on either its CFAA or CDAFA claims. In particular, Amazon cannot show that Perplexity accessed Amazon's private servers at all, intentionally or otherwise; that Perplexity was not authorized to access Amazon's public website or any information customers chose to share when they authorized the Assistant to make purchases; that Perplexity obtained any private information from Amazon; that Amazon was damaged; or that Perplexity engaged in fraudulent activity.  Without any basis to show that Perplexity obtains private Amazon data, Amazon focuses on user login data.  But that data does not belong to Amazon; it belongs to the users who utilize the Assistant (and never reaches Perplexity's servers in any event). There is no legal basis for Amazon's CFAA or CDAFA claims, nor any evidence to support them.

**Second**, Amazon does not show it has suffered **any** harm, let alone "imminent" and "irreparable" harm required for a preliminary injunction.  Amazon claims that using the Assistant "degrades" the shopping experience, as if customers cannot decide for themselves if they would prefer an experience that does not include being deluged by ads.  Customers are—and should be— free to choose the shopping experience they prefer.  Amazon also speculates about hypothetical security issues with the Assistant that do not exist and that would not impact Amazon in any event.

***Third***, the balance of the equities strongly disfavors an injunction.  The harm to Perplexity, its employees, and investors from an injunction would be devastating; it would wipe out tens of millions of dollars in investment and billions of dollars in equity value and potentially eliminate the leader in agentic AI from the market.  Absent an injunction, Amazon stands to suffer no harm at all, and certainly nothing comparable to the harm an injunction would cause Perplexity.

***Fourth***, the public interest clearly favors innovation, consumer choice to use agentic AI on e-commerce sites, free competition, and an open internet—not Amazon's attempt to use its market power to force consumers to experience the internet how Amazon would prefer it.

***Finally***, Amazon's proposed injunction is fatally overbroad.  Rather than merely protect Amazon's claimed interest in requiring Perplexity to identify when the Assistant is active on Amazon.com (surely so Amazon could block it), Amazon seeks to prevent Perplexity ***and its employees*** from using Amazon.com with ***any*** AI agents and demands that Perplexity identify all its users who have accessed Amazon.  The overbreadth of the injunction reveals Amazon's anti-competitive and anti-consumer intent to force users to face its advertising and upselling.

## II.    BACKGROUND

***<u>Perplexity and the Comet Browser</u>***.  Perplexity is an AI company founded on the conviction that technology should make knowledge accessible and useful for everyone.  Perplexity builds tools that help people cut through the noise on the internet to find information and accomplish tasks more efficiently.  Shevelenko Decl. ¶¶ 3-4.  Perplexity's signature product is an AI-powered search tool that delivers comprehensive, conversational answers with citations.  *Id.* ¶ 19.  Perplexity generates income through premium subscriptions, and never sells, licenses, or exploits user data.  *Id.* ¶¶ 19-20.  This user-first philosophy has enabled the three-year-old company to compete with AI initiatives from tech giants like Google, OpenAI, and Microsoft.  *Id.* ¶ 36.

In late 2024, Perplexity began developing Comet, an AI-powered web browser designed to help users accomplish their online goals more effectively.  *Id.* ¶¶ 6, 10.  To develop Comet, Perplexity spent ▮▮▮▮▮▮▮ to acquire browser company Sidekick and assembled a dedicated team of more than 100 engineers, researchers, and specialists—the largest team Perplexity had ever devoted to a single project.  *Id.* ¶¶ 10, 41.  Comet is not just another product for Perplexity—it

1  represents the company's future.  *Id.* ¶ 41.  ███████████  Perplexity's $14 billion

2  valuation in May 2025—a $5 billion increase from the last funding round.  *Id.*  After seven months

3  of intensive development and technical innovation, Comet launched with a limited release on July

4  9, 2025, and became widely available to the public on October 2, 2025.  *Id.* ¶¶ 11-13.

5       Comet is a web browser—software that displays websites, just like Chrome, Safari, or

6  Firefox.  Yarats Decl. ¶ 5.  Comet is built on Chromium—the open-source engine that also powers

7  popular browsers like Google's Chrome, Microsoft's Edge, and Opera—and thus benefits from

8  regular security updates and a browsing experience that users are familiar with.  *Id.* ¶¶ 7, 25.

9       Comet includes an optional AI "Assistant" feature, which operates within the browser.

10  *Id.* ¶ 6.  Users activate the Assistant only when they choose to, via an icon or keyboard shortcut.  *Id.*

11  ¶ 10.  Once activated, the Assistant can perform tasks on the user's behalf within the browser session

12  based on the user's instructions, such as comparing products across multiple websites, gathering

13  reviews and pricing data, or filling out forms.  *Id.* ¶ 6; Shevelenko Decl. ¶¶ 5-7.  The Assistant

14  operates with complete transparency.  Real-time visual feedback, including screenshots and cursor

15  highlighting, shows users exactly where the Assistant will interact on a page.  Yarats Decl. ¶ 11;

16  Rucinski Decl. ¶¶ 10, 13.  An Assistant panel displays the requested task, the planned steps to

17  complete it, real-time progress updates, and a complete audit log of all actions taken.  Yarats Decl.

18  ¶ 11.

19       User control and data security are fundamental to the Assistant's design.  Users must

20  manually authorize significant actions, and the Assistant cannot complete purchases without the

21  user manually finalizing the transaction and verifying payment information.  *Id.* ¶ 12.  Through the

22  Settings menu, users can configure permissions or block specific websites, and users can enable

23  "incognito" mode to prevent the Assistant from accessing browsing information.  *Id.* ¶ 14.  The

24  Assistant cannot access stored payment methods or share personal information without user

25  permission.  *Id.* ¶ 13.  Contrary to Amazon's assertions (Mot. 8, 9, 14, 16), neither the Assistant nor

26  the Comet browser ever transmits login credentials, payment information, browsing history, or

27  private messages to Perplexity.  *Id.* ¶ 15.  ███████████████████████

28  ████████████████████████████████████

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1  ██████████████████████████████████ *Id.* ████████████████████████████

2  ████████████████████████████████████████████████████████ *Id.*

3       Perplexity maintains robust security, continuously merging all upstream Chromium security

4  patches and implementing comprehensive defenses against "prompt injection" attacks—malicious

5  instructions embedded in web content that attempt to manipulate AI behavior. *Id.* ¶¶ 22-23. ████

6  ██████████████████████████████████████████████████████ *Id.*

7       User response to Comet has been extremely positive. ██████████████████████

8  ████████████ and is growing every month. Shevelenko Decl. ¶ 18. Users particularly value the

9  Assistant's help with online shopping, especially to gather reviews, prices, and availability

10 information across multiple websites for side-by-side comparisons. *Id.* ¶ 15.

11      ***Amazon: E-Commerce Giant and Competitor in Agentic AI Development***. Amazon is the

12 largest marketplace and online retailer, and one of the largest tech companies, in the world. As the

13 world's eleventh most visited website, with hundreds of millions of daily users, Amazon plays a

14 fundamental role in consumers' lives. *Id.* ¶¶ 22, 37.

