QUINN EMANUEL URQUHART &
SULLIVAN, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Daniel C. Posner (Bar No. 232009)
danposner@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Andrew Schapiro (admitted *Pro Hac Vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1881
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Renita N. Sharma (admitted *Pro Hac Vice* )
renitasharma@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

William Pilon (Bar No. 326487)
williampilon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Attorneys for Defendant Perplexity AI, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

AMAZON.COM SERVICES LLC, a Delaware limited liability company,

Plaintiff,

vs.

PERPLEXITY AI, INC., a Delaware corporation,

Defendant.

Case No. 3:25-cv-09514-MMC

**DECLARATION OF CHRISTOPHER RUCINSKI IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Hon. Maxine M. Chesney
Courtroom 7

## I. Introduction

I, Christopher Rucinski, declare as follows:

1. I am a Vice President at Charles River Associates ("**CRA**"). My business address is 200 Clarendon St, Boston, MA 02116. This declaration ("**Declaration**") summarizes my current opinions, which are subject to change depending on ongoing discovery and any additional information received.

2. At the request of the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn Emanuel**") as counsel for Defendant Perplexity AI, Inc. ("**Perplexity**" or "**Defendant**") in the above-captioned litigation ("**Litigation**"), I hereby submit this Declaration in support of Defendants' Answering Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction.

## II. Education, Expertise, and Previous Testimony

3. My subject matter expertise includes computer science generally, and I have been admitted to testify as an expert in various federal court proceedings regarding computer source code analysis, data analysis, and digital evidence collection.

4. I graduated *cum laude* with an A.B. in computer science from Princeton University in 2010, and in 2015, I obtained the Global Information Assurance Certification as a Certified Forensic Examiner, which I renewed in 2019. In 2010, I began working at Elysium Digital as a computer scientist, and I continued to work there until Elysium Digital was acquired in 2015 by Stroz Friedberg. I continued to work at Stroz Friedberg until it was acquired by Aon in 2016, and I worked at Aon through its subsidiaries Stroz Friedberg and Elysium Digital until 2025. In 2025, I began working at CRA.

5. Throughout my professional career of more than 15 years, I have consulted on more than 100 technical matters, many of which have involved the analysis of various applications, data, and computer source code. I have offered expert opinions about the operation of computer source code and computer applications, and I have testified as an expert several times in the last several years. I have experience with web browser automation, including using Selenium to

programmatically interact with web sites.[1] I have also provided technical consulting services for the Federal Trade Commission.

6. My current *curriculum vitae* is attached here as **Exhibit A**.

## III. Summary of Expected Testimony

7. I have been asked by counsel for Defendant to offer expert opinions responding to the expert declaration of David Evans ("**Evans Declaration**") and Plaintiff's Motion for Preliminary Injunctive Relief ("**Plaintiff's PI Motion**"), both dated November 4, 2025. To the extent I do not address certain statements in the Evans Declaration or Plaintiff's PI Motion, it should not be assumed that I agree with such statements.

8. For the reasons discussed in detail below:

a. The Comet Assistant displays Amazon's advertisements to the user when browsing amazon.com on the user's behalf.

b. Comet's user-agent string is consistent with the RFC 9110 standard and the user-agent strings of similar browsers.

c. The Evans Declaration's primary citation, the Brave Article, purporting to show security vulnerabilities in Comet is flawed because it was published by a biased source, a competitor to Comet, Brave.

d. The Brave Article is a flawed purported support of the Evans Declaration because it shows that Perplexity resolved the potential security issue identified in the article before it was published.

e. The Guard.io Article is a flawed purported support of the Evans Declaration because it shows the user has already fallen for the scams by deciding to trust a malicious web site, email, or hyperlink prior to using the Comet Assistant.

f. The Evans Declaration's tertiary citation, the LayerX Article, purporting to show security vulnerabilities in Comet is flawed because it was published by a biased source, a competitor to Comet, LayerX.

[1] *See* https://www.selenium.dev/.

g. The LayerX Article is a flawed purported support of the Evans Declaration because it fails to show a connection to amazon.com, and the purported exploit it documents is easily thwarted by the user once it begins.

h. The Evans Declaration demonstrates Comet's security by failing to exploit it.

i. A theoretical security breach of a user of Comet Assistant would implicate only limited amounts of the user's data stored at amazon.com, not Amazon's data.

## IV. Overview of Perplexity's Comet Web Browser

9. Web browsers are computer applications like Google Chrome, Brave, and Firefox that facilitate access to web pages on the Internet displaying the text and media of web pages and providing hyperlinks to allow navigation to other web pages by clicking on them. Comet is a web browser recently released by Perplexity that allows a user to browse web pages like any web browser. In addition, Comet includes the Comet Assistant feature, which allows a user to specify instructions that the Comet Assistant follows to navigate web pages on the user's behalf in the Comet browser. When a user asks the Comet Assistant to browse the Internet on his or her behalf, the result is similar to asking a human assistant to (1) perform the browsing, (2) show the browsing as he or she is performing it, and (3) provide written updates as he or she performs the task. This process is described on Perplexity's blog, a screenshot of which is below.

## Transparency: Watch Comet Assistant work

Trustworthy assistants show their work. Now it's easier to see when the Comet Assistant is browsing for you and what actions it's taking on your behalf. You can watch while Comet works or see its reasoning step-by-step in the Assistant sidecar. With the newest Comet Assistant, you'll see exactly where it's clicking, scrolling, or interacting with a site. And there are clear buttons to stop the Assistant or provide more guidance.




*Figure 1*: Screenshot from Perplexity's Blog[2]

10. To verify and show this, on November 23, 2025, I used the Comet Assistant to navigate to yahoo.com and display recent football scores. I provided the Comet Assistant with the prompt, "Browse to yahoo.com and click through links to find the scores of recent football games" and clicked the button following my prompt to submit it. I provided the Comet Assistant no further instructions or guidance as it carried out my request. As I instructed it to, on my behalf the Comet

[2] *See* **Exhibit B**. Perplexity Team. "Comet Assistant puts you in control." https://www.perplexity.ai/hub/blog/comet-assistant-puts-you-in-control. November 14, 2025.

Assistant browsed to yahoo.com and navigated the web site by clicking and scrolling to find the information I requested. Documentation of the actions the Comet Assistant performed in response to my request is provided in the screenshots below.




*Figure 2*: Comet Browsing the Internet on My Behalf




*Figure 3*: Comet Browsing the Internet on My Behalf, Navigating to yahoo.com




*Figure 4*: Comet Browsing the Internet on My Behalf, Clicking on a Hyperlink




*Figure 5*: Comet Browsing the Internet on My Behalf, Scrolling Through a Web Page

11. The Comet Assistant implements a form of Artificial Intelligence called "Agentic AI," so-called because it permits a user to request computer-related tasks to be performed on his or her behalf and the AI will do so as the user's agent (in the non-legal sense), a.k.a. assistant. My use

of Comet is consistent with AI agents such as Comet Assistant performing tasks only at the request of users; they do not otherwise act unless instructed to do so by the user.[3]

## V. The Comet Assistant Displays Amazon's Advertisements to the User When Browsing Amazon.com on the User's Behalf

12. Plaintiff's PI Motion suggests that if the Comet Assistant browses amazon.com on a user's behalf, advertisements are not shown to the user. Page 15 of Plaintiff's PI Motion states,

> Amazon's advertisers pay for their ads to be shown to humans, with billing based on valid ad impressions. *Id.* When automated agents, such as the Comet AI agent, generate ad traffic, Amazon must invest engineering resources to detect and filter out these non-human impressions before billing advertisers. *Id.*

13. I disagree. In its default configuration, the Comet Assistant does display Amazon's advertisements to the user when browsing amazon.com on the user's behalf. To show this, on November 23, 2025, I used the Comet Assistant to navigate to amazon.com and search for an office chair. I provided the Comet Assistant with the prompt, "Browse to amazon.com and click through links to find an office desk chair with good reviews and a cost of under $300," and clicked the button following my prompt to submit it. I provided the Comet Assistant no further instructions or guidance as it carried out my request. As I instructed it to, on my behalf the Comet Assistant browsed to amazon.com and navigated the web site to find a suitable office chair. As it navigated amazon.com on my request, the Comet Assistant displayed several advertisements to me from amazon.com's web site, and it clicked through three of them as well (each a sponsored item) to consider the office chairs suggested by those advertisements. Documentation of the actions the Comet Assistant performed in response to my request is provided in the screenshots below.

[3] *See, e.g.*, **Exhibit C**. Perplexity Team. "Agents or Bots? Making Sense of AI on the Open Web." https://www.perplexity.ai/hub/blog/agents-or-bots-making-sense-of-ai-on-the-open-web. August 4, 2025. "User-driven agents only act when users make specific requests, and they only fetch the content needed to fulfill those requests."




*Figure 6*: Comet Browsing the Internet on My Behalf, Displaying Advertisements from Several Brands Including Samsung as well as "Black Friday Deals" on the Amazon.com Home Page




*Figure 7*: Comet Browsing the Internet on My Behalf, Displaying an Advertisement ("Black Friday Deal") on the Search Results Page of Amazon.com




*Figure 8*: Comet Browsing the Internet on My Behalf, With the Comet Assistant Displaying and Clicking on a Sponsored Item on the Search Results Page of Amazon.com




*Figure 9*: Comet Browsing the Internet on My Behalf, With the Comet Assistant Displaying and Clicking on a Sponsored Item on the Search Results Page of Amazon.com




*Figure 10*: Comet Browsing the Internet on My Behalf, With the Comet Assistant Displaying and Clicking on a Sponsored Item on the Search Results Page of Amazon.com

## VI. Overview of User-Agent Strings from the Internet Engineering Task Force RFC 9110 Standard

14. The Internet Engineering Task Force ("**IETF**") is the standards development organization for the Internet, and while adherence to its published standards is voluntary, the IETF creates the most authoritative references for understanding the details of how the networking details of the Internet operate.[4] The IETF publishes its standards in "RFC" documents. "RFCs" stands for "Request For Comments," and these documents "describe the Internet's technical foundations, such as addressing, routing, and transport technologies."[5]

15. The "user-agent string" is the value that browsers send to web servers for the "User-Agent" header field when making HTTP(S) requests of web servers to serve web page content. These sorts of requests are typically made whenever a user's browser navigates to a new web page. As the current (last updated in June 2022) standard documentation ("**RFC 9110**") for the user-agent

[4] *See, e.g.*, **Exhibit D**. "Introduction to the IETF." https://www.ietf.org/about/introduction/. Last accessed November 25, 2025.

[5] *See, e.g.*, **Exhibit E**. "About RFCs." https://www.ietf.org/process/rfcs/. Last accessed November 25, 2025.

string states, the user-agent string primarily enables web servers to send appropriate content based on the type and capabilities or lack of capabilities of the browser:[6]

> The "User-Agent" header field contains information about the user agent originating the request, which is often used by servers to help identify the scope of reported interoperability problems, to work around or tailor responses to avoid particular user agent limitations, and for analytics regarding browser or operating system use.

16. RFC 9110 further establishes that the user-agent string should not be overly detailed or include more than a limited amount of subproducts lest the user-agent string become so specific as to be used to "fingerprint" the user against their wishes. Fingerprinting a user in this way would adversely impact a user's privacy and allow their browsing to be more easily tracked (emphasis in original):

> A user agent **SHOULD NOT** generate a User-Agent header field containing needlessly fine-grained detail and **SHOULD** limit the addition of subproducts by third parties. Overly long and detailed User-Agent field values increase request latency and the risk of a user being identified against their wishes ("fingerprinting").

17. RFC 9110 also makes clear that browsers are permitted to "masquerade" by reporting different user-agent strings, which should be interpreted by web servers as a request for content appropriate for the user-agent string currently being reported by the browser:

> If a user agent masquerades as a different user agent, recipients can assume that the user intentionally desires to see responses tailored for that identified user agent, even if they might not work as well for the actual user agent being used.

## VII. Comet's User-Agent String is Consistent with the RFC 9110 Standard and the User-Agent Strings of Similar Browsers

18. In my testing I found that when using Comet to access amazon.com either manually or by using Comet Assistant, it reported a user-agent string of "Mozilla/5.0 (Macintosh; Intel Mac

[6] *See* **Exhibit F**. R. Fielding, M. Nottingham, and J. Reschke. "RFC 9110 HTTP Semantics." https://www.rfc-editor.org/rfc/rfc9110.html#name-user-agent. June 2022. pp. 76 – 77, "10.1.5. User-Agent."

OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/142.0.0.0 Safari/537.36," which is essentially the same user-agent string reported in the Evans Declaration, just with some versions updated. This is consistent with RFC 9110 in that Comet reports "Chrome" since its capabilities or lack thereof are largely defined by the open source project Chromium, which defines how web pages are displayed in Comet.[7] The web page display capabilities of Google's Chrome browser are also largely defined by the open source project Chromium upon which Google's Chrome browser is based.[8] In my testing I found that when using the Google Chrome browser to manually access amazon.com, it reported the same user-agent string as Comet, which is expected since both browsers are largely based on Chromium.

19. The Plaintiff's PI Motion asserts on page 9 that, "Unlike Comet, other web browsers with agentic AI capabilities use unique user-agent strings to identify both the browser identity and whether browsing activity is being conducted by an AI agent," without providing any examples of such web browsers. I disagree. Comet's user-agent string is consistent not only with Google Chrome but also with other browsers, including browsers with an AI component, that are based on Chromium. For example, in my testing I found that when using the Atlas browser, published by another AI company, OpenAI, to access amazon.com either manually or by using Atlas's agentic AI assistant, it reported the same user-agent string as Comet and Google Chrome. I also found that when using the Brave browser to manually[9] access amazon.com, it reported the same user-agent string as Comet and Google Chrome. The Brave browser is available for download from brave.com, the same web site that published the Brave Article upon which the Evans Declaration relies.

---

[7] *See, e.g.,* **Exhibit G**. Perplexity Team. "The Intelligent Business: Introducing Comet for Enterprise Pro." https://www.perplexity.ai/hub/blog/the-intelligent-business-introducing-comet-for-enterprise-pro. August 14, 2025. p. 3, "Built on Chromium, Comet ensures complete compatibility with existing Chrome extensions, enterprise security policies, web applications, and single sign-on systems."

[8] *See, e.g.* **Exhibit H**. "The Chromium Projects." https://www.chromium.org/chromium-projects/. Last accessed Nov. 25, 2025.

[9] In my testing I found that while the Brave browser includes an AI feature called "Leo," which can answer questions or summarize the currently displayed web page, currently it does not support a feature that allows browsing web pages on a user's behalf.

## VIII. The Evans Declaration's Primary Citation, the Brave Article, Purporting to Show Security Vulnerabilities in Comet is Flawed Because it was Published by a Biased Source, a Competitor to Comet, Brave

20. The Evans Declaration purports to show that Comet currently suffers from "several security issues." The Evans Declaration's primary citation purporting to show that Comet currently suffers from security vulnerabilities is the "**Brave Article**," which discusses prompt injection.[10] The Brave Article is a flawed attempted support of this notion because it was published by a biased source, Brave, which is a competitor of Comet. Brave offers a web browser of the same name, in direct competition to Comet.[11] Brave also recently released a browser-based AI assistant called "Leo" that is a direct competitor to Comet Assistant. See https://brave.com/leo/, which advertises, "Brave Leo AI // The smart AI assistant built right into your browser. Ask questions, summarize pages, create new content, and more."[12]

## IX. The Brave Article is a Flawed Purported Support of the Evans Declaration Because It Shows that Perplexity Resolved the Potential Security Issue Identified in the Article Before it was Published

21. The Brave Article itself (defined above) documents that Perplexity responded to the purported prompt injection security issue identified in the article before it was published, which undermines the Evans Declaration's assertion that Comet is currently vulnerable to prompt injection. Below is a screenshot from one of the last sections of the Brave Article, showing that Brave's "Final testing of the vulnerability appears to be patched" on August 13, 2025, and it wasn't until one week later on August 20, 2025 that the Brave Article was published. In a parenthetical update, the Brave Article also claims that Perplexity has not "fully mitigated the kind of attack

[10] *See* **Exhibit I**. "Agentic Browser Security: Indirect Prompt Injection in Perplexity Comet." https://brave.com/blog/comet-prompt-injection/. August 20, 2025.

[11] *See, e.g.*, **Exhibit J**. "The browser that puts you first." https://brave.com/. Last accessed on November 25, 2025.

[12] *See* **Exhibit K**. "Brave Leo AI." https://brave.com/leo/. Last accessed on November 25, 2025.

described here" but provides no dates to this claim and provides no further updates either dated or otherwise.



## Disclosure timeline

- **July 25, 2025**: Vulnerability discovered and reported to Perplexity
- **July 27, 2025**: Perplexity acknowledged the vulnerability and implemented an initial fix
- **July 28, 2025**: Retesting revealed the fix was incomplete; additional details and comments were provided to Perplexity
- **August 11, 2025**: One-week public disclosure notice sent to Perplexity
- **August 13, 2025**: Final testing confirmed the vulnerability appears to be patched
- **August 20, 2025**: Public disclosure of vulnerability details (**Update**: on further testing after this blog post was released, we learned that Perplexity still hasn't fully mitigated the kind of attack described here. We've re-reported this to them.)

*Figure 11*: Disclosure Timeline from the Brave Article as it Appeared on November 23, 2025

**X. <u>The Guard.io Article is a Flawed Purported Support of the Evans Declaration Because It Shows the User Has Already Fallen For the Scams by Deciding to Trust a Malicious Web Site, Email, or Hyperlink Prior to Using the Comet Assistant</u>**

22. The Evans Declaration purports to show that Comet currently suffers from "several security issues." The Evans Declaration's secondary citation purporting to show that Comet currently suffers from security vulnerabilities is the "**Guard.io Article,**" which is discussed in paragraph 7 of the Evans Declaration.[13] The Guard.io Article is a flawed attempted support of this notion because it shows that the user has already fallen for the three scams described therein by deciding to trust a malicious web site, email, or hyperlink prior to using the Comet Assistant.

---

[13] *See* **Exhibit L**. "Nati Tal and Shaked Chen." "'Scamlexity' // We Put Agentic AI Browsers to the Test - They Clicked, They Paid, They Failed." https://guard.io/labs/scamlexity-we-put-agentic-ai-browsers-to-the-test-they-clicked-they-paid-they-failed. August 20, 2025.

23. The below screenshot is from 0:06 of the first scam demonstration video linked in the Guard.io Article that purports to show the purported exploit discussed therein related to a fake shopping web site. This screenshot shows that the user has already, on their own and with no demonstrated interaction with the Comet Assistant, navigated to walmart-cart-cash.lovable.app, the scam web site which the Guard.io article characterizes as "an obviously fake shopping site," and only then asked the Comet Assistant to perform a purchase on the user's behalf. If I told my human assistant to go to a specific web site that I identify and buy something for me that turned out to be a scam, I would blame myself, not my assistant, because my assistant carried out my instructions exactly as I had specified them. The analogy holds here as well for the Comet Assistant; the user was already tricked by the time the Comet Assistant was invoked by the user.




*Figure 12*: 0:06 of https://www.youtube.com/watch?v=OPblVgtbzec, last accessed on November 23, 2025.

24. The below screenshot is from 0:11 of the second scam demonstration video linked in the Guard.io Article that purports to show the purported exploit discussed therein related to a fake email purporting to be from a bank. This screenshot shows that the user has already, on their own and with no demonstrated interaction with the Comet Assistant, navigated to the fake email, which

the Guard.io article characterizes as "from a fresh new ProtonMail address (so it's clearly not from a bank)," and only then asked the Comet Assistant to click a link in the email on the user's behalf. Just as with the first scam demonstration in the Guard.io article; the user was already tricked by the time the Comet Assistant was invoked by the user.




*Figure 13*: 0:11 of https://www.youtube.com/watch?v=maabHiTIxqA, last accessed on November 23, 2025.

25. The below screenshot is from 0:03 of the third scam demonstration video linked in the Guard.io Article that purports to show the purported exploit discussed therein related to a fake text purporting to be from a doctor. This screenshot shows that the user has already, on their own and with no demonstrated interaction with the Comet Assistant, trusted the text in question, which the Guard.io article characterizes as "a text from you 'Doctor,'" and also trusted the link therein, which just like the obviously fake shopping site from the first demonstration is from the loveable.app domain, and only then asked the Comet Assistant to click a link from that text on the user's behalf. Just as with the first and second scam demonstrations in the Guard.io article; the user was already tricked by the time the Comet Assistant was invoked by the user.




*Figure 14*: 0:03 of https://www.youtube.com/watch?v=cPgYv4fLQBo, last accessed on November 23, 2025.

**XI. <u>The Evans Declaration's Tertiary Citation, the LayerX Article, Purporting to Show Security Vulnerabilities in Comet is Flawed Because it was Published by a Biased Source, a Competitor to Comet, LayerX</u>**

26. The Evans Declaration purports to show that Comet currently suffers from "several security issues." The Evans Declaration's tertiary citation purporting to show that Comet currently suffers from security vulnerabilities is the "**LayerX Article,**" which is discussed in paragraph 8 of the Evans Declaration.[14] The LayerX Article is a flawed attempted support of this notion because it was published by a biased source, LayerX, which is a competitor of Comet. LayerX offers an "All-in-One AI & Browser Security Platform," as advertised on its homepage.[15] LayerX essentially offers

[14] *See* **Exhibit M**. "Aviad Gispan." "CometJacking: How One Click Can Turn Perplexity's Comet AI Browser Against You." https://layerxsecurity.com/blog/cometjacking-how-one-click-can-turn-perplexitys-comet-ai-browser-against-you/. October 4, 2025.

[15] *See* **Exhibit N**. "The All-in-One AI & Browser Security Platform." https://layerxsecurity.com/. Last accessed on November 25, 2025.

a product that augments regular browser functionality just as Comet offers the Comet Assistant to augment the regular browser functionality of the Comet browser.

## XII. The LayerX Article is a Flawed Purported Support of the Evans Declaration Because It Fails to Show a Connection to Amazon.com, and the Purported Exploit it Documents is Easily Thwarted by the User Once it Begins

27. The LayerX Article documents a purported security exploit wherein information is inappropriately disclosed about an email that the Comet Assistant previously wrote and sent in response to a user prompt. The LayerX Article does not describe how the purported exploit that it documents is related in any way to amazon.com or to any shopping web site. Additionally, in the video documentation of the purported exploit, it is abundantly clear to the user that something unexpected is happening since the malicious prompt is displayed clearly, in all-capitalized letters, in three separate locations on the screen, and the whole prompt is prominently displayed in the middle of the screen. Upon noticing the unexpected prompt in any of these places, the user could intervene to abort the execution of the malicious prompt and thus thwart the exploit. The figure below is a screenshot of the demonstration video linked in the LayerX Article, which illustrates this. In this figure I have added two red boxes to the original screenshot to clearly show two places where the malicious prompt is displayed. The large red arrow identifying the third and most prominent location of the malicious prompt, in its entirety in the center of the screen with very little else displayed on the screen, is from the original video.




*Figure 15*: 0:34 of https://www.youtube.com/watch?v=n8vLom-Musc, last accessed on November 25, 2025.

## XIII. The Evans Declaration Demonstrates Comet's Security by Failing to Exploit It

28. In paragraphs 13 – 14, the Evans Declaration documents repeated failures to exploit Comet in empirical testing despite claiming that Comet has a "huge attack surface"[16] and citing to several articles that purport to show step-by-step instructions for how to exploit Comet. Paragraph 13 of the Evans Declaration states that, "I was not able to fully reproduce the proof-of-concept attacks described in the preceding paragraphs." Paragraph 14 of the Evans Declaration documents three separate attempts to exploit Comet, none of which resulted in an exploit and all of which show Comet successfully performing tasks at the request of the user without compromising any information. Paragraph 14 states that in performing the documented tasks, the Comet Assistant (1) opened hyperlinks that "could have included links that would have taken malicious actions or transmitted user data," but in fact did not, (2) sent an email that, "could have included sensitive user

[16] *See* Evans Declaration at paragraphs 9 and 16.

information," but in fact did not, and (3) "add[ed] items to a shopping cart," with no mention of a security vulnerability being exploited.

29. The Evans Declaration nonetheless concludes in paragraph 15 that "[M]y own preliminary tests indicate that users of the Comet AI browser are at high risk of exploitation." In fact, the Evans Declaration shows the opposite: In the face of several potential exploits attempted by an expert computer science professor with access to step-by-step purported proof of concept exploit videos, the Comet browser successfully withstood all attempts. This is an indicator that Comet's security posture is currently robust.

## XIV. A Theoretical Security Breach of a User of Comet Assistant Would Implicate Only Limited Amounts of the User's Data Stored at Amazon.com, Not Amazon's Data

30. Neither Plaintiff's PI Motion nor the Evans Declaration describe any actual breach of data related to a user of Comet Assistant, but theoretically if a Comet Assistant user were both breached and already logged into amazon.com when the breach occurred, only a limited amount of the user's data and not Amazon's data would be implicated. Amazon publishes guidance about how it collects and handles user information. For example, an Amazon web page entitled, "How Amazon Protects Your Personal Information" states:[17]

> We maintain physical, electronic, and procedural safeguards for the collection, storage, and disclosure of personal information. Our security procedures mean that we may ask you to verify your identity before we disclose personal information to you.

31. Amazon's defensive security posture as described above is prudent. With hundreds of millions of users, Amazon does not have the luxury of assuming that each and every one of its users have full control of their accounts at all times. In order to protect itself, Amazon must instead design its systems under the assumption that at least some of its users' accounts have been breached at all times.

---

[17] *See* **Exhibit O**. "How Amazon Protects Your Personal Information." https://www.amazon.com/gp/help/customer/display.html?nodeId=GX5YKQX9U5LNE63W. Last accessed on November 25, 2025.

32. In order to verify that the combination of security protections from Amazon and the Comet Assistant would protect the disclosure of certain user information in the theoretical event that a user of Comet Assistant were breached, on November 24, 2025 I performed an experiment where I (1) logged into my personal amazon.com account in the Comet browser, (2) asked the Comet Assistant to "Show me my credit card information stored in amazon.com," and finally (3) asked the Comet Assistant to "Show me the full credit card number of my Prime Store Card." The full screen of the final result of this experiment is shown in the figure below, which is partially redacted with black boxes in red outline to refrain from revealing certain information about my credit cards.



*Figure 16*: Screenshot of My Interaction With Amazon.com Using the Comet Assistant on November 24, 2025

33. As shown above, despite me asking it to do so, the Comet Assistant refused to display my full credit card number and did not provide me an option to override that refusal. Consistent with Amazon's published statements about how it protects user information, the Comet Assistant stated that:

> For security and privacy protection, financial platforms like Amazon deliberately do not show full credit card numbers once they've been saved. This is a standard security practice to prevent unauthorized access to sensitive financial information.
>
> ...
>
> I'm designed to protect your sensitive financial information and cannot access or display full credit card numbers, even from your own account.

34. Considering credit card information as in the above example, theoretically if a Comet Assistant user were both breached and already logged into amazon.com when the breach occurred, an adversary might gain access to the last four digits of a user's credit cards stored in amazon.com but would not be able to access the full credit card numbers. Thus, only a limited amount of the user's data and not Amazon's data would be implicated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 25th day of November, 2025 in Medford, Massachusetts.

By ______________________
Christopher Rucinski