1  **OPPENHEIM + ZEBRAK, LLP**
2  Jennifer L. Pariser (*pro hac vice* pending)
   461 Fifth Avenue, 19th Floor
3  New York, NY 10017
   Telephone: (212) 951-1156
4  jpariser@oandzlaw.com

5  **SHADES OF GRAY LAW GROUP, P.C.**
6  Naomi Jane Gray (Bar #230171)
   100 Shoreline Highway, Suite 386B
7  Mill Valley, CA 94941
   (415) 746-9260
8  ngray@shadesofgray.law

9  *Attorneys for Amici Curiae RELX, Inc.,*
10 *LexisNexis Risk Solutions Inc. and*
   *Elsevier, Inc.*
11

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMAZON.COM SERVICES LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>    v.<br><br>PERPLEXITY AI, INC., a Delaware corporation,<br><br>    Defendant. | Case No. 3:25-cv-09514-MMC<br><br>**BRIEF OF RELX, INC., LEXISNEXIS RISK SOLUTIONS INC., AND ELSEVIER, INC. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Maxine M. Chesney<br><br>*(Filed concurrently with Motion for Leave and Proposed Order)* |

## TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ............................................................................................... 1

INTRODUCTION ......................................................................................................................... 2

ARGUMENT ................................................................................................................................. 4

    I.    PERPLEXITY'S COMET IS NOT SYNONYMOUS WITH ITS USERS ....................... 4

    II.   THE PUBLIC INTEREST FAVORS AN INJUNCTION .................................................. 5

    III.  AMAZON'S REQUEST FOR INJUNCTIVE RELIEF IS REASONABLE. ..................... 6

CONCLUSION .............................................................................................................................. 7

# TABLE OF AUTHORITIES

**Cases**

*Facebook, Inc. v. Power Ventures, Inc.*,
  252 F.Supp.3d 765 (N.D. Cal. 2017) ............................................................................ 6

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
  741 F.Supp.2d 1165 (C.D. Ca. 2010) ........................................................................... 6

*League of Wilderness Defend./Blue Mtns. Biodiversity Proj. v. Connaughton*,
  752 F.3d 755, 766 (9th Cir. 2014) ................................................................................ 6

*Oakley, Inc. v. Sunglass Hut Intern.*,
  No. 01-1065, 2001 WL 1683252 (C.D. Ca. 2001) ....................................................... 6

*Sammartano v. First Judicial Dist. Court, in and for Cty of Carson City*,
  303 F.3d 959 (9th Cir. 2002) ........................................................................................ 6

*Warner Bros. Ent. Inc., et al. v. WTV Systems, Inc.*,
  824 F.Supp.2d 1003 (C.D. Ca. 2011) ........................................................................... 6

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) .......................................................................................................... 5

**INTERESTS OF *AMICI CURIAE*[1]**

*Amici curiae* are part of the RELX family of companies, providers of information-based analytics and research for professional customers in several business sectors including legal, risk, and scientific/technical/medical.

- *Amicus curiae* RELX, Inc.'s LexisNexis division ("LexisNexis") operates one of the world's largest online research platforms. Customers use this powerful tool to access legal research including case law, state and federal statutes, state and federal regulations, law journals, and treatises, as well as general news articles and consumer information. The company maintains the world's largest electronic database for legal and public-record-related information, providing access to billions of searchable documents and records from more than 45,000 legal, news and business sources.

- *Amicus curiae* LexisNexis Risk Solutions Inc. ("LexisNexis Risk") is a leading global data analytics provider for professional businesses and customers worldwide. The company delivers targeted solutions for a wide range of industries including insurance, financial services, healthcare and government, providing data, advanced analytics platforms and integrated AI solutions to help organizations reduce risk and improve decisions.

- *Amicus curiae* Elsevier Inc. ("Elsevier") is a premier global academic publishing company and information analytics business. It specializes in publishing technical, medical, and scientific content, with a portfolio that includes prestigious academic research journals such as The Lancet and Cell Press. Elsevier publishes more than 600,000 articles annually and its catalog receives over one billion annual downloads.

*Amici* make these materials available to users through a variety of models, but always subject to end-user license agreements similar in many respects to that of Amazon.com Services LLC ("Amazon"). *Amici* represent an important sector of the online ecosystem with knowledge of how agentic AI agents align with large platforms. *Amici* also embrace the promise of AI,

---

[1] No counsel for any party authored this brief in whole or in part or made any monetary contribution intended to fund the preparation or submission of this brief.

incorporating AI technology into their client offerings and business operations. *Amici* therefore have a strong interest in this Court's consideration of Amazon's requested preliminary injunction.

## INTRODUCTION

LexisNexis offers more than 30 legal and business products including its flagship legal research tool Lexis+; its business and financial reporting tool Nexis; corporate legal solutions from CounselLink+; its AI-powered research and drafting product Protégé; and more. All of these products are available at lexisnexis.com [2] and their use is subject to General Terms and Conditions.[3] These Terms and Conditions state, among other things, that the services may be accessed only by "Authorized Users" with a unique LexisNexis user ID.[4] Users may not give their login credentials to another person, even a colleague who may be assisting with research. The Terms and Conditions also prohibit access or use of the service "via mechanical, programmatic, robotic, scripted or any other automated means."[5]

LexisNexis Risk offers more than a hundred tools to help businesses across multiple industries and governmental entities reduce risk. These include Accurint for Healthcare to protect against fraudulent claims, LexisNexis Emailage for fraud analytics on email address information, ThreatMetrix to detect and prevent fraud patterns, and Flyreel, an AI-enabled solution that allows customers to initiate property claim inspections.[6] All of these products are subject to LexisNexis Risk's Terms and Conditions, which expressly prohibit sharing of login credentials.[7] The Terms and Conditions also state that users "may not use any robot, spider, other automatic software or device, or manual process to monitor or copy our Web Site or the Content without [LexisNexis Risk's] prior written permission."[8]

Elsevier offers dozens of tools to help students, researchers, scientists, authors, and

---

[2] LEXISNEXIS, *LexisNexis Products & Services*, https://www.lexisnexis.com/en-us/products.page (last visited March 5, 2026).
[3] LEXISNEXIS, *General Terms and Conditions*, (Oct. 31, 2025), https://www.lexisnexis.com/en-us/terms/general/default.page.
[4] *Id*. §§2.1 – 2.2.
[5] *Id*. §1.2(a).
[6] LEXISNEXIS RISK, *Our Products*, https://risk.lexisnexis.com/products (last visited March 5, 2026).
[7] LEXISNEXIS RISK, *Terms and Conditions of Use for this Web Site*, https://risk.lexisnexis.com/terms (§ 9) (last visited March 5, 2026).
[8] *Id*. §2.1.

business executives across numerous industries find the resources and productivity solutions they need.[9] Some of these products require the user to create an account in order to access the full range of services associated with the product. These include ScienceDirect, the premier platform for scientific, health and technical literature; ClinicalKey, which provides reference materials for healthcare professionals; Knovel, which delivers research and advance discoveries in engineering; and more. All of these products are subject to Elsevier's Terms and Conditions which state that where a product requires registration, only the registered user may access that service.[10] The Terms and Conditions also state that users "may not use any robots, spiders, crawlers or other automated downloading programs . . . to search, scrape, extract, deep link or index any Content."[11]

*Amici* have clear business reasons for including these requirements in their Terms and Conditions. Limiting products and services to a single user is essential, not merely to protect *amici's* income stream, but also to minimize password leaks, fraudulent activity, unauthorized access to confidential research inquiries, and compromises to data security. Password sharing also distorts user analytics, making it harder for *amici* to tailor the user experience for each person, ultimately making the product less helpful. Agentic AI tools such as Perplexity's Comet are simply a form of password sharing. When a user gives an AI agent their login credentials, the service is no longer being accessed solely by a single human using a known device with predictable behavior. Instead, it is effectively being used by both the user and the AI agent, often utilizing multiple automated processes.

*Amici* also have strong business reasons to prohibit the use of bots and other automated tools on their websites. Robots operate exponentially faster than humans and can therefore generate web traffic far beyond human usage, resulting in bot-driven performance degradation. Extensive robot usage also increases bandwidth costs for the site operator. If a single automated client consumes as much traffic as thousands of humans but pays nothing extra, margins erode quickly. Undeclared robots also increase the likelihood of security breaches, fraudulent use of the

---

[9] ELSEVIER, *Products*, https://www.elsevier.com/products (last visited March 5, 2026).
[10] ELSEVIER, *Terms and Conditions*, *Registered User Grant of License* (rev. January 16, 2026), https://www.elsevier.com/legal/elsevier-website-terms-and-conditions.
[11] *Id.,* Using Our Services.

service, unauthorized data mining, and other significant business risks.

*Amici* have developed their own AI agents to assist users in streamlining research and performing other tasks. These products are developed in a way that works seamlessly with their existing products and respect legal requirements. This is the way agentic AI should work, by integrating with the underlying platform, either through a custom-designed agent or with a trusted and licensed partner. AI agents benefit no one other than themselves when they drill through a platform's technical and legal restrictions to run without permission on a site. When properly licensed and conformed to the platform's specifications, AI tools can benefit the platform, the user and the AI provider. But unlicensed AI bots are simply the latest version of automated crawlers that website owners have long prohibited, for good reason. They deserve no special consideration merely because AI is a new technology.

## ARGUMENT

### I. Perplexity's Comet Is Not Synonymous with Its Users

Perplexity would have the Court believe that Comet is a simple tool that does nothing more than carry out the wishes of its human users and emphatically is not an unauthorized user or a robot of the sort prohibited by the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. ("CFAA").[12] In its Opposition to Amazon's Motion for Preliminary Injunction, Perplexity refers to the technology at issue as its "'Comet' AI Assistant (the 'Assistant')" and thereafter as the "Assistant". ECF No. 35 ("Opp.") at 1. This is misleading. Comet appears to be a suite of products that includes both the "Comet Assistant" and the "Comet Agent".[13] Perplexity's marketing materials for these products compares their functionality: the "Assistant" is a traditional LLM chatbot "designed primarily for **passive assistance**" while the "Agent" is a semi-autonomous actor designed to "**actively perform tasks** on your behalf" (emphasis in original).[14] This case is about the Comet Agent. Perplexity may refer to it as an assistant but it is one that is far more capable and

---

[12] Perplexity's deployment of Comet on the Amazon Store, with notice of Amazon's Terms and Conditions, is a clear violation of CFAA, as set out in Amazon's briefs and *Amici* will not address Perplexity's underlying liability further.

[13] PERPLEXITY AI, *Comet Assistant vs. Comet Agent: Understanding the Key Differences* https://www.perplexity.ai/comet/resources/articles/comet-assistant-vs-agent (last visited March 5, 2026).

[14] *Id.*

self-directed than its passive counterpart or other simple programs. Indeed, Perplexity has explained, "we place particular emphasis on the agent's ability not only to exchange information with its environment but also to actively modify it."[15] These are not the behavior characteristics of a simple program deployed by a human user like a word processing program. The Comet Agent takes over for the user in the same way a second human operator would do.

Further, as explained above, commercial website operators such as *amici* prohibit additional persons from sharing an authorized user's login credentials, even if the additional people are humans operating at the direction of the authorized user. Website owners have this right, just as the owner of any brick and mortar business has the right to restrict its premises to employees and contractors, even if an employee might want to invite a guest into the building. It is the owner of the site that has the right to set the rules; not the users of that space. E-commerce businesses set these conditions in part for security and because they do not want to lose control over the customer relationship. In its Opposition, Perplexity pitches its service as offering consumers a shopping experience "that does not include being deluged by ads." Opp. at 1. In reality, Perplexity simply wants to replace Amazon's ads with its own. Outside the setting of this litigation, Perplexity's CEO has candidly explained "we plan to use all the context [from Comet] to build a better user profile and . . . show some ads."[16] Comet's functionality and commercial aspirations made clear it cannot be treated as an avatar for the user.

## II. The Public Interest Favors an Injunction

In arguing against the preliminary injunction, Perplexity contends that the public interest factor, see *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008), weighs against an injunction because consumers should have "the choice to use the latest AI technology" Opp. at 23. But consumers do not have any entitlement to a product that infringes the rights of others. Their interest lies instead with the sound application of the law. "[C]ourts have consistently held in CFAA cases" that "the public interest weights in favor of an injunction." *Facebook, Inc. v. Power Ventures, Inc.*,

---

[15] Jeremy Yang *et al.*, *The Adoption and Usage of AI Agents: Early Evidence from Perplexity*, ARXIV:2512.07828v2 at 3 (Dec. 10, 2025), https://arxiv.org/pdf/2512.07828.

[16] Julie Wang, *Perplexity CEO says its browser will track everything users do online to sell 'hyper personalized' ads*, TECH CRUNCH (Apr. 24, 2025), https://techcrunch.com/2025/04/24/perplexity-ceo-says-its-browser-will-track-everything-users-do-online-to-sell-hyper-personalized-ads/.

252 F.Supp.3d 765, 785 (N.D. Cal. 2017); *see, e.g., Warner Bros. Ent. Inc., et al. v. WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1015 (C.D. Ca. 2011) ("the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources"); *Sammartano v. First Judicial Dist. Court, in and for Cty of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002) (public has significant interest in upholding First Amendment principles in weighing injunction) (citing cases); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F.Supp.2d 1165, 1184 (C.D. Ca. 2010) (public has the right not to be confused by infringing trademarks); *Oakley, Inc. v. Sunglass Hut Intern.*, No. 01-1065, 2001 WL 1683252 at 12 (C.D. Ca. 2001) (important public interest in favor of protecting patent rights favors injunction). Consumers also have other interests including a functioning internet environment where the websites they visit are not disrupted by bots.

Second, consumers do not comprise the only sector of the public whose interests must be considered in the context of a preliminary injunction. The public also encompasses the wider e-commerce ecosystem, including service providers like *amici*, who cannot maintain their websites when they are invaded by robots, and also depend on the consistent enforcement of their end-user license agreements.

Third, Perplexity notes that "fair competition" is a consideration in assessing the public interest but only points to its own stake in the AI market as potentially prejudiced by an injunction. This is the wrong analysis. "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defend./Blue Mtns. Biodiversity Proj. v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) (internal citation omitted). In this regard, the Court should consider the interests of other companies that have developed agentic AI tools but are willing to abide by the law. Far from Perplexity being "stuck in the pit lane while all its competitors circle the track for the duration of this litigation," Opp. at 23, it is Perplexity's competitors who should cry foul that they are willing to follow the law and abide by Amazons' terms while Perplexity flouts it.

### III.    Amazon's Request for Injunctive Relief Is Reasonable.

*Amici* take no position on the reasonableness of every component of Amazon's Proposed Order for Preliminary Injunctive Relief. ECF No. 4-7 ("Proposed Order"). At a minimum,

however, the two main provisions of Amazon's Order are appropriately tailored to preserve the status quo during the pendency of the litigation. *League of Wilderness*, 752 F.3d at 767. Specifically, Amazon's Proposed Order ¶ 2(a) would enjoin Perplexity from accessing Amazon's "protected computer systems" via an AI agent. Amazon's Proposed Order ¶ 2(b) would enjoin Perplexity from using any existing Amazon user accounts or creating new ones for the purpose of allowing its AI agents to access Amazon's "protected computer systems." (*Amici* interpret "protected computer systems" as the non-public facing portions of the Amazon Store that are curated for particular customers.) These provisions are narrowly tailored to prevent Perplexity's breach of Amazon's express Terms and Conditions concerning the unauthorized sharing of login credentials and the use of automated tools on its website. These injunctions do no more or less than require Perplexity to follow the same law and practice that all responsible web citizens must follow.

## CONCLUSION

Perplexity's use of its agentic AI product Comet does not stand in the shoes of its users. By deploying this model, on notice from Amazon that it is in breach of Amazon's end-user license agreement, Perplexity violates CFAA and should be enjoined.

Dated: March 5, 2026

Respectfully submitted,

By: */s/ Jennifer L. Pariser*
**OPPENHEIM + ZEBRAK, LLP**
Jennifer L. Pariser (*pro hac vice* pending)
461 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com

**SHADES OF GRAY LAW GROUP, P.C.**
Naomi Jane Gray
100 Shoreline Highway, Suite 386B
Mill Valley, CA 94941
(415) 746-9260
ngray@shadesofgray.law

*Attorneys for Amici Curiae RELX, Inc., LexisNexis Risk Solutions, Inc. and Elsevier, Inc.*