15      Unfortunately, Amazon also has a well-documented history of abusing this market power.

16 The FTC and 17 states are currently suing Amazon, alleging it "is a monopolist that uses a set of

17 interlocking anticompetitive and unfair strategies to illegally maintain its monopoly power" whose

18 "actions allow it to stop rivals and sellers from lowering prices, degrade quality for shoppers,

19 overcharge sellers, stifle innovation, and prevent rivals from fairly competing against Amazon."[1]

20 Just a few months ago, Amazon agreed to pay a $1 billion penalty and provide $1.5 billion in refunds

21 to settle a different FTC lawsuit about its alleged use of deceptive practices to manipulate customers

22 into enrolling or remaining in Amazon Prime.[2]

23      Not coincidentally, Amazon recently entered the nascent agentic AI market as a competitor

24 to Comet. In March 2025, Amazon formed a group focused on agentic AI "to help users and

---

[1] https://www.ftc.gov/legal-library/browse/cases-proceedings/1910129-1910130-amazoncom-inc-amazon-ecommerce

[2] https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-secures-historic-25-billion-settlement-against-amazon.

customers automate more of their lives," and in October, Amazon launched its Quick Suite agentic AI tools.[3]

**_Amazon's Irrelevant Complaints About "Buy with Pro"_**.   In November 2024, Amazon raised concerns about a feature called "Buy with Pro" that Perplexity offered to its premium subscribers.  Shevelenko Decl. ¶¶ 25-26.  Buy with Pro is not an agentic AI application[4] and is not part of the Comet browser, which did not exist at the time.  *Id.*  Buy with Pro allowed users to purchase from Amazon through Perplexity's Amazon accounts, unlike the Assistant, which uses purchasers' *own* accounts.  *Id.* ¶ 24-26; *see* Mot. 7.  In response to Amazon's complaints, Perplexity disabled Buy with Pro's Amazon shopping feature.  *Id.* ¶ 26.  Contrary to Amazon's argument (Mot. 8), Perplexity did not agree that it would never use AI agents to access Amazon.  *Id.* ¶ 27.

**_Amazon's Efforts to Exclude Perplexity from Its Marketplace_**.   On August 4, 2025, Amazon raised concerns about the way Comet identifies itself when accessing Amazon.com.  *Id.* ¶¶ 29-30.  Amazon did not explain the reason for its objection, beyond a vague concern about "agentic AI," nor did it raise any concerns with Comet's security.  *Id.* ¶¶ 29-32.  Amazon's concern about identification made no sense.  Comet correctly identifies itself as a Chromium-based browser, consistent with the identification practices of other Chromium-based browsers that offer AI capabilities.  Yarats Decl. ¶ 8; Rucinski Decl. ¶ 19.  Amazon's request that Perplexity change the way Comet identifies itself—so that Amazon could block Comet from accessing its site—was a bald exclusionary tactic by the e-commerce giant.  Nevertheless, as a gesture of good faith, Perplexity offered to share anonymized usage data to address Amazon's concerns.  Shevelenko Decl. ¶ 30.

Amazon never responded.  *Id.*  Instead, on August 19, 2025, Amazon blocked Comet users from accessing Amazon.com.  Mot. 10; Yarats Decl. ¶ 26.  Amazon did not notify Perplexity in

---

[3]  https://www.reuters.com/technology/artificial-intelligence/amazons-aws-forms-new-group-focused-agentic-ai-2025-03-04/; https://www.aboutamazon.com/news/aws/amazon-quick-suite-agentic-ai-aws-work; https://aws.amazon.com/blogs/aws/reimagine-the-way-you-work-with-ai-agents-in-amazon-quick-suite/.

[4]  Amazon mischaracterizes Perplexity's description of Buy with Pro as an "AI-powered shopping assistant" as an admission it is an "agentic AI" product.  Mot. 7.  As Amazon knows, these are different things.  Perplexity never marketed Buy with Pro as "agentic AI."

advance; Perplexity learned of this only through user reports. Yarats Decl. ¶ 26. Shortly afterward, Comet released a routine update as part of its ███████ release schedule. *Id.* ¶¶ 25-26. One consequence of the update was to restore access to Amazon. *Id.* ¶¶ 26-27. While Perplexity could have intentionally evaded Amazon's block, that is not what happened. The update was standard maintenance work that had been in development for weeks before Amazon's action. *Id.* ¶¶ 24-27.

On September 29, 2025, Amazon called Perplexity again to repeat the same vague and unfounded concerns about "agentic AI." Shevelenko Decl. ¶¶ 33-35. Perplexity again explained why the Assistant did not violate any of Amazon's rights or cause any problems. *Id.* Perplexity made no commitments to alter Comet, nor did it have any obligation to do so. *Id.*; Yarats Decl. ¶ 8.

Amazon sent Perplexity a cease-and-desist ("C&D") letter on October 31, 2025, which again failed to acknowledge Perplexity's explanations and misrepresented how the Assistant works. Amazon filed this suit days later and moved for a preliminary injunction. Amazon's proposed injunction seeks not only to require Perplexity to identify when a Comet user has turned on the Assistant, but also to prevent Perplexity and its employees from accessing Amazon.com using any AI agents. Notice of Mot. 2. Amazon also seeks to require Perplexity to identify every Amazon user who ever used the Assistant on Amazon, with no regard for their privacy rights. *Id.* at 3. Amazon's proposed injunction would devastate Perplexity, depriving it of the fruits of tens of millions of dollars in investment, billions in valuation, and more than a year of development work. Shevelenko Decl. ¶¶ 37-41. And, again not coincidentally, it would eliminate the market leader in agentic AI, clearing the way for Amazon's agentic AI suite.

## III.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Rather, it may be awarded only upon a "clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Because the "grant of a preliminary injunction is the exercise of a very far reaching power," it should not be entered where the Court would be required to "decide doubtful and difficult questions of law or disputed questions of fact." *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (per curiam). As the party seeking a preliminary injunction, Amazon must clearly show that: (1) it is likely to succeed on the

1   merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance

2   of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

3   Amazon has not come close to meeting its burden on any of these elements.

4   **IV.    ARGUMENT**

5        **A.    Amazon Has Not Shown A Likelihood Of Success On The Merits**

6        Amazon asserts claims under the CFAA, 18 U.S.C. § 1030(a)(2) and (a)(4), and the CDAFA,

7   Cal. Penal Code § 502.  To succeed on its § 1030(a)(2) claim, Amazon must prove that Perplexity

8   "intentionally accesses a computer without authorization, or exceeds authorized access, and thereby

9   obtains . . . information from any protected computer," and that as a result Amazon suffered

10  "loss . . . during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(a)(2),

11  (c)(4)(A)(i)(I).    To succeed on its § 1030(a)(4) claim, Amazon must show that Perplexity

12  "knowingly and with intent to defraud, accesses a protected computer without authorization, or

13  exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains

14  anything of value;" and that as a result Amazon suffered "loss . . . during any 1-year

15  period . . . aggregating at least $5,000 in value."  18 U.S.C. § 1030(a)(4), (c)(4)(A)(i)(I).  The

16  elements of a CDAFA claim "do not differ materially from the necessary elements of the CFAA"

17  (except as to damages, discussed *infra*).  *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d

18  1218, 1260 (N.D. Cal. 2022) (citation omitted).  Amazon fails to satisfy any of these elements.

19                **1.    The CFAA Is Inapplicable To Amazon's Public Website**

20       As a threshold matter, Amazon has not shown, and cannot show, it is likely to succeed on

21  its claims because the anti-hacking statutes on which it relies simply do not apply to the Assistant's

22  alleged conduct.  Amazon.com is a public retail website whose product listings are viewable by

23  anyone, regardless of whether they have logged into the website.  As Amazon concedes (Mot. 17),

24  the CFAA does not apply to public websites.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,

25  1199-1200 (9th Cir. 2022) (CFAA "is premised on a distinction between information presumptively

26  accessible to the general public and information for which authorization is generally required").  In

27  *hiQ Labs*, the Ninth Circuit recognized three categories of the internet for purposes of determining

28  whether and how the CFAA applies: "(1) computers for which access is open to the general public

*and permission is not required*, (2) computers for which authorization is required and has been given, and (3) computers for which authorization is required but has not been given." *Id.* at 1197-98 (emphasis added); *see id.* at 1198-99 (describing categories as "no gates," "gates up," and "gates down"); *BrandTotal*, 605 F. Supp. 3d at 1262.  Amazon admits that at least the majority of its website falls into the first category; in fact, it does not identify any part that is *not* in that category, such that the CFAA could apply to it.

Even if Amazon could show that some private content is behind a password "gate" on Amazon.com, the Assistant's conduct past the "gate" still does not implicate the CFAA.  To strain to show otherwise, Amazon compares itself to a totally different kind of website: Facebook, a social-media platform that requires users to log in before they can view *anything* (other than a log-in page).  Mot. 13 (citing *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016)) (discussing access to "Facebook users' password-protected profiles").  In *Power Ventures*, the Ninth Circuit held that defendant Power—which had copied data that Facebook *only* made available behind a password and used it "to send mass messages as part of a promotional campaign"—violated the CFAA because Facebook hadn't authorized Power's access to its website "as to the purposes for which Power [] sought to use it."  *hiQ Labs*, 31 F.4th at 1199.  Far from engaging in any such unauthorized conduct "past the gate" here, the Assistant merely helps users, *at their explicit direction*, complete the very purchases that Amazon.com exists to facilitate.  Any password "gate" exists only to allow a customer to complete a purchase (something that benefits Amazon), not to open a world of private content to the customer.  And if the Assistant reaches a customer's password "gate" before a transaction is completed, the Assistant *stops* and requires the user to manually enter or authorize the use of her credentials.  Yarats Decl. ¶ 12.

Amazon's claims thus contradict the CFAA's core purpose as an anti-hacking statute that prohibits unauthorized access to nonpublic websites.  *See hiQ Labs*, 31 F.4th at 1196 (CFAA "enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking"); *see CDK Glob., LLC v. Tekion Corp.*, No. 25-cv-1394, 2025 WL 1939951, at *5 (N.D. Cal. July 15, 2025) (CFAA is "anti-hacking statute" (citation omitted)).  As Amazon acknowledges

(Mot. 6), the Assistant operates only when users ask it to "perform actions on [their] behalf." This is not the unwanted "hacking" or "intrusion" into nonpublic websites that the CFAA prevents.

Moreover, because "the CFAA is primarily a criminal statute, and is interpreted consistently in the criminal and civil contexts, the rule of lenity applies and requires courts to limit its reach to the clear import of its text and construe any ambiguity against enforcement." *BrandTotal*, 605 F. Supp. 3d at 1260 (cleaned up) (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134-35 (9th Cir. 2009)); *see hiQ Labs*, 31 F.4th at 1200 ("rule of lenity favors our narrow interpretation of the 'without authorization' provision in the CFAA"). The rule of lenity closes the door to Amazon's attempt to expand the CFAA to cover the Assistant's fully authorized actions taken only and explicitly at the direction of Amazon's customers on a mostly (if not entirely) public website.

### 2.    Amazon's Conditions Of Use Cannot Establish A CFAA Claim

Amazon discusses its "Conditions of Use" at length, but notably asserts no claim for breach of contract. Amazon's attempt to shoehorn a breach-of-contract claim into the CFAA is unavailing, because the "violation of the terms of use of a website . . . cannot establish liability under the CFAA." *Power Ventures*, 844 F.3d at 1067; *see id.* at 1069 (reaching same conclusion under CDAFA); *Chegg, Inc. v. Doe*, No. 22-cv-7326, 2023 WL 4315540, at *2-3 (N.D. Cal. July 3, 2023) (denying preliminary injunction under CFAA and CDAFA because "the fact that Homeworkify has clearly flouted Chegg's terms of use . . . has no bearing on whether it has violated the CFAA").

It is undisputed that the Conditions of Use do not bind Perplexity. *See* Mot. 6 (admitting that Perplexity is a "third party[]"). The Conditions of Use acknowledge this reality; the section governing "Agents" is addressed to Amazon users, not to third parties like Perplexity. *See* Conditions of Use, McLain Decl. (ECF 4-6), Ex. 2 at 5 ("The terms in this section ('Agent Terms') apply if *you*"—*i.e.*, the Amazon customer—"use, allow, enable, or cause the deployment of an Agent to access, use, or interact with any Amazon Services." (emphasis added)).[5] To avoid having

---

[5]  This provision and others show that Amazon expressly permits its customers to authorize third parties to access and use their accounts. *See* Conditions of Use, McLain Decl., Ex. 2 at 1 ("[Y]ou agree, on behalf of yourself and all members of your household and others who use any Amazon Service under your account, to the following conditions.").

to sue its own customers to coerce them into browsing the internet on its terms, Amazon dresses up contract claims against its customers as CFAA and CDAFA claims against Perplexity. *See, e.g.*, Mot. 6 (stating that Conditions of Use "put Perplexity on notice that the Comet AI agent's actions were unauthorized," but admitting in next sentence that Perplexity is not a party to them).

The Court should not fall for it. The Ninth Circuit has repeatedly declined to extend the CFAA or CDAFA to violations of a website's terms of service, which "most people are only dimly aware of and virtually no one reads or understands." *United States v. Nosal*, 676 F.3d 854, 861 (9th Cir. 2012) (*en banc*); *see id.* at 862 ("Not only are the terms of service vague and generally unknown . . . but website owners retain the right to change the terms at any time and without notice. Accordingly, behavior that wasn't criminal yesterday can become criminal today without an act of Congress, and without any notice whatsoever" (citation omitted)); Conditions of Use, McLain Decl., Ex. 2 at 4 (Amazon "reserve[s] the right to make changes to . . . Conditions of Use at any time").

### 3. Amazon Will Not Prevail On Its § 1030(a)(2) Claim

Amazon cannot show likely success on its §1030(a)(2) claim because (i) the Assistant does not "access[]" Amazon's computers; (ii) any access is authorized; (iii) the Assistant does not "obtain[] . . . information"; and (iv) Amazon has not suffered cognizable harm.

#### (a) The Assistant does not "access" Amazon computers

Amazon cannot demonstrate that the Assistant intentionally accesses Amazon's computers, because the Assistant merely uses "'reactive' data collection, logging and sending to [Perplexity] data that users receive from [Amazon] through their normal use of the website." *See BrandTotal*, 605 F. Supp. 3d at 1260. *BrandTotal* concerned the defendant's browser extension, which, *inter alia*, monitored ad metrics by "automatically send[ing] data to BrandTotal while a user browses websites like Facebook." *Id.* at 1232. Facebook brought CFAA and CDAFA claims against BrandTotal. *Id.* at 1260. The Court found that BrandTotal's browser extension operated only "reactive[ly]," by accessing Facebook data that had been transmitted to users. *Id.* Applying the rule of lenity, the Court found it was not clear that the CFAA "could encompass BrandTotal analyzing data on users' computers that the users are authorized to access from Facebook." *Id.* at 1260-61. The Court granted summary judgment for BrandTotal on that portion of Facebook's claims. *Id.*

As in *BrandTotal*, Comet's Assistant engages only in reactive data collection. When users visit Amazon.com through Comet's browser, they load and view the Amazon website on their own device. Yarats Decl. ¶ 17. If and when a user engages Comet's Assistant by prompting the Assistant (for example, to make a purchase on Amazon.com), the Assistant will view and analyze the data sent by Amazon to ***the user's*** computer. Within the Comet browser, the Assistant then takes actions to accomplish that prompt; those actions are communicated by the user's computer to Amazon's servers. At no point does any Perplexity server contact any Amazon server, as would be required for Amazon to establish that Perplexity "access[ed]" Amazon's computers. Yarats Decl. ¶ 17. Because Perplexity does not "access" Amazon's computers, Amazon's § 1030(a)(2) claim fails.

(b)     The Assistant does not access Amazon.com "without authorization" or by "exceed[ing] authorized access"

Even if Comet "intentionally accessed" an Amazon computer, it did not do so "without authorization" or by "exceed[ing] authorized access." 18 U.S.C. § 1030(a)(2). As noted, almost all (if not all) of Amazon's website has "no gates"—it is accessible without a password. And when Comet does reach a "gate," the Assistant requires the user to manually enter or to authorize the use of her credentials. Amazon misplaces reliance on *Power Ventures* to attempt to show otherwise.

***First***, *Power Ventures* is factually inapposite. The defendant Power was a social-networking site that solicited users to "enter their Facebook account information and access Facebook . . . through Power.com." *Facebook, Inc. v. Power Ventures, Inc.* (*Power Ventures MSJ Ruling*), 844 F. Supp. 2d 1025, 1028 (N.D. Cal. 2012*), aff'd in part, vacated in part, rev'd in part*, 844 F.3d 1058 (9th Cir. 2016). Once the users provided their account information, Power used it to obtain their Facebook data. *Power Ventures*, 844 F.3d at 1063. Power then spammed the users' contacts with invitations to join Power. *Id*. Those emails purported to be from "The Facebook Team." *Id*. When Facebook learned of Power's access, it issued a C&D letter and implemented technical blocks. *Id*.

Unlike Power in relation to Facebook, Perplexity's Assistant does not (i) solicit users' Amazon login credentials; (ii) enter users' login credentials; (iii) log in to Amazon.com; (iv) obtain

or scrape data from Amazon;[6] (v) use Amazon for any manner or for any purpose other than executing Comet users' requests; (vi) misrepresent itself to third parties as operating as "Amazon"; or (vii) use Amazon's data to solicit Amazon users to join Perplexity.  Critically, although Power obtained authorization from Facebook users to log into their Facebook accounts, it then obtained their "friends" lists and used them to solicit clients for its own purposes.  *See hiQ Labs*, 31 F.4th at 1199 (Power violated CFAA because Facebook hadn't authorized access to its website "as to the purposes for which Power [] sought to use it").  Perplexity's Assistant does not do this.  Instead, it automates only those actions the customer directs: for example, adding a product to a cart, clicking through Amazon's purchase steps, and—***if authorized by a user after the user manually enters or confirms payment information***—completing a purchase.  Yarats Decl. ¶¶ 11-13.  Unlike Power, which was mass-spamming users' Facebook friends, the Assistant stands in the shoes of Amazon's customers and acts exactly as they could and would, making delegation of their Amazon authorization to the Assistant valid.[7]

---

[6]  Amazon acknowledges (Mot. 8) that Perplexity users log into Amazon themselves.  Users may save their passwords on their own devices, but even then, the Assistant would not log into Amazon absent the user's express direction.  Yarats Decl. ¶¶ 11-12, 20.  And as discussed below, the Assistant does not obtain anything from Amazon that would implicate the CFAA or CDAFA.

[7]  *Power Ventures* is also inapposite because there, Facebook sent a C&D letter that "plainly" "put Power on notice that it was no longer authorized to access Facebook's computers."  *Power Ventures*, 844 F.3d at 1067 n.3.  The record "show[ed] unequivocally that Power knew that it no longer had authorization to access Facebook's computers, but continued to do so anyway."  *Id.* at 1067.  By contrast, in *Domain Name Commission Ltd. v. DomainTools, LLC*, the plaintiff's communication merely "remind[ed] defendant that . . . its access to [plaintiff's] servers was subject to plaintiff's terms of use."  449 F. Supp. 3d 1024, 1029 (W.D. Wash. 2020).  The court found that plaintiff's letter "did not revoke defendant's access."  *Id.*  Here, Amazon has been far from "plain" with respect to whether Comet is "authorized to access [its] computers."  *Power Ventures*, 844 F.3d at 1067 n.3.  Although Amazon shared "concerns" about Comet during calls with Perplexity in August and September, those conversations did not constitute or result in any unequivocal revocation of Comet's access to the site.  Shevelenko Decl. ¶¶ 29-35.  And Amazon's carefully worded C&D letter merely asks Comet to "cease [acting] in violation of the [CFAA] and [CDAFA]," McLain Decl., Ex. 7 at 1—laws that Comet and Perplexity have never violated—and does not forbid the use of Comet's non-AI features—*i.e.*, a person's use of Comet as an ordinary browser—to make purchases on Amazon.  McLain Decl., Ex. 7 at 1.  The record thus does not "show[] unequivocally that [Perplexity] knew that it no longer had authorization to access [Amazon]'s computers, but continued to do so anyway."  *Power Ventures*, 844 F.3d at 1067.

**Second**, *Power Ventures* is procedurally inapposite. The district court there did not issue a preliminary injunction and **denied** Facebook's motion for judgment on the pleadings. *Facebook, Inc. v. Power Ventures, Inc.* (*Power Ventures Ruling on Pleadings*), No. 5:08-cv-5780, 2010 WL 3291750, at *12 (N.D. Cal. July 20, 2010) (finding "a genuine issue of material fact as to whether Power's access or use of the Facebook website was 'without permission'"). After discovery and summary judgment briefing, Power **did not dispute** that it had obtained information from portions of Facebook's website that required a username and password to access. *Power Ventures MSJ Ruling*, 844 F. Supp. 2d at 1028 (stating that Power's website "provided participants with a list of their Facebook friends, obtained by Power from Facebook"); *Power Ventures*, 844 F.3d at 1067-68 & n.4 (stating that Power admitted it had "t[aken], copied, or made use of data from the Facebook website," used someone's Facebook account without Facebook's authorization, used automated scripts to collect information from Facebook's site, and incorporated Facebook's site in another database). The Ninth Circuit relied heavily on these undisputed facts and admissions to reach its conclusion that Power accessed Facebook's computers without authorization. *Id.* at 1068 ("[A]s it admitted, Power . . . accessed Facebook's computers without authorization to do so . . . . We therefore hold that . . . Power accessed Facebook's computers 'without authorization' within the meaning of the CFAA and is liable under that statute."); *see id.* at 1069 (Power "admittedly refused to comply" after C&D letter "clearly notified Power of the revocation of access" and that Power "conceded" that it "no longer had permission to access Facebook's computers at all"). This case, which is not even past the pleading stage, let alone summary judgment, is thus materially different.

**Finally**, Amazon misrepresents the *Power Ventures* court's "bank" analogy. *See* Mot. 13, 25. *Power Ventures* said the following:

> Suppose that a person wants to borrow a friend's jewelry that is held in a safe deposit box at a bank. The friend gives permission for the person to access the safe deposit box and lends him a key. **Upon receiving the key, though, the person decides to visit the bank while carrying a shotgun**. The bank ejects the person from its premises and bans his reentry. The **gun-toting jewelry borrower** could not then reenter the bank, claiming that access to the safe deposit box gave him authority to stride about the bank's property **while armed**. In other words, to access the safe deposit box, the person needs permission **both** from his friend (who controls access to the safe) **and** from the bank (which controls access to its premises). Similarly, for Power to continue its campaign using Facebook's computers, it needed authorization

both from individual Facebook users (who controlled their data and personal pages) and from Facebook (which stored this data on its physical servers). Permission from the users alone was not sufficient to constitute authorization after Facebook issued the cease and desist letter.

*Power Ventures*, 844 F.3d at 1068 (bold emphasis added). In attempting to equate Comet's access to Amazon.com with the bank customer's friend's visit to the bank in the *Power Ventures* analogy, Amazon omits the shotgun. Mot. 13, 25. This omission is not trivial—the shotgun is the most important part because, like the public portion of Amazon's website with which the Comet Assistant interacts, banks are open to the public—not just to holders of accounts or safe deposit boxes. *See hiQ Labs*, 31 F.4th at 1197 (holding that § 1030(a)(2) applies only to information "delineated as private through use of a permission requirement of some sort," because "'an authentication requirement, such as a password gate, is needed to create the necessary barrier that divides open spaces from closed spaces on the Web'" (quoting Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1161 (2016))). In other words, like almost all of Amazon's website, banks have "no gates." *Id.* at 1199 (CFAA did not apply to portions of LinkedIn that were accessible without username or password). And whenever Comet reaches a "gate," the Assistant requires the user to manually enter or authorize the use of her credentials and finalize the purchase. There is no shotgun, nor any need for one. The Court should thus reject Amazon's argument that it is likely to succeed on the "without authorization" or "exceed[ing] authorization" element.

(c)    The Assistant does not "obtain . . . information" from Amazon

Amazon cites no evidence or law to establish that Perplexity "obtain[ed] information" from Amazon computers. It only makes the conclusory assertion that Comet "us[ed] confidential customer information to make purchases in the Amazon Store" and "t[ook] the information back to its own servers." Mot. 14. The Amazon witness declaration that supposedly supports this statement is similarly conclusory, asserting (in a parenthetical aside) that "the Comet AI agent transmits [user account] information back to Perplexity's servers for processing." Fernandes Decl. (ECF 4-3) ¶ 10. That statement is not only unsupported by any evidence; it is false. Yarats Decl. ¶ 15 (explaining that Comet does not transmit data such as user passwords or payment information back to Perplexity's servers). ████████████████████████████████████████████████

1

2

3

4 ██████████████████████████████████████████ *See hiQ Labs*, 31 F.4th at

5 1201 (data users shared on their public LinkedIn profiles "is not owned by LinkedIn").[8]  Amazon's

6 misleading declaration—the sole evidence it cites to support the key assertion that Perplexity

7 "obtain[ed] information"—provides no support that Amazon is likely to establish that element.

8       Without the conclusory declaration, Amazon effectively equates obtaining "information"

9 with obtaining mere access, but the CFAA's text forecloses that equation.  The CFAA does not

10 define "obtain[]," but courts have made clear that "obtain[ing] . . . information" must encompass

11 conduct beyond merely obtaining ***access to*** the information.  18 U.S.C. § 1030(a)(2).  Given the

12 similarity between the language in the CFAA and the Stored Communications Act ("SCA"), *see* 18

13 U.S.C. § 2701(a), the Ninth Circuit has held that the two statutes should be harmonized to the extent

14 the language overlaps, *see hiQ Labs*, 31 F.4th at 1200 ("The similarity of language in the SCA and

15 the CFAA is a strong indication that they should be interpreted *pari passu*." (cleaned up)).

16       It follows that courts should assign significant meaning to the few differences between the

17 two statutes—and there is a key difference between the statutes' use of the word "obtain[]."

18 Specifically, the SCA punishes those who "intentionally access[] without authorization a facility

19 through which an electronic communication service is provided" and "***thereby obtain[]***, alter[], or

20 prevent[] authorized ***access to*** a wire or electronic communication while it is in electronic storage

21 in such system."  18 U.S.C. § 2701(a) (emphasis added).  In short, the SCA extends to a person who

22 accesses an email system without authorization and thereby "obtains" mere "***access***" to an email in

23 that system, regardless of whether the person obtained the email itself or any information in the

24 email, such as by downloading, printing, or even memorizing it.  *Id.* (emphasis added); *accord In re*

25

26 _____

27    [8]   Amazon's witness declaration is also wrong when it says Comet can "make

28 purchases . . . without the user having to make another click."  Fernandes Decl. ¶ 10.  The Comet Assistant never completes purchases without the user taking over again and explicitly—and manually—authorizing the purchase herself.  Yarats Decl. ¶ 12.

1  *Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) (stating that SCA reaches

2  one who "(1) gained unauthorized access to a 'facility' where [he or she] (2) **accessed** an electronic

3  communication in 'electronic storage'" (emphasis added) (quoting 18 U.S.C. § 2701(a))).

4      In contrast, the CFAA reaches only those who access a computer without authorization **and**

5  **thereby "obtain[] . . . information**" contained therein.  18 U.S.C. § 1030(a)(2) (emphasis added).

6  Courts must give meaning to this difference between §§ 1030(a)(2) and 2701(a).  *See hiQ Labs*, 31

7  F.4th at 1200 (noting that statutes are "nearly" identical).  Indeed, if obtaining information were

8  equivalent to obtaining access to the information, the "obtained information" element of a CFAA

9  claim would be redundant.  *Brekka*, 581 F.3d at 1132 (setting forth separate "intentionally accessed

10  a computer" and "obtained information" elements); *see P.C. Yonkers, Inc. v. Celebrations the Party

11  & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (affirming denial of preliminary

12  injunction under CFAA where there was "absolutely no evidence as to what, if any, information

13  was actually viewed, let alone taken"), *cited approvingly in Brekka*, 581 F.3d at 1132 (9th Cir.).

14  Amazon's "obtaining information" argument therefore fails.

15                        (d)    Amazon cannot show cognizable harm

16      Amazon must also show "loss to 1 or more persons during any 1-year period . . . aggregating

17  at least $5,000 in value."  18 U.S.C. § 1030(c)(4)(A)(i)(I); *see id.* § 1030(g).  "The term

18  'loss' . . . relates to costs caused by harm to computer data, programs, systems, or information

19  services."  *Van Buren v. United States*, 593 U.S. 374, 391 (2021) (quoting 18 U.S.C. § 1030(e)(11)).

20  The statute thus focuses on "technological harms—such as the corruption of files—of the type

21  unauthorized users cause to computer systems and data."  *Id.* at 392.  The costs of "internal

22  investigations in efforts to ascertain the nature and scope of . . . unauthorized access to the

23  data . . . are not technological in nature" and do not constitute cognizable harm.  *X Corp. v. Ctr. for*

24  *Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 983 (N.D. Cal. 2024) (cleaned up).

25      Amazon identifies three alleged losses: (i) employee time "spent . . . investigating and

26  responding to Perplexity's covert behavior;" (ii) "engineering resources" spent to "filter out" ad

27  impressions allegedly generated by the Assistant's traffic; and (iii) the costs of unblocking the

28  accounts of Amazon users who Amazon blocked for allegedly using the Assistant.  Mot. 14-15.

Each purported harm (to the extent it exists) is self-imposed; it was not "caused by" Perplexity, but by Amazon's own investigation of its customers' activity.  *Van Buren*, 593 U.S. at 391.  It identifies no harm to Amazon's computer data, programs, systems, or information services that Perplexity caused—only speculation about possible future harm.  *See, e.g.*, Fernandes Decl. ¶ 24 ("I believe cyber criminals can potentially exploit the Comet AI agent.").  Nor **could** Amazon identify any such harm, because the Assistant merely uses the website as an Amazon user would, and at that Amazon user's direction.  Amazon's claimed harms do not constitute "loss" under the CFAA.  *X Corp.*, 724 F. Supp. 3d at 983 (granting motion to dismiss CFAA claim for failure to allege loss).[9]

### 4.     Amazon Will Not Prevail On Its Section 1030(a)(4) Claim

Amazon also seeks relief under 18 U.S.C. § 1030(a)(4) of the CFAA.  For the same reasons discussed above, Amazon is not likely to prevail because it cannot establish that (i) the Assistant "accesses" Amazon's computers (*see supra*, p. 10); (ii) any access is without authorization or in excess of authorization (*see supra*, p. 11); or (iii) Amazon has suffered cognizable harm (*see supra*, p. 16).  Nor can Amazon establish that Perplexity acted with "intent to defraud," or that Perplexity "further[ed] the intended fraud and obtain[ed] anything of value."  18 U.S.C. § 1030(a)(4).

***First***, Amazon argues, incorrectly, that it can satisfy this element with mere "wrongdoing and . . . not . . . proof of common law fraud."  Mot. 16 (citing *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892 (N.D. Cal. 2010)).  Amazon relies solely on two cases that have been abrogated.  Mot. 16 (citing *Multiven* and *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000)).  In *Shurgard*, the court held that the defendant violated § 1030(a)(4) by "participat[ing] in dishonest methods to obtain the plaintiff's secret information." 119 F. Supp. 2d at 1126.  But the defendant had merely received emails containing the plaintiff's trade secrets from one of the plaintiff's employees, who had sent the emails while he still had access

---

[9]  Even to the extent investigatory costs do constitute "loss" under the CFAA, that loss would not include "costs to investigate *potential* violations that do not turn out to be violations." *BrandTotal*, 605 F. Supp. 3d at 1265.  Thus, assuming Amazon could succeed in establishing a CFAA violation (which it cannot), its cognizable harms would be limited to costs incurred to investigate the use of the Assistant inside the relatively miniscule (if any) part of Amazon.com that is only accessible with a password—not the use of the Comet browser across Amazon.com.

to the information as an employee.  *Id.* at 1123.  This reasoning was abrogated by *Nosal*, which affirmed the dismissal of § 1030(a)(4) charges alleging substantially identical facts.  676 F.3d at 856; *see id.* at 863-64 (CFAA is not a misappropriation statute); *see also Van Buren*, 593 U.S. at 378 (same).  Likewise, *Multiven* (1) addressed a similar fact pattern involving the use of a current employee's concededly valid workplace credentials; (2) relied heavily on that employee's violation of the employer's terms of computer use; and (3) collapsed the "without authorization" and "intent to defraud" elements such that satisfaction of the "without authorization" element constitutes satisfaction of both.  725 F. Supp. 2d at 892-94.  *Multiven* has therefore been abrogated too.  *See, e.g.*, *Nosal*, 676 F.3d at 859 (stating that § 1030(a)(4) "intent to defraud" element is ***in addition to*** authorization element, which appears in § 1030(a)(2) and (a)(4)); *id.* at 860 (rejecting interpretation of CFAA that would allow employers to "manipulate their computer-use and personnel policies so as to turn these relationships into ones policed by the criminal law"); *Power Ventures*, 844 F.3d at 1067 (stating that breach of computer use policy does not constitute CFAA violation).

 ***Second***, even if mere "wrongdoing" were sufficient, Amazon has not shown any.  Amazon hangs its entire "wrongdoing" theory on (i) Buy with Pro, which Perplexity—long before litigation was likely—immediately ended after Amazon complained, *see* Shevelenko Decl. ¶ 26; and (ii) its objections to Comet's "user-agent" string, which Amazon asserts is a fraudulent "subterfuge."  Mot. 16.  But Comet uses substantially the same user-agent string as other non-Google Chrome browsers built on Chromium, like Edge, Brave, and Opera; this has nothing to do with Amazon specifically or misrepresentation generally.  Yarats Decl. ¶ 8 ("[U]sing Chrome's user-agent string ensures websites deliver properly formatted content" and "[t]his practice exists because most websites are optimized and tested for Chrome given its dominant market share"); Rucinski Decl. ¶ 18.

 More importantly, Amazon never identifies ***any*** legal duty that would require Comet to use a different user-agent string.  Instead, it complains that the failure to do so violates its Conditions of Use and is not "responsible practice."  Mot. 9.  As discussed, *supra* p. 9, the Conditions of Use do not apply to Perplexity, which is a third party—and in any event, violations of the Conditions of Use cannot establish a CFAA violation.  *Nosal*, 676 F.3d at 859-60; *Power Ventures*, 844 F.3d at 1067.  And Amazon's unsupported and contested claims of "responsible practice" are incorrect and

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

plainly insufficient to establish a legal duty to speak.  *See Nosal*, 676 F.3d at 858 (rejecting interpretation of CFAA that would turn the statute "into a sweeping Internet-policing mandate").

**Third**, the Court should reject Amazon's argument that Comet has obtained information "of value."  *Brekka*, 581 F.3d at 1132.  In conclusory fashion, Amazon argues that the information Comet obtains must have value, or else Comet would not obtain it.  Mot. 17.  Putting aside that courts should not entertain such expansive logic when interpreting criminal statutes, Amazon's argument again assumes that the Assistant obtains "confidential customer information," when that is not the case.  As explained above, *supra* p. 14, the Assistant does not obtain customer information from Amazon.  Yarats Decl. ¶ 15.  And even if it could be said to have "obtained" █████████ public listings on Amazon.com, the CFAA does not protect such public listings.  *See hiQ Labs*, 31 F.4th at 1198-99.  Accordingly, Amazon is not likely to succeed on its § 1030(a)(4) claim.

### 5.    Amazon Will Not Prevail On Its CDAFA Claim

CDAFA claims generally "rise or fall with . . . CFAA claims because the necessary elements of Section 502 do not differ materially from the necessary elements of the CFAA, except in terms of damages."  *BrandTotal*, 605 F. Supp. 3d at 1260.  Barring the cognizable harm requirement, for the reasons discussed *supra*, Amazon cannot establish a likelihood of success on its CDAFA claim.

### B.    Amazon Has Not Demonstrated Irreparable Harm

Amazon's attempts to establish irreparable harm are ill-informed, speculative, and unsupported by the record.  Comet **benefits** Amazon and its customers.  And even if Amazon could substantiate its arguments, it only alleges harm to third parties that is fully compensable by money damages, not the irreparable harm necessary to support a preliminary injunction.

"A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable injury is not merely possible in the absence of an injunction, but likely."  *Quintara*, 2020 WL 5408068 at *2. To meet its burden, Amazon must provide "specific and non-speculative evidence" demonstrating that "the harm is both likely and imminent" and that "monetary damages are insufficient."  *SPS Techs.*, 2019 WL 1974902, at *15 (C.D. Cal. Mar. 11, 2019); *Norton v. Gilliam*, 2022 WL 20210183, at *2 (C.D. Cal. July 21, 2022) (citing *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).  "[U]nsupported and conclusory statements regarding harm [the

1  movant] might suffer . . . without more, will [not] suffice." *Id.* (quoting *Herb Reed Enters., LLC*,

2  736 F.3d at 1250); *see also Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473

3  (9th Cir. 1985) (conclusory affidavits offered by party executives are insufficient to demonstrate

4  irreparable harm).  Amazon fails to show irreparable harm.

5     **First**, Comet's Assistant does not "interfere[]" with Amazon's "control of its computer

6  systems," as Amazon asserts without evidentiary support.  Mot. 20.  The Assistant does not affect

7  Amazon's control of its systems; it does not change Amazon's cybersecurity measures, activity

8  monitoring, access controls, or user login information.  Yarats Decl. ¶¶ 9, 16-20.  Unlike in the cases

9  on which Amazon relies, the Assistant does not access any private or limited-access computer

10  systems.  *Id.* ¶¶ 11, 15; *cf. Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279 (S.D. Fla.

11  2020) (defendant tutoring company used access to private student portal to send unsolicited

12  advertising to other students); *Chegg, Inc. v. Doe*, 2023 WL 7392290, at *8 (N.D. Cal. Nov. 7, 2023)

13  (defendant stole paywalled tutoring content and posted it to competing website).  Nor does it use its

14  users' login credentials to send spam marketing messages to other Amazon users, as in *Power

15  Ventures.*  Yarats Decl. ¶ 20.  Rather, the Assistant accesses the **public** Amazon marketplace as an

16  agent to purchase products for authorized Amazon users, which is not unlawful, and causes no harm

17  to Amazon.  *Id.* ¶ 18; *see hiQ Labs*, 31 F.4th at 1199-1201.

18     **Second**, Comet does not create any risk to the "private data of Amazon customers."  Mot.

19  21.  Amazon's customers are also Comet's users (and Perplexity's customers), and Comet employs

20  state-of-the-art security to protect their data.  Yarats Decl. ¶¶ 21-23.  Comet maintains robust

21  browser security, requires user approval for significant actions such as purchases and even accessing

22  stored payment information, and never transmits login credentials, payment information, browsing

23  history, or private messages to Perplexity's servers.  *Id.* ¶¶ 20-23.  Amazon offers no evidence as to

24  its own security measures—and certainly no evidence that user data is any safer with Amazon than

25  with Perplexity. ███████████████████████████████████████████████████

26  ██████████████████  Yarats Decl. ¶¶ 22-23.  None of the risks Amazon speculates about have

27  actually come to pass—Amazon has not reported to Perplexity any increase in unauthorized orders,

28  fraud, or chargebacks as a result of the Comet Assistant.  Shevelenko Decl. ¶ 17.

-20-               Case No. 3:25-cv-09514-MMC

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1  Amazon's claim that the Assistant "obtains all available data in [a] user's Amazon account"

2  is untrue.  Amazon's declarations say only that the Assistant "can" access account data.  Fernandes

3  Decl. ¶ 24; Evans Decl. (ECF 4-2) ¶ 4.  In fact, users choose to store their credentials locally on

4  their own devices, and users retain full control over their payment information—neither Comet nor

5  the Assistant "transmit" this information "back to Perplexity's servers" as Amazon incorrectly

6  alleges.  Yarats Decl. ¶ 20.[10]  Amazon bases its vulnerability claim on reported incidents that have

7  already been addressed by Perplexity.  Evans ¶¶ 5, 7, 8; McLain Exs. 5, 6, 11; Rucinski Decl. ¶¶ 20-

8  27.  Amazon's own cybersecurity expert admits that he could not reproduce the attacks, confirming

9  there is no present vulnerability (if there ever were one).  Evans Decl. ¶ 13.[11]

10  Moreover, even if Comet's users' data *were* vulnerable (which Amazon has not shown), it

11  belongs to the users, not Amazon.  *hiQ Labs*, 31 F.4th at 1201 (data users shared on their public

12  LinkedIn profiles "is not owned by LinkedIn").  Amazon's argument that it will lose goodwill from

13  a hypothetical Perplexity data breach is pure speculation, unsupported by the record, and far too

14  attenuated from Amazon to support a finding of likely irreparable harm to it.  *See Herb Reed Enters*.,

15  LLC, 736 F.3d at 1250-51 (platitudes about goodwill and reputation, not grounded in evidence, are

16  insufficient to establish a likelihood of irreparable injury); *Qualcomm Inc. v. Compal Elecs., Inc.*,

17  283 F. Supp. 3d 905, 919 (S.D. Cal. 2017) (denying preliminary injunction where plaintiff made

18  "conclusory assertions about the importance of goodwill to [its] enterprise," which are not enough

19  to demonstrate that it is likely to be irreparably harmed by the loss of goodwill).  To claim irreparable

20  harm from "the loss of goodwill and reputation," a movant must provide "specific evidence that

21  such damage threatens [its] business *with termination*."  *SPS Techs.*, 2019 WL 1974902 at *15

22

23  [10]  This distinguishes *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425 (D. Md.
24  2024), *Reliable Prop. Servs.*, and *Qibaa*, which Amazon cites (Mot. 22) as cases that found
   irreparable harm based on the theft of customer data.  In contrast, Comet does not take or store any
25  customer data without permission.  Yarats Decl. ¶¶ 12-15.

26  [11]  Perplexity objects to the Evans Declaration's extensive reliance on inadmissible hearsay
   such as blog posts from the website of a company offering a competing AI-powered web browser.
27  Evans ¶¶ 5, 7, 8; *see Musk v. OpenAI, Inc.*, 769 F. Supp. 3d 1017, 1026 (N.D. Cal. 2025)
   ("Newspaper articles are classic hearsay . . . .  While technically a court may consider hearsay
28  evidence while ruling on a motion for a preliminary injunction, the Court here affords the articles
   little weight." (citation omitted)).

1    (emphasis added).  *See Hoist Fitness Systems, Inc. v. Tuffstuff Fitness Int'l, Inc.*, 2017 WL 5640562,

2    at *3 (C.D. Cal. Oct. 31, 2017) (finding CEO declaration without market analysis insufficient to

3    establish loss of customers as irreparable harm due to presence of numerous other competitors in

4    the market).  Amazon does not even attempt to make such a showing here.

5        **Third**, Amazon argues (Mot. 22) the Assistant is "degrading Amazon customers' shopping

6    experience" because it "may not add selected products to existing deliveries," and "deprives

7    Amazon of opportunities to . . . sell additional products by making recommendations or offering

8    promotional benefits to actual humans."  Therein lies Amazon's true concern:  the Assistant allows

9    users to avoid Amazon's advertising and upselling.  But customers do not see this as a "degrading";

10   after all, they chose to use the Assistant (and they could choose not to).  Yarats Decl. ¶ 16.  If

11   anything, Comet **benefits** Amazon by allowing customers to make purchases even when they would

12   not otherwise choose to wade through Amazon's upselling and promotional content.  In any case,

13   any such "lost opportunities"—if actionable at all—are compensable by money damages.  *Ariz.*

14   *Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally

15   defined as harm for which there is no adequate legal remedy, such as an award of damages.").

16       **C.    Amazon's Requested Injunction Would Harm The Public Interest**

17       The injunction Amazon seeks would harm the public interest by stifling consumer choice,

18   fair competition, and innovation.  Amazon admits it wants to shut Comet down so that its customers

19   cannot use the Assistant to bypass Amazon's advertising and upselling.  There is a strong public-

20   policy interest in favor of promoting consumer choice.  *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,

21   4 F.3d 819, 827 (9th Cir. 1993) (affirming denial of preliminary injunction where injunction would

22   have "depriv[ed] consumers of a choice of products"); *see also Epic Games, Inc. v. Apple Inc.*, 2021

23   WL 5205487, at *2 (N.D. Cal. Nov. 9, 2021) ("consumer choice is in the interest of the public");

24   *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (affirming denial of

25   preliminary injunction based in part because the "public also has an interest in maintaining consumer

26   choice"); *CLS Worldwide Servs., LLC v. Cartier Exec. Limo Serv.*, 2006 WL 8563341, at *18 (C.D.

27   Cal. June 15, 2006) (noting public's strong interest in ensuring companies can compete freely and

28   consumers have product choice).  Amazon is trying to take away its customers' option to buy the

1  item they want without facing Amazon's "product recommendations," "minimum free shipping

2  thresholds," and "promotional benefits." Mot. 22. This is ***against*** the public interest.[12]

3       Amazon's proposed injunction would also violate the strong public policy in favor of

4  providing customers with the choice to use the latest AI technology—here, agents—to make

5  purchases on e-commerce sites. *See, e.g.*, *Wagner Aeronautical, Inc. v. Dotzenroth*, 2022 WL

6  6837701, at *10 (S.D. Cal. Oct. 7, 2022) ("Preserving and protecting innovation . . . is clearly in the

7  public's interest, and for that very reason, the issuance of a preliminary injunction would not be in

8  the public interest . . . ."); *Brighton Collectibles, Inc. v. Pedre Watch Co.*, 2013 WL 5719071, at *6

9  (S.D. Cal. Oct. 21, 2013) (denying an injunction as it "would not encourage innovation, instead it

10  would stifle fair competition and in turn, impair the public interest"). Amazon seeks to stunt the

11  development of competing agentic AI by denying Comet access to its marketplace—the largest

12  online marketplace in the world—to protect its own profits and force consumers to use its agentic

13  AI offerings. That is not in the public interest either.

14       Amazon's only argument on this element is that the public interest is served by enforcing

15  the CFAA, but Perplexity is not violating the CFAA, as demonstrated above. To the contrary,

16  Amazon's weak showing on the merits and irreparable harm elements weighs against granting an

17  injunction. *See Active Network*, 2010 WL 3463378, at *6 (where a plaintiff fails to present strong

18  evidence on the merits and a particularized showing of irreparable harm, "[i]f anything, an

19  injunction would violate the public's interest in fair and healthy competition").

20       **D.    The Balance Of Equities Weighs Strongly In Perplexity's Favor**

21       Amazon also fails to demonstrate that the equities support granting a preliminary injunction.

22  To the contrary, the equities weigh heavily in favor of denying Amazon's motion.

23

24

---

25       [12] It is no coincidence that Amazon seeks to enjoin Comet now. Amazon formed its own
group focused on agentic AI in March 2025 and launched a suite of agentic AI products in

26  October 2025—all while it was preparing its case against Perplexity. Amazon now seeks to
exclude Comet from its marketplace just as it launches its own agentic AI program. This is

27  plainly anticompetitive behavior. *See Int'l Jensen*, 4 F.3d at 827; *Active Network, Inc. v. Elec.
Arts Inc.*, 2010 WL 3463378, at *6 (S.D. Cal. Aug. 31, 2010) (denying preliminary injunction that

28  would "violate the public's interest in fair and healthy competition").

Before issuing a preliminary injunction, the court must balance the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it.  *See Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980).  Here, the issuance of a preliminary injunction would be devastating to Perplexity.  Perplexity would lose its first-mover advantage in the AI-assisted shopping space—meaning it would lose market share, reputation, users, and the ability to iterate and improve Comet while this litigation is pending. Shevelenko Decl. ¶¶ 37-40.  Perplexity would be stuck in the pit lane while all its competitors circle the track for the duration of this litigation, and would be left far behind if and when it is allowed to rejoin the race.  *Id.* ¶¶ 36-38.  In all likelihood, Perplexity would not be able to catch up and would lose the entirety of its multimillion-dollar investment in developing Comet.  *Id.* ¶¶ 38-39, 41.  On the other hand, as shown, *supra* p. 19, Amazon stands to suffer no actual, non-speculative harm from ***its own customers' use*** of the Assistant to purchase products ***on Amazon.com***—that is, to generate revenue for Amazon—during the duration of this case.  The balance of the equities is not even a close call; it heavily favors Perplexity and precludes an injunction.

### E.    Amazon's Proposed Injunction Is Fatally Overbroad

The Court should deny Amazon's motion for the independent reason that the injunction it seeks is far broader than the conduct it complains of or the harm it claims to have suffered.  *See Winter*, 508 F.3d at 886 ("an overbroad preliminary injunction is an abuse of discretion").  The conduct Amazon complains of is merely that the Assistant does not sufficiently identify itself as agentic AI. Mot. 1-2. But Amazon does not stop at requiring the Assistaant to identify itself; it also seeks to enjoin Perplexity ***and its employees*** from ever "[a]ccessing, attempting to access, or assisting, instructing, or providing a means for others to access or attempt to access Amazon's protected computer systems"—which Amazon defines as its entire marketplace.  Notice of Mot. at 2.  Amazon also demands that Perplexity and its employees not use or create Amazon accounts through ***any*** AI agent, destroy all data, identify every Amazon account ever accessed by Perplexity and its employees, and provide a declaration certifying compliance.  *Id.* at 2-3.  Amazon gives no reason and cites no authority for seeking an injunction that is so much broader than the conduct it

complains about—to the point that it would impact the private shopping of hundreds of Perplexity employees.

The proposed injunction is overbroad for two additional reasons. ***First***, as explained above, *supra* p. 7, as Amazon has conceded, and as the Ninth Circuit has made clear, the CFAA and CDAFA ***do not even apply*** to the vast majority (if not, any part) of Amazon's website, which requires no username or password to access. *hiQ Labs*, 31 F.4th at 1198-99. Because Amazon's proposed injunction would prohibit the Comet Assistant from accessing the entire public Amazon Store, it is fatally overbroad. ***Second***, to the extent the proposed injunction would bar ***any*** use of Comet—even a user's manual use as an ordinary web browser without the Assistant—to access Amazon.com, it fails for being overbroad because Amazon has not even tried to show that ordinary human browsing on its website using Comet would be illegal or causes it harm.

### F.    Amazon Must Post A Bond

If the Court is nevertheless inclined to grant Amazon's motion, the Court should require that Amazon post a bond sufficient to cover the substantial harm the injunction will cause Perplexity. Federal Rule of Civil Procedure 65(c) requires the moving party to give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) "[T]he bond amount should be sufficient 'to protect [the] adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.'" *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1059 (S.D. Cal. 2006) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring in part and concurring in the judgment.)).

Here, Amazon's proposed injunction would threaten Perplexity's valuation, which recently increased $5 billion on the strength of Comet, and Perplexity's entire investment in Comet, including ███████ Perplexity spent to acquire Sidekick and develop the browser.  Shevelenko Decl. ¶ 41.  To protect Perplexity from these losses, Amazon should post a bond of at least $1 billion.

### V.    CONCLUSION

For the foregoing reasons, the Court should deny Amazon's Motion.

1    DATED: November 25, 2025                    QUINN EMANUEL URQUHART &
2                                                SULLIVAN, LLP

3                                                By_____/s/ John B. Quinn_____
4                                                    John B. Quinn
                                                    *Attorneys for Perplexity AI, INC.*
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28