UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, District Judge

AMAZON.COM SERVICES, LLC,      )
                               )
            Plaintiff,         )
                               )
vs.                            )   No. C 25-09514-MMC
                               )
PERPLEXITY AI, INC.,           )
                               )
            Defendant.         )
_____)

San Francisco, California
Friday, March 6, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 9:02 - 11:09/11:25 - 12:36 = 3 HOURS 18 MINUTES

APPEARANCES:

For Plaintiff:
                        Hueston Hennigan, LLP
                        523 West Sixth Street
                        Suite 400
                        Los Angeles, California 90014
                    BY: MOEZ M. KABA, ESQ.
                    BY: CHRISTINE M. WOODIN, ESQ.
                    BY: YOUZHIHANG DENG, ESQ.

                        Hueston Hennigan, LLP
                        1 Little West 12th Street
                        3rd Floor
                        New York, New York 10014
                    BY: HAGAN SCOTTEN, ESQ.
                    BY: LISA CHEN, ESQ.

          (APPEARANCES CONTINUED ON NEXT PAGE)

For Defendant:
                                  Quinn Emanuel Trial Lawyers
                                  865 South Figueroa Street
                                  10th Floor
                                  Los Angeles, California 90017
                          BY:     DANIEL C. POSNER, ESQ.
                          BY:     JOHN B. QUINN, ESQ.

                                  Quinn Emanuel
                                  50 California Street
                                  Suite 22nd Floor
                                  San Francisco, California
                                    94111
                          BY:     MR. JONATHAN H. KIM, ESQ.

Transcribed by:                   Echo Reporting, Inc
                                  Contracted Court Reporter/
                                  Transcriber
                                  echoreporting@yahoo.com

3

Friday, March 6, 2026                                    9:02 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Now calling Civil Matter 25-9514, Amazon.com Services, LLC versus Perplexity AI, Inc.

Counsel, please approach the lectern.

THE COURT:  Okay.  Good morning.

THE CLERK:  And if you could state your appearances for your colleagues as well.

THE COURT:  All right.  Let's start with Plaintiffs.

MR. KABA:  Sure thing.  Good morning, your Honor.  Moez Kaba, Christine Woodin, Hagen Scotten, Youzhihang Deng, and --

THE COURT:  Too fast.

MR. KABA:  Okay.

THE CLERK:  And into the microphone.

THE COURT:  Mr. Scotten, and then who else have you got?

MR. KABA:  Moez Kaba.

THE COURT:  Okay.

MR. KABA:  Christine Woodin.

THE COURT:  I have that.

MR. KABA:  Hagen Scotten.

THE COURT:  We've got him.

4

MR. KABA:  Youzhihang Deng.

THE COURT:  Okay.  Some of these people are not on my list, but that's okay.

MR. KABA:  I apologize for that.

THE COURT:  All right.  So, that's the last name that's spelled --

THE CLERK:  D-E-N-G.

THE COURT:  All right.  Okay.  Thank you.

MR. KABA:  And Lisa Chen, C-H-E-N.

THE COURT:  Okay.

MR. KABA:  For Plaintiff.

THE COURT:  All right.  Is there anyone left at the -- all right.

Now for the Defense.

MR. QUINN:  Good morning, your Honor.  My name is John Quinn appearing for the Defendant Perplexity.  With me is my partner Dan Posner.

MR. POSNER:  Good morning.

MR. QUINN:  And our colleague Jonathan Kim.

MR. KIM:  Good morning, your Honor.

THE COURT:  Very good.  Good morning.  Thank you.  Welcome.

All right.  So, sit down and make yourselves comfortable for a minute.  So, we have a motion for preliminary injunctive relief.  I just wanted to mention

5

before we launch into whatever we do this morning here in court that I did receive essentially on the eve of the hearing this morning a motion for leave to file an amicus brief by a company called Relex, Inc. (phonetic).  They indicated that I believe there was no objection by the Plaintiff, but once by the Defendant.

Is that correct?

MR. POSNER:  Yes.  This is Mr. Posner.  Yes -- I'm not sure if this is on.  Yes, we do have an objection based on timeliness.  The brief was obviously filed the day before this hearing, which --

THE COURT:  Right.

MR. POSNER:  -- we believe is untimely really under any standard.  We haven't had a full opportunity to digest it, certainly no opportunity to respond to it.  So, we would request that it not be considered in the record.

THE COURT:  Well, I am essentially leaning toward denying the motion at least for purposes of this hearing. If I were to grant the motion before the hearing, then we're looking at whoever was posing the position taken in the amicus brief, needing time to respond to it.  The hearing will go over.  Everybody is -- maybe not in full, but it would go over for any opportunity to respond.  Everybody was ready to go forward today essentially and have their positions stated without having to deal with this other

6

argument.

So, at least as of this time, I'm not granting it, and I think I'd probably just deny it in general because if I can, I'd like to give you some kind of tentative or even a ruling today if possible because you've spent an awful lot of time on this already.

So, at the moment, I'm just going to put it aside.  We did have an earlier request for an amicus brief, and I have granted that particular motion.

Interesting, though, it did cite a case that said, yes, you could grant it even though on the eve of trial essentially, but that's for that judge, not for us here.

Okay.

MR. POSNER:  Thank you, your Honor.

THE COURT:  All right.  So, then let's I guess get into -- and I have a pretty good idea of what's going on here, although I'm not at all really technologically sophisticated.  So, I tried to put whatever's going on here into essentially more, I don't know, anthropomorphic truth perhaps or something where I could just simplify it a bit and, as I understand it on Amazon, if somebody has an account and they want the Defendant, their AI agent -- and I guess is there a dispute over whether one could call in a bot?  Can you call in a bot or only an AI agent?  It's shorter to say bot, but I can say AI agent if you want me

7

to.

UNIDENTIFIED SPEAKER:  I'm not sure about bot, your Honor.  We refer to it as an AI agent.

THE COURT:  I know.

(Portion of proceedings missing.)

MS. CHEN:  Yes, it is now.

THE COURT:  All right.  Well, occasionally when there's not going to be an AI agent, Mr. Posner, the account holder.  He says, I'm more like you, drop in and help me and pick out something nice to wear, whatever and give me some instructions, and I come in, and I intentionally pretend I'm (indiscernible), and I do (indiscernible.)  I'm well aware of the way I do, and he's giving me instructions.  He wants to impress -- or he wants something.  I'm not sure what kind of instructions he may give me, but it's going to save him time.

All right.  So, I'm going to do whatever I'm doing or whatever I do, and I have while I'm there heard pretty much whatever he can observe on the screen, and I'm not sure if I get any other information, but I get information off the website that he's using and he's using what is the Plaintiff's website.

So, you end up with essentially me dropping by looking in this website.  Now, they prefer to tell me how to shop. They're a business.  This isn't a charitable organization.

8

And I say, no, we want to sell you (indiscernible).  We don't want Judge Chesney coming in here and picking things out for you.  You can pick your own things out.  Thank you very much.

So, that's kind of where we are as I understand it putting it in very very simple non-technological terms.  And then we have a couple of statutes, the federal statute and the state statute, and the cases haven't really helped us a lot on some of these issues.  And even if I were to find, for example, which I'm kind of inclined to do since I was giving the Defendants to make probably the first argument on this if you have -- whether or not there's been a violation of 103502.

Instead he had some loss.  He had a flurry of cases all following in terms of time but not necessarily the holding the Van Buren case, when he was in court, where what appears to be dicta (indiscernible) narrow definition of loss that doesn't appear to apply here.  However, and then we have the Ninth Circuit and dicta stating that that is a requirement, that essentially -- and then we have other courts going contrary to whatever the Ninth Circuit said is dicta -- about the dicta in the Supreme Court.  We have Judge Spero, apparently he reached a decision.  Also, the 10th Circuit recently came down more in accord with what Judge Spero found.

9

We have Judge Breyer, the Supreme Court opinion, as requiring some kind of (indiscernible) to the computer. Maybe some other cases, but then they are pretty recent.

So, we have to make some determination in that regard that also the question about where that (indiscernible) because nobody (indiscernible) in those cases.

So, anyway, that's sort of a preview of my (indiscernible). All right. And I'm not sure where we are as far as I had some of my advance information from (indiscernible) from Ms. Gardner (indiscernible).

I think it was Plaintiff's counsel that had a PowerPoint, is that correct? So, you know, you did not have a chance to play that in some way. So, if you would like to do that, that's fine.

I've kind of given everyone an idea of just where I'm leaning and where I see the main -- main issues to be. So, maybe we'll start with Plaintiff's counsel because it's their motion. Okay.

MR. KABA: Thank you very much, your Honor.

THE COURT: All right. And I'd just ask that each counsel, when they come up to the mic, to -- to state your appearance because, again, we just have a recording.

I'm now being handed something called (indiscernible) -- motion for preliminary injunction and a bunch of slides. Was this given to Defense counsel?

10

MR. KABA:  Yes, we -- we handed the slides.  Then they -- they also have slide decks which they may or may not use.  We also -- they gave that to us as well.

THE COURT:  Okay.  Good.

MR. KABA:  Your Honor, I'm sorry.  Moez Kaba for Plaintiff Amazon.

Your Honor, I have a lengthy deck.  I don't actually want to go through all of it.  Instead, I wanted to -- the Court with issues that the Court, quite frankly, are familiar with at this point.  A lot of papers have been filed.

What I would like to do, though, is just focus on a few key aspects of the Court's remarks and -- and really make sure we are clear on what Amazon is seeking in this case.

THE COURT:  Okay.

MR. KABA:  We are asking the Court to resolve a question we submit the law actually has already answered. When it comes to Perplexity has been told in writing unambiguously and repeatedly, that it is not authorized to access another company, here Amazon, password protected system, and it continues to access them anyway, does the law provide a remedy.

We believe the answer under the federal statutes, the FAA, the California statute, CEAFA, and this Circuit's

11

controlling, is yes.  The answer does not change because the unauthorized accessor, in your metaphor, you, Judge, is an AI company or because it convened some customer to use its product or even if it thinks I'm actually helping the customer do it.

And we think -- consider what Perplexity is actually asking this Court to hold.  Here is an entire ecosystem of password protected systems on the Internet, your Honor, shopping websites, Facebook profiles, legal services companies like Lexus, Netflix, to bank accounts.  Every one of those companies is entitled under established Federal and California law to control who can access the private information sitting behind their login wall.

Perplexity advocates a rule that none of those restrictions should matter because it, as an agent, may go where it wishes, take what it finds, and disregard the restrictions website owners place on it.  Perplexity's claim really boils down to a user's consent is a master key.  It unlocks any password protected system on the Internet regardless of what the system's owner has said.  That is not the law of the Ninth Circuit.  That is not the law of California.  No case supports that when checked, nor should this Court.

By contrast our request is narrow, and it is grounded in the law.  The CEAFA prohibits intentionally accessing a

12

password protected system without authorization. California's CEAFA is broader than that even, and it prohibits accessing a computer system.

Amazon has told Perplexity, you may not access our password protected systems.  We would like you to stop. That was the injunction, your Honor.  It is not -- it is not an injunction or a prohibition on visiting public web pages on Amazon.

THE COURT:  I understand that.  I can't remember if you used the bank example or that's just something that came to mind, that a person was maybe walking in a bank, and that was fine, and let's say somebody's got a safe deposit box and it's in a separate room and they say, here I am again, where should we go to the safe deposit box, and the bank essentially took that safe deposit box (indiscernible) on what we know.

MR. KABA:  Right.

THE COURT:  You're not going and for whatever reason, okay, I'll leave the bank and --

MR. KABA:  Yes, it did.

THE COURT:  Maybe I don't.  Maybe I find somebody who's an insider with a key, an actual (indiscernible) out of there, which would -- the safe deposit box I would assume.  That's not happening here, but anyway.

MR. KABA:  You're right.  That -- I didn't -- the

13

other one I sort of was toying with, your Honor, is important, I mean, was the public allowed to be there.  But mostly we have to show ID when we walk in, but, you know it's open to the public.

But in order to go back to your Honor's chambers, that person has to be authorized.  Now, your clerk may be authorized.  Your clerk may have a keycard.  Your clerk may have (indiscernible) that, Hey, would you run to the back and grab something for me?  Even hand the front the keycard. That doesn't mean the front is allowed to go back there. The Court didn't authorize that.  That's another sort of less bot (indiscernible) metaphor that we were using.

THE COURT:  Right.  So, let's just say for a moment that whoever the friend is who got the keycard to go back to chambers says -- they go back there and they get whatever they get.  They (indiscernible), and they think, Gee, I had no idea that I couldn't.  I thought that (indiscernible) knew what he was talking about.  He gave me the keycard and okay.  But then if it's made clear to the person and you say you have in your letter.  I don't think there's any dispute about clarity of the letter.  We've talked about that, but if anybody was under the impression that it was okay, as long as the account holder said it was okay, then Amazon made an effort to tell the alleged intruder that they were intruding and (indiscernible) as far

14

as Amazon is concerned.

So, okay.  You've covered all that.

MR. KABA:  Yeah.  And, so, that -- and that's really what's happening (indiscernible) that if you've got (indiscernible).  We said in our letter.  They acknowledge it in their public statement.  We filed this lawsuit.

So, now the answer, your Honor, we could -- it sounded like you have a couple of really sort of core questions on -- on the merits.  One of them was the law question.

THE COURT:  Yes.

MR. KABA:  So, I think we have to go, one, just what is the loss here.  I think the statute is helpful.  The statute defines loss to include all sort -- all sorts of loss, and I think that's where the Court has to start, as many District Courts in this case have started.

But I think you can also go to Power Ventures (phonetic), your Honor, which is a Ninth Circuit decision from 2015.  It is a pre Injurin (phonetic) decision, I acknowledge, but it has not ever been overruled by the Ninth Circuit.

So, when you start with the text of the statute, 1030(e)(11), loss is defined to include the reasonable cost to any victim, including the cost of responding to an event, conducting a damage assessment, and restoring the data, program, system or information --

15

THE COURT:  (Indiscernible.)

MR. KABA:  -- to a condition.

THE COURT:  All right.

MR. KABA:  And in Power Venture, the Ninth Circuit says, again, undisturbed, that the loss includes the -- this language, and the Ninth Circuit considered sufficient loss in that case the cost to investigate and respond to Power Venture's essentially trespass onto Facebook password protected places.

So, we think the Ninth Circuit has actually at least currently binding, not a dicta or dicta on dicta, considered investigative and responsive cost to be sufficient for their -- for their statute.

We've also cited -- and I know your Honor's familiar with it because you just cited back to me a bunch of these cases on courts in this District overwhelmingly considering investigative and other responsive costs to qualify as losses.  We said that the case, the Apple v. NCO, case, the case -- it's all cited in our reply.

THE COURT:  So, (indiscernible) question, you have to concede how (indiscernible), the Ninth Circuit making the comment it does, which are called the dicta that (indiscernible), and basically said, well -- and I have a footnote to confuse everybody -- Van Buren reviewed the statutory admission of "damage" and "loss" and concluded

16

that this civil remedies provision requires a showing of "technological harm" such as the corruption of files of the type of unauthorized users caused the computer system to make as far as internal (indiscernible).

But, again, here we've got an interesting situation because they (indiscernible) --

MR. KABA:  They weren't.

THE COURT:  -- that we have here.  They were looking at someone going beyond authorization, and they have a page that they essentially thought that confounded that -- in violation of a criminal statute that everybody pretty much uses a computer or goes on the web would be in violation and (indiscernible) trying to show what the statute was more likely to be covering, they then gave a rather narrow definition.  Now, whether they did that simply to make a  point of having, say, looked at the Ninth Circuit (indiscernible), actually saying this is what's required, which is kind of an interesting point.  It's not binding in the moment.  If one is concerned about what way the Supreme Court is going, then one would say, Gee, it looks like the majority of them are all -- the majority of them were thinking that it's a very narrow definition that -- it's certainly narrower than the -- than the language that is in the law section, 1030, which doesn't go that far.

The Ninth Circuit in making their comment in

17

(indiscernible) thought about (indiscernible) or maybe just didn't think it was important at that point.  They certainly didn't need to address the issue as a (indiscernible) matter in a case.  They already had been cited matters in the case on other issues.

But they just left us here with that, and certainly leaves the Court this question because keep in mind I'm not deciding today whether the Plaintiff wins the case or not.

MR. KABA:  Of course.

THE COURT:  I'm only here to decide whether they have a likelihood to prevail, and then the (indiscernible) the likelihood (indiscernible) go to the Supreme Court.  It's going to find that they've been damaged, and then they'll take the loss (indiscernible) -- whether these losses as asserted would then be (indiscernible) amounts of the losses and where is the Ninth Circuit going to -- and in any event, so, that's one question.

But even if we could just get past this, if we do, we still have (indiscernible).

MR. KABA:  But that's exactly right, your Honor, because I -- your Honor sort of laid out the land better -- better than I could.  You're right.  I mean, in Power Ventures, again, (indiscernible) doesn't cite, Power Ventures court says, yes, you investigated and responded to these.  (Indiscernible.)  We haven't (indiscernible).

18

THE COURT:  Well, let me add a little bit because it -- I have done this before.  So, for whatever reason, they can get a (indiscernible).

MR. KABA:  Yes.

THE COURT:  And If there was one sitting in the chair here, they would be telling you slow down, and I didn't have to say anything.  The recorder doesn't care, but if you want me to really follow your argument, you have to slow down a little bit.  Okay.

MR. KABA:  Certainly, your Honor.

THE COURT:  All right.  Thank you.

MR. KABA:  So, as -- as you already pointed out, the -- the sort of trail of what our loss is goes from the statute to the kind of reference in Van Buren, the -- not analyzed for the reason you've just described, because that would have taken someone who had authorization, and the argument was that you'd use it in the wrong way.  To hiQ (phonetic), which doesn't deal with password protected spaces at all and the ability to have to address the loss question.

But we go back to Power Ventures when the Ninth Circuit "new the (indiscernible) cost to be sufficient to get over the $5,000 threshold.  And, as you are saying, your Honor, here we are not on a definitive at the end of the case do we win.  It's the likelihood of success and is there enough

19

here to give us -- to give the Court comfort that there are losses that exceed this threshold.

I would say under any view of losses, we will exceed the threshold.  We have put in a declaration from Mr. Fernandes at paragraph 21 saying even as of the date of the declaration, we had exceeded the $5,000 threshold 50X.  And some of it is to investigate.  But, your Honor, there are also other harms to the accounts that were responded to for which there were (indiscernible).

So, even if you don't consider the investigative responsive call on their own email, we have to restore accounts that got blocked because we believed they were using the Agent AI, in violation of our rules.  We have to --

THE COURT:  So, is that my fault that the AI Agent that you decided to do that?

MR. KABA:  Well, your Honor --

THE COURT:  It's not my idea.

MR. KABA:  Well, if you break into my home, is it really your fault that I have to put up a window again?  Yes, I would say so.  So --

THE COURT:  Well, no.  This isn't really broken, all right.  This is entered, and I came in, and I looked around, and I said okay there's something really here that I want to take.  I checked out your TV.  It's not new enough,

20

I checked out your stereo, I went through other things and then I left, all right, didn't really take anything with me. I learned a lot while I was there.  Maybe I can picture the -- kind of off somewhere so that I can remember to come back at a later time or what have you, but I haven't been terribly impressed with my being at fault for you deciding that you were going to close out the account.  So, maybe you could clarify, but I read that more or less as -- well, let me ask you.  Why did you close down the account?  That's (indiscernible) because you wanted to shop and you deleted something (indiscernible)?

MR. KABA:  Because based on our detection, your Honor, it didn't appear that it was Mr. Posner.  It appeared that it was somebody who was not authorized based on the way that you as the agent are clicking through pages or scanning information --

THE COURT:  Okay.  You were protecting Mr. Posner from unauthorized intruders?

MR. KABA:  We were -- and we were protecting the integrity of our passwords protected system from unauthorized intruders.

THE COURT:  If you closed him out, you would close me out?

MR. KABA:  Correct.  And that's what you try to do

21

when you put up a lock.  You -- you say that's not being used properly.  Someone is accessing or a bot or, I'm sorry, an agent or someone else is accessing this account without authorization.  We're going to block it.  Then we find out, Oh, it was him.  I used this agent.  I want my account back. Then we have to restore it back.  And that's another form of loss that goes beyond just the investigative cost and response cost here, your Honor.

THE COURT:  What was the loss then that Amazon incurred by (indiscernible) or locking Mr. Posner out of his account?

MR. KABA:  Well, it was -- the -- the loss was having to restore the account.  So, the amount of engineering time and response time.

THE COURT:  Okay.

MR. KABA:  That's what's captured in the declaration.

THE COURT:  All right.  Now, I will say that I wanted to take a look at whether you're using in-house people who are salaried in some way and you said to them, okay, go do this other job, that other job you usually do, and that your balance sheet at the end of the year may not look any different.  You didn't hire outside people, third parties to come in, what have you.  And I could see some law that said that that -- if your own people are spending time

22

doing something that is different than what their regular job was or that the -- or assigning them to (indiscernible), that that would count.

So, I guess that's okay, but it gave me pause for a minute because ordinarily people are saying (indiscernible) this, and in this instance you didn't put your own people and said go over there and figure it out. So, okay. Keep going.

MR. KABA: That's -- that's correct, your Honor. And I -- I would say that the Fernandes declaration explained at least to that point what the losses were, what the costs were, and the amount of money that Amazon had already spent we believe is cognizable under -- I have the declaration up on the screen if your Honor would like to look at it, but it goes into some detail about it's investigating, it's monitoring, it's remediating the effect of the -- its unauthorized activity.

UNIDENTIFIED SPEAKER: But, your Honor, I think --

THE COURT: Stop for a minute.

MR. KABA: Certainly.

THE COURT: It's very interesting. My understanding if we -- I see people here in court that flip these monitors in such a way that I have to turn them all the way around to see what you're seeing, and then I can see it on the screen that it had been moved frankly, because if

23

it's close enough on the screen that is closest to you, not the one that's farthest from you.  Apparently, if it has to go on the -- someone has to flip everything back again, but it wasn't doing that before.  So, okay.

There are a couple of losses you're incurring that I wasn't terribly impressed with.  And, so, just to let the Defendants know, one was the cyber security issue which there may well be a triable issue as to whether or not one of the informations is acquired and sent somewhere that isn't subject to having in a way that otherwise would be.  That seems like a triable issue but not necessarily one in which you're likely to prevail on, but you'll want a declaration on that particular point.  And I'm trying to think the types of cyber security, I have to double check with some of the others, but the idea of going in and trying to figure out what happened, who was there, was there any damage, et cetera at least in the past have been not to the loss under Section 1030 even.  I guess just for the record, I should -- so, 15 U.S.C. Section 1030, and we're looking primarily at (a) and then as well as Section (g), and then also when I mention 502, that's the California Penal Code and originally I think, I'm sorry, you're not a district attorney.  How can you be bringing anything under the California Penal Code.  I don't know why the legislature was so lazy that they couldn't simply put civil claims in the

24

Civil Code and leave the Penal Code to everybody who practices criminal law in the Federal Court.  But, anyway, they didn't.  They I guess -- to the state, and, so, there you are in the Penal Code.

MR. KABA:  Yes.

THE COURT:  Which doesn't happen very often.

MR. KABA:  Yeah.  And then with the California system, there are often civil causes of action buried as well in the Penal Code, and I think, as the Court has seen, there are cases here in Federal Court that assert claims under 502.3 of the California Penal Code, and because your Honor asked about that additional section, 502(e) authorizes a civil action by any owner of a computer system who suffers damage or loss from a violation.  It does not have a -- a minimum dollar threshold.  It does not limit it in any way.  There's no case law that says that it is -- some losses are cognizable and others are not.

And, so, I think the -- and -- and if we're talking -- frankly, he didn't even respond on this -- on the issue in his opposition which we would submit concedes the -- the point.  Our -- our view is we've satisfied the loss threshold for purposes of the PI under 1030 -- 18 U.S.C. 1030(e)(11), but even if there was a question about that, the CDA that they claim under 502(c) and 502(e) of the California Penal Code puts that question to rest because

25

there is at least some loss here.  There is at least some harm here.

And, so, I think that should address any question that the Court has really on loss for purposes at least of -- of issuing the preliminary injunction.  I --

THE COURT:  Let me stop you for a minute.  Can I see the clerk up here.

THE CLERK:  Yes, your Honor.

(Pause.)

THE COURT:  All right.  So, we have pretty much covered --

MR. KABA:  Yeah.

THE COURT:  -- whether there's a showing of wrongdoing and there's other initial loss.  There were, of course, other issues.  If one is going to seek preliminary injunction with.  Otherwise what I was talking about injury or damage, of course then you have the statute for that standing under the statute, and then you need to be able to make a showing of irreparable injury for purposes of injunctive relief that caused (indiscernible) -- that if I'm going to grant your motion, you have to show that you would be -- not you personally.  I'm sorry -- that your client would be irreparably injured if they don't get this relief and -- and that would be any way that's not compensable just at the end of the day with damages.

26

So, you have that showing that you have to make, and then we can get to the hardships in terms of (indiscernible), and then, lastly, whether the public's interest, as the Defendant's arguing, essentially, well the public, Mr. Posner and anybody else who actually (indiscernible).

So, I guess maybe you should take those up also at this time just --

MR. KABA:  Yes.  I understand.  And, with the Court's permission, my -- my partner, Mr. Scotten, is going to address the other three factors.  I just wanted to make sure that if the Court had any more questions on the -- the merits.

THE COURT:  Yes, but then I'm not sure what (indiscernible) is going to take to --

MR. KABA:  Understood.

THE COURT:  -- raise something that gives me some pause again, and I may have to have you back up here.

MR. KABA:  I understand.

THE COURT:  All right.

MR. KABA:  So, why don't I shift to Mr. Scotten, to address the other factors, and then I'll be back insofar as if there are any further questions on the merits, your Honor.

THE COURT:  Great.

27

MR. SCOTTEN:  Thank you, your Honor.

(Pause.)

MR. SCOTTEN:  So, again, Hagen Scotten, your Honor.  Thank you very much.

THE COURT:  Yes.

MR. SCOTTEN:  I will be pretty brief here.  I don't think that Perplexity has cited to a single case where a court found violation of the CFA or CEAFA and didn't also find the other factors satisfied.  I'll go through them pretty quickly.

I'm going to flip through my slides to help me remember, but I (indiscernible) for them, have to go through it.

THE COURT:  So, I asked the court reporter.  She did say she could (indiscernible).  I'm not sure what (indiscernible), and I didn't have anything go down.  So, she took the time to try and put this together.  I'll just slide back a bit --

MR. SCOTTEN:  Sure.

THE COURT:  -- and try and look at your slides if you want me to and view or however.

MR. SCOTTEN:  Your Honor, I'm comfortable just us talking.  And if there's a quote I want you to see, I'll suggest you turn to your screen, your Honor.

THE COURT:  Okay.  Thanks.

28

MR. SCOTTEN:  So, irreparable harm where I'll spend most of my time, we've identified three phases of irreparable harm.  Each one is sufficient.  They are unauthorized access to controlled computer systems, damage to our customer relationships and goodwill, and then security risks.

THE COURT:  Okay.  The goodwill is the third one I mentioned.  I couldn't quite -- I didn't quite see if somebody was unhappy with their shopping experience as overseen by me, the AI Agent as opposed to Amazon itself, then why wouldn't they just get mad at me, even though I'm free at this point, but, otherwise it was not (indiscernible) for me.  So, why wouldn't you just say, Ah, we're not going to use the check me or AI Agent anymore because, you know, it didn't do a very good job, and I'm just going back to Amazon?  Why would they get mad at you?

MR. SCOTTEN:  Well, because, essentially, your Honor, they very may not know who to blame, right.  If -- if Mr. Posner said, Judge Chesney, please go to Face -- to Amazon and buy me some towels, and the towels take too long to get there, they're overpriced, they're not the best towels, Mr. Posner doesn't know that Judge Chesney's a bad shopper versus Amazon's a bad store.  And, so, next time, just as likely to, Judge Chesney, you seem like a great shopper, but Amazon is terrible.  Go -- go shopping at

29

Target.  Go shopping at the whole Net.  I don't trust Amazon like I used to where I always got the best products the fastest.

And, you know, in one individual case, just you and Mr. Posner, your Honor, who knows how that goes.  Would it have cost millions of users?  There's a significant impact on goodwill reputation.

THE COURT:  Has that happened either immediately in this particular case or based on some prior experience at either Amazon or some similarly situated to the current facts here at this hearing or is it just a few?

MR. SCOTTEN:  I would think it's a -- it's a reasonable -- we put in two sworn declarations explaining how this works, but the simple answer, of course, is, your Honor, we don't know because Perplexity refused to be transparent.  We don't know when -- when a customer doesn't come back, they just don't come back.  We don't even know if they used Comment, much less why, which really gets to why this is a class of irreparable harm.  You can't quantify it because we don't know who's coming and who's going.

THE COURT:  Fair enough.  I'm not going to try to find a way that the AI Agent, because if I don't use their (indiscernible), because apparently (indiscernible).

MR. SCOTTEN:  Well, they're controlling access to their (indiscernible) I guess.

30

I would also suggest, your Honor, there's a good reason the cases don't usually get to this, Power Ventures or (indiscernible).  They stop at my first factor, which is unauthorized access to private password secured areas which are privately controlled is alone a sufficient irreparable harm.

THE COURT:  Yes.  They have seen that they have a liability and the act that creates liabilities -- well, not liabilities, the act that constitutes a violation can also be a dual role in the essential -- the harm.  In other words, if I don't stop it they'll keep coming by, well, then you can analogize it a little bit to address (indiscernible).  So, let's say somebody owns a piece of property, they don't live there or anything, and that would be a privacy interest.  It's open land, and they own it and they test it off and asserts that, you know, trespassers (indiscernible) trespassers will be shot, (indiscernible) -- but, anyway, just no trespasses and then -- and say somebody drops by and comes in, climbs over the fence and I've told them repeatedly please stay out, this is private property, and they don't, they get (indiscernible), they get an injunction to stop from going on my property, and the trespasser can say, I'm not doing anything really (indiscernible).  I've got a view of the ocean or I've (indiscernible), but, nonetheless, I think is probably

31

entitled to.  So, I guess that's kind of what this law (indiscernible).

MR. SCOTTEN:  I think that's right, your Honor.  I think you can see at page 20 of our opposition, Perplexity doesn't contest this rule.  Their answer here is, you know, we're not doing it.  It's a merit defense.  But I don't actually think there's a real legal dispute that if we make out violations which I think are pretty clear for the reasons just discussed, that irreparable harm follows.

And I mentioned the goodwill.  So, I'll just mention the third category briefly, which is risk, the danger posed by Perplexity.  And this is an area where there's a dispute, that you Honor need not reach because the first two factors are so clear, but I do think we have much better the argument, and we've put in two declarations from -- from Professor Evans, an expert here.  And they contested the first one.  We put in a rebuttal declaration that explained in great detail the particular vulnerabilities of (indiscernible).  Essentially, it's such a powerful tool that could go anywhere and look at anything and responsible -- responsible parties do not design a router to be that powerful so it can access all the stuff and see all these things, and that is what makes it so dangerous.  The case law here is also clear.  I think we cited the very recent WhatsApp decision from this District finding that security

32

risk for a business that's on the Internet, as both WhatsApp and Amazon are, are going to be harmed. And Dr. Evans' work here is buttressed by several studies done by other (indiscernible). It's found specific vulnerabilities, and Perplexity says, well, we attached those, but that's a little -- it's sort of like closing the barn door after the horse bolted. Of course, the horse didn't bolt through it, but that's only because their industry partners told them, Hey, your barn door's open, before the -- the horse got out.

So, I think we have incredibly well grounded set of risks, and I think the (indiscernible) brief, the one your Honor didn't check, the older one, also does a good job explaining why risks with AI agents can be greater magnitude because it's not just you shopping for Mr. Posner, your Honor. You're -- you're shopping for thousands and hundreds of thousands of people. And, so, if something is going wrong, it's going to be replicated at great scale. So, I think we also make it out on that ground. So, irreparable harm I think is pretty easy. (Indiscernible) on the merits. I'll take the other two factors quickly.

Similar -- slow down, yes, your Honor. Thank you.

THE COURT: If you wanted to cite me to where you think you've made the strongest showing on the security (indiscernible) to -- now, you were citing to Fernandes declarations or a different one?

33

MR. SCOTTEN:  More recent, Evans declaration.

THE COURT:  Oh, Evans.

MR. SCOTTEN:  So, here, your Honor --

THE COURT:  Wait.

MR. SCOTTEN:  Sorry.

THE COURT:  Get it out of the pile, all right. (Indiscernible) declarations -- okay.  Some of them were (indiscernible), declarations filed by -- if the Court is going to potentially -- surreply -- (indiscernible) reply all get into the things that you say (indiscernible).

MR. SCOTTEN:  Sure.  So, here's --

THE COURT:  Could you wait one second?

MR. SCOTTEN:  Yes, your Honor.  Of course.

THE COURT:  Thank you.

Now, here is the problem I'm having.  What I think is the original Evans, which was filed quite sometime ago in November --

UNIDENTIFIED SPEAKER:  That's right, your Honor.

THE COURT:  Then I'm trying -- and I'm sure I had it here somewhere.  I don't want to take too too much time on that, but I thought I'd just have you point me to where there -- that particular matter is raised, and let me find -- I don't know that I have that.  I should, but --

MS. CHEN:  Your Honor, Plaintiff has a copy.

THE COURT:  Well, that's fine, but I want to see

34

if also I could find it.  I also want to suggest to Plaintiffs that any time you file a brief in connection with a matter that's going to be heard, you put the hearing date and time on it, okay.  Right now I mostly just have a lot of things that I have to figure out.  Give me a second, and I may take this also -- just a minute.

I thought I had everything until -- it concerns me here.

(Pause.)

THE COURT:  Okay.

MR. SCOTTEN:  Yes, your Honor.  And I apologize for interrupting the Court's search before.  What I was going to suggest, your Honor, the conclusion is also on your Honor's screen.  That is one area where I thought the PowerPoint might actually be helpful.

THE COURT:  All right.  I may pop back and look at that because the -- (indiscernible) stuff, of course, is mostly attached?

MR. SCOTTEN:  That's right, your Honor.

THE COURT:  Give me a second.

(Pause.)

THE COURT:  Well, that's a little bombastic.

MR. SCOTTEN:  Well, it's -- It is just included as paragraph 39, and, actually, I think your Honor's -- that sort of gets to the point your Honor's talking about, the

back and forth rounds here.

So, we put on -- in Dr. Evans' additional declaration. Perplexity contested it.  We put in this rebuttal declaration your Honor has now, which has 38 paragraphs leading to the conclusion that Perplexity is quite dangerous.  Perplexity, of course, did not like that.  So, as your Honor pointed out, they put in what amounted to a surreply.  But the surreply did not contest these points. It was essentially about other issues such as whether the second time we blocked them, they really knew we were blocking them.

Dr. Evans' detailed explanation of why AI is particularly dangerous is essentially at this point unrebutted, and I take your Honor's point you want facts.  I don't want to belabor the facts, but I'm happy to walk through sort of the -- the basic principles here.

THE COURT:  Well, let's just say (indiscernible) something, so now you don't have it.  So, I was endeavoring to take a quick look at what preceded the conclusory remarks that are on the screen, just to see if I'm missing something from before or I missed something before.

(Pause.)

THE COURT:  All right.  What he is saying is that the response by Perplexity to what Plaintiff pointed out did not address certain risks that he felt were particularly

36

important, in other words, what he's saying, rather than some of the problems, but you haven't -- you haven't said (indiscernible).

Now, what is it that he is saying specifically they didn't address that remains outstanding as his allegation of what was wrong?

MR. SCOTTEN:  I think --

THE COURT:  And let me hand this back.

MR. SCOTTEN:  Thank you, your Honor.

THE COURT:  Okay.

MR. SCOTTEN:  And I think it is -- it is more than what Dr. Evans was saying is there is a systemic category, nature of risk, that they have not remedied at all.  They sort of patched specific holes in the dike, but the dike as a whole is incredibly weak and likely to break.

One of the basic problems is computer scientists who specialize in security have this thing called Rule of Two. There are three possible broad categories of capability that one could give a tool like Comet.  They could give it the ability to search the Internet, which means icking information from everyone, makes it very vulnerable to bad information getting in there.  They can give it the ability to access personal information, things like browsing history, shopping history on Amazon, your address, which is dangerous in a different way because those are things people

37

don't protect, and they can give it the ability to do things like buy stuff on Amazon, what computer scientists call changed states, actually make things happen.

And Dr. Evans has in what is unrebutted testimony explained that responsible programs only have two out of those three things.  That's the Rule of Two.  Don't give it all three capabilities.

Perplexity chose to give the Common AI Agent all three capabilities.  They made it powerful, and as -- as he said and his language was (indiscernible) too dramatic, flashy, that it was powerful.  Wow, this is a great sports car.  It can do all kinds of amazing things.  But that makes it dangerous.

THE COURT:  Okay.  What do you think (indiscernible)?

MR. SCOTTEN:  Essentially, the ability to take in information from anywhere, so, you can browse the Internet. It's undisputed, Comet's browser.

THE COURT:  Yes.

MR. SCOTTEN:  Which -- which has a vulnerability aspect because it means you can pull in bad code from anywhere.

THE COURT:  Without describing why it's important, if you just wanted to list some --

MR. SCOTTEN:  Sure.

38

THE COURT:  -- and outline one, two, three.

MR. SCOTTEN:  Sure.

THE COURT:  What's one?

MR. SCOTTEN:  One, broad access to data.

THE COURT:  Okay.  What's two then?

MR. SCOTTEN:  Two, access to personal data.  So, narrow but dangerous.  One is wide, public data.  Two is narrow, private data, things like -- so, Google can search the Internet, but it can't just look at your bank account, for example.  So, two is access to personal or private data.

THE COURT:  Right.  So, broad doesn't encompass two?

MR. SCOTTEN:  Correct.  Broad in the sense of can scroll the whole Internet.  So, a lot of these risks --

THE COURT:  Yes.

MR. SCOTTEN:  I won't tell you what the (indiscernible) that's right, sorry, your Honor.

THE COURT:  All right.  You can scroll the whole Internet but not what?  Because, two, is the what?

MR. SCOTTEN:  Two is the stuff that is personal, private, passwords.

THE COURT:  All right.  Password protected, let's say.  So, broad is just some kind of public broad is what you're saying?

MR. SCOTTEN:  Like the Internet, for example, your

39

Honor.  Anything browser, if look at the Internet like Google Net.

THE COURT:  Okay.  But, as I understand it, if you were doing the outline, it wouldn't be broad as one or let's say broad, Roman I and access to password protected or private information would be (a).  It would be Roman II.

MR. SCOTTEN:  That is right, your Honor.

THE COURT:  Okay.  Keep going.

MR. SCOTTEN:  And then Roman III is the ability -- and Professor Evans is in the back of the courtroom.  He's probably cringing at my lay explanations but is the ability to do things.

THE COURT:  All right.

MR. SCOTTEN:  He is the security expert whose declaration --

THE COURT:  No, no.  Where is he in the courtroom?  I want to see if he is cringing.  So far, no.

MR. SCOTTEN:  Good.  It's the ability to do things.  Your Honor can imagine that if you had one and two, so, you're looking at all this information, maybe you're still not dangerous because you're not doing anything with it, but Comet can be dangerous, because it's an agent, can go shopping, which is why we're here in front of your Honor.

So, what Professor Evans --

THE COURT:  Okay.  Three is you don't just get it

40

and kind of hang out there, but you then start doing things, very much like Mr. Posner could do -- if he wanted to take the time to do it himself and he's a busy lawyer.  He doesn't have time to shop for himself.  Okay.

MR. SCOTTEN:  Right.  Mr. Posner, to be clear, has all three of these capabilities.  People have these capabilities.  Responsible design does not trust Comet, does not trust an AI Agent with all three of these capabilities, and that's the systemic and unaggressive issue --

THE COURT:  Okay.

MR. SCOTTEN:  -- identified.

THE COURT:  Why don't I -- cyber security question.  How am I different when I'm shopping as Mr. Posner than Mr. Posner is?  In other words, why was he doing -- if he just did it himself, would not create the cyber security concern, right?  Amazon has whatever protections in place that would deal with his shopping.  Is that right?

MR. SCOTTEN:  Correct.

THE COURT:  All right.  But then he turns it over to me.  What do I do differently as him that he isn't doing that creates the cyber security difference?

MR. SCOTTEN:  So -- so, two things, your Honor.  One -- and this is what I was getting at from the amicus brief -- your Honor can operate at scale.  You can do a billion things at once.  You can -- you -- if Mr. Posner

41

makes a mistake, he makes one mistake.  If your Honor -- not your actual Honor, but if the agent makes a mistake, you can replicate a million times over because you operate at scale.

THE COURT:  What's the mistake?

MR. SCOTTEN:  Transferring too much data back to Perplexity, reading code on the Internet that tells you to do malicious things, which would be actual vulnerability if it were detected in -- repeatedly by Perplexity's competitors.

THE COURT:  Well, let me get back to that for a minute.  Just assume he's not using it.  He's just doing whatever he's doing.  Is he making any mistakes then that you would be able to articulate?  He's just a shopper with an account.

MR. SCOTTEN:  Amazon shoppers, like all people, can make mistakes.

THE COURT:  Yeah, what -- what would be an example then of a mistake that the account holder could make? Anything they do is what Amazon lets them do, isn't it?

MR. SCOTTEN:  They could fall for a scam.  The --

THE COURT:  Hmm?

MR. SCOTTEN:  Fall for a scam, and that happens, and that's a risk you have to accept when you deal with people.

THE COURT:  Well, is that on the -- the Web

42

itself, on Amazon?  Wouldn't that be somebody else's fake Amazon or something like that?

MR. SCOTTEN:  It could be any number of things. It could be sending you a real Amazon information to a scamming website.  It could be -- and these are similar to the issues that were actually detected.  It could be -- sorry, your Honor.

THE COURT:  No.  I'm just trying to think.  In other words, let's say somebody gets the spear -- by email that says something like, I don't know, I don't remember what some of these were that went out but -- but some concern about some charge on your Amazon account or something like that and then you have a password -- they get some kind of information that would allow somebody then to get into that account or at least use the information in some way other than the desirable.

All right.  Let's say that -- that some -- that somebody like Mr. Posner, except he wouldn't fall for it, but let's say somebody like him wanted, they could deliver to a third party protected information from the Amazon account they pulled.  Okay.  Now, are you concerned that I as an AI Agent would fall for some spear fishing on Amazon?

MR. SCOTTEN:  Not only concerned.  This is something that happened.  This is exactly what those multiple industry sources that Perplexity says it's now

43

addressed did.  I mean, the agent -- agents are in some ways more human than we think.  It -- it falls for these types of scams.  It did fall for these scams.  It will do that, and it can do it not just for Mr. Posner's information but for lots of folk's information.

THE COURT:  Okay.  But then they said they fixed it?

MR. SCOTTEN:  They said they fixed those specific attacks.  It's sort of, you know, those three things will not happen again, but that is really what I'm trying to get at with the Evans declaration.  It's going to happen.  It's a systemic vulnerability.  That exact thing will happen, but there's been no rebuttal to the point that this sort of thing is a continued vulnerability because of those three capabilities.  And -- and I think a lot of it, your Honor, just to back up a step, is helpful to your Honor in understanding why Amazon is so concerned.  But the Court need not reach it.  Again, we're pretty set at step one. The law rightly says it's enough harm to interfere in Amazon's ability to control systems, and that makes sense. Let Amazon worry about that.  That's the harm, not -- not letting other people in the control systems.

Public interest, your Honor.  On -- actually, I think, your Honor said you wanted to hear hardship first, hardships.  Right.  Balancing the scales.

44

So, this -- this is an easy one in our view because the scales look like this.  Courts say time and again if you're -- you're in violation of these statutes, there is no -- you have no hardship in stopping doing that.  And our injunction here is exceedingly narrow.  We are asking the Court just to say don't go into password protected areas of our store.  That doesn't count as a hardship.  And in other cases, the Ninth Circuit in (indiscernible), for example, had said, You're going to face -- you, the Defendant, are going to face devastating or extreme hardships.  Still doesn't count if it's solely because of your illegal conduct.

So, we think there's almost nothing on one side of the scale.  I just talked about what's on Amazon's side of the scale.  It's the harms we just discussed.

THE COURT:  Yes.

MR. SCOTTEN:  I should note, though, that I think Perplexity's harms are exaggerated.  Perplexity touts itself as accurate -- and we're not disputing this -- in all person agent.  It makes websites.  It helps you study.  It can summarize news articles.  It can write emails.  The idea that it will cease to function as a viable enterprise or even be materially impaired by not being able to go to the password protected area of a single website, probably would not be much of a hardship, even if it's cognizable, which it isn't.

45

And then, finally, your Honor, on public interest, again, the courts say -- <u>Power Ventures</u> says -- <u>Parsant</u> (phonetic) says that you are -- it is in the public interest to prevent unauthorized access to computer systems.  If your Honor agrees with us, then we're likely to succeed on the merits, then this factor flows almost automatically.  In fact, it does flow automatically under the case law.

And that makes sense.  These statutes are for the policy judgment, don't do this.  So, of course, the public interest is in not doing it.

The last point I'll stress on that, though, because I think it is helpful from the prior (indiscernible), again, the one your Honor accepted.  This lack of transparency has additional public interest costs.  When an agent like Comet refuses to identify itself, it can't be held accountable.  Actually, another good distinction between yourself and Mr. Posner, if Mr. Posner does do something wrong -- Mr. Posner can never do something wrong.  But, if a malicious shopper does something wrong.  They can be held accountable.  If they commit a tort, you can sue them.

Perplexity hides its role so it can be legally accountable.  It's not accountable for any harms it may cause.  And, as the amicus points out, that's also discourages innovation area of safety.  If -- if you know who's doing what, then if you incentivize folks to be safe

46

because they know they'll be held accountable for unsafe --
Perplexity's refusal to identify itself or to identify its
Comet Agent when it's in the store defeats that.

And -- and I'll stop there unless your Honor wants to
hear more of these.

THE COURT:  No.  The amicus brief that I did allow
for you to file, they're not going to get into whether it's
a violation or whatever in general, but they wanted to point
out why it's important to identify one's self as an AI
agent, and that's their position.

MR. SCOTTEN:  I think that's right, your Honor.

THE COURT:  Okay.  All right.  If I were to grant
the relief sought in some format, there's the question of a
bond, and we don't have to do that right now, but is that
part of what you're inclined to talk about or somebody else?

MR. SCOTTEN:  I'm happy to discuss the bond, your
Honor, and I think the short answer on that is the -- this
Court has ample discretion under Rule 65 if, as here,
Defendant asks for a specific amount under the Ninth Circuit
case in Barkwell and Gomez (phonetic), they need evidence.
They need to make a showing.

They haven't made that showing, particularly for the $1
billion amount that they have asked for.  Their sole
citation is to paragraph 41 of the Shettelinko (phonetic)
declaration.  That has some sealed numbers in it.  So, I'm

47

not going to talk about specific numbers, but the point is those numbers are relevant.  They talk about numbers of the valuation of Perplexity, and they suggest -- I'm not sure they've really established a link -- of how much the Perplexity valuation is relevant to Comet.

But what they haven't established or even really tried to show is that Comet is going to be materially affected by not being allowed to go into one password protected part of one website.  They give you the premise, well, here's the value of Comet.  Comet -- well, you need to indemnify us essentially for (indiscernible) into that.  There is no reason whatsoever to think Comet's going anywhere just because it can't go into one part of the Amazon Store.  So, they haven't made their showing on that, and I think that's all I can say on that.

THE COURT:  Just --

MR. SCOTTEN:  Right.

THE COURT:  -- talking about -- I'm sure I brought it out, the problem was that because they were two essentially kind of cyber security declarations that wasn't within a big binder.  So, it didn't quite fit, and I put both of them to the side and then couldn't see over the other big stack -- both of them handy, but I'm just --

MR. SCOTTEN:  And we're sorry about the hearing date.  As you know, your Honor, the hearing date has moved a

48

couple of times in this, but we apologized they weren't organized around that.

THE COURT:  Okay.  Yes.  I think -- and talking about the bond for a second just to -- to set it up just to get there because I still haven't heard from the table across the aisle here.

The idea of a bond is what does the Plaintiff ultimately lose.  In other words, yes, if the Court found that the Plaintiff has a likelihood of success or, as you know, there's an alternative test in the Ninth Circuit.  If the Plaintiff raises a serious question on an issue, as long as they can show that imbalanced it sharply as opposed to just in but sharply in favor of the movant, then that could be enough.

And, so, you're looking at, well, what if -- what if at the end of the day the Plaintiff loses.  What has happened to the Defendant in the interim?  And the question then is have they had to shut down things, did they go to the factory and fire all the employees?  What happened there that really needs to be compensated in some way and -- because the Plaintiff didn't win, all right.  So, that's what we're looking at.

In this instance we haven't talked about the idea of the alternative test.  We've already been talking about likelihood.  If you do show that, in other words, if I were

49

to find that, then, of course, then there's a less chance that you're going to lose at the end of the day, but there's always a possibility because usually preliminary injunctions are sought in a part of the case, and all kinds of things can happen along the way.

So, I did look carefully to see if there could be any kind of figure put on just shutting down your Amazon operation versus shutting everything down essentially.  I didn't see it, but I can hear from them this morning and see if they -- they have anything further that I can actually consider in connection with this hearing, but I figured we may as well take that up as well now, and you have.  So --

MR. SCOTTEN:  Thank you, your Honor.  And I do want to be precise about one thing before I sit down.

THE COURT:  Um-hmm.

MR. SCOTTEN:  Nobody wants to shut down their Amazon operation.  To be clear, Comet, the browser, is welcome everywhere on Amazon.  If Mr. Posner wants to use Comet, the browser, to do his shopping on Amazon, he can do that.  The Comet AI Agent is free to look around in all of the public parts of the Amazon Store.  We are not asking them to shut down any Amazon operation or anything approaching that.

We're really just saying these are password protected. Don't send your agent.  You can go there yourself, but don't

send your agent in there.  So, it is much narrower.

THE COURT:  Let's just say as a practical matter, how it would work as you say would be fine.  So, here I am, and I -- they just have me look around to the public area, which is everything for sale on the website, and let's assume that Mr. Posner can tell me what he wants me to look for in particular and I do that, and then he goes, okay, that's great.  Thank you very much.  I want to buy it.  All right.  Then he would go into this personal account, and he would place the order that way, having had me find it for him?  Is that the --

MR. SCOTTEN:  I am not that much of an expert on how Comet works.  But, yes, that is my understanding, that it can fill -- under -- under Ninth Circuit law, it can look at public spaces, and under Ninth Circuit law, it can't go into private spaces.  So, it looks around the Internet, finds what you want, and then you just have to do it yourself.

THE COURT:  At that point?

MR. SCOTTEN:  At that point.

THE COURT:  Otherwise, I could just do the order for him, and it shows up on his doorstep, or whatever?

MR. SCOTTEN:  And if you assumed your Honor's analogy, I think you could say where that's perfectly reasonable.  Nobody's really going to have a problem if Mr.

51

Posner asks you to do some window shopping for him and -- and come back and, your Honor says, I thought these towels are nice.  But you can imagine a lot of stores that would not allow your Honor to walk in there with Mr. Posner's credit card and say, hi, I'm -- I'm Dan Posner.  I'm here to buy some towels.

THE COURT:  Okay.  All right.  Thank you.

MR. SCOTTEN:  Thank you, your Honor.

THE COURT:  All right.  Now, who's going to -- let's -- I just want to make sure on our time, just make -- I know we're already over an hour.  So, we don't have to worry about the court reporter needing a break or anything, but I just wanted to check.

All right.  So, who's going to speak first on -- on behalf of Perplexity?

MR. QUINN:  I am, your Honor.  John Quinn.  I'm here for Perplexity.  We have a presentation also.

THE COURT:  All right.  Well, I'm going to hear that as soon as you hand it up to me, which you did.  Thank you.

Will you need the screen as well or --

MR. QUINN:  Yes.

THE COURT:  Okay.

MR. QUINN:  Yes, I will I think.

THE COURT:  Feel free to do that, but let me know

if you're doing it because, as I said --

MR. QUINN:  I'll call -- I will call it out.

THE COURT:  -- behind me, and I do want to look at you.  So, all right.  Go ahead.

MR. QUINN:  Thank you, your Honor.

I'd like to begin by discussing the likelihood of success under Section 2030(a)(2), and the first question, the first question to be addressed is who's accessing Amazon's computer because the -- the CEAFA requires that there be access to a computer.  Who's accessing?

Amazon's opening papers dealt with this -- the intentional access element of the CEAFA in just one sentence.  They said, and I quote:

"There can be no real dispute that Perplexity intentionally accessed Amazon's computers when deploying its Comet AI Agent into the Amazon Store through Amazon's private customer accounts."

Their entire case on access rests on this assumption.  It is a faulty assumption that Perplexity is deploying the Comet AI and is accessing the computers.  In fact, it is Amazon's users that are deploying from their own account in an authenticated authorized browsing session that they have initiated through the browser window.

53

If I could just maybe go back to -- I think the Court has a graph of how the agent works, but it might be useful to look at some screenshots --

THE COURT:  Okay.

MR. QUINN:  -- that show him actually in action.

THE COURT:  Okay.  Let's see.  I'll back up a bit so that I can hopefully look at this and not lose track of you up there.

MR. QUINN:  Yes.  So, we're looking at page four.

THE COURT:  Okay.

MR. QUINN:  So, Perplexity's Comet is, of course, a Web browser.  And that, of course, is software that loads websites on the user's device.  It renders the pages, and it allows users to interact with those pages.

The Assistant is one feature of that browser.  Now, this is information -- when you log in, this is information that Amazon returns to the user's browser.  And the Assistant is a feature.  When the user downloads the Comet Web browser, there is a box they can check.  You'll see it in the upper right-hand corner.  It's circled -- it's circled there -- is a box they can check to activate the browser.

This AI Assistant, you'll see, is entirely opt in. Users must discernibly enable it.  And, once enabled, it never acts on its own initiative.

54

THE COURT:  How -- can I stop you for just a second.  So, how do we get to this screen?  This would not be in our Amazon screen, correct, originally, because Amazon wouldn't have the Assistant up there, would it?

MR. QUINN:  Well, if they're using the Comet browser -- they have to be using the Comet browser.

THE COURT:  All right.

MR. QUINN:  So, they've logged into Amazon using the Comet browser.

THE COURT:  All right.  Now -- all right.  So, they're using the Comet browser which then brings up in the Amazon screen with the -- through the browser?

MR. QUINN:  Exactly.  So, Amazon would log -- Amazon returns certain information, HTML code.  So, he can then connect with the -- interact with Amazon website, and they can check that box that you see in the upper right-hand corner, and this is something the -- the user has to enable. It runs locally on the user's device.  So, the user has this on their browser.  And it only reacts to instructions from the human user.

As if any browsing session, Amazon returns this HTML code back to the user, and this is true whether the user is a human being or whether it's the Assistant, same thing happens.

The Comet that -- we can turn that, look at the next

55

page, you'll see that we just enlarged that.  That's what you'd check, that box.  And if you check the box -- if we can turn to the next page, page six -- this side bar that you see on the right-hand side comes up.  You see it says Assistant.

THE COURT:  Um-hmm.

MR. QUINN:  And so that would show that the Assistant is there, and if you then -- if you turn to the next page, if you give the Assistant then an instruction, this is what I want -- and this example you'll -- on page seven, you'll see the user has given an instruction, please purchase the best afternoon tea, et cetera, to have in the spring.

THE COURT:  You lost me a moment.

MR. QUINN:  This is on page seven.

THE COURT:  Okay.  Yes.  Yes.  I see it.  I'm actually going to look at the printed --

MR. QUINN:  Right.

THE COURT:  -- slide to that one, looks smaller.

MR. QUINN:  So, you've given the Assistant an instruction, and once you've given the Assistant an instruction, the Web page, you'll see it changes color.  It becomes blue.  It says the Assistant's on.  It's been given a request, and it's on the request.  And it starts to return information, and you see that in the browser window.

56

And it reaches a point where it's found something that it thinks complies with the request.  It's using the reading capability to comply with the request.  And if we look at page seven, you'll see it's come up with a product that it thinks is responsive.

And at that point, it stops.  You'll see over on the right-hand side, at the bottom, it says, complete the purchase of the tea.  And you have to either -- at that point the user has to say, okay, that's what I want, click on purchase or, cancel.

THE COURT:  Okay.  Just go back to the very, very beginning.  If someone wants to use its Assistant, all right, it -- it just downloads the Comet browser?

MR. QUINN:  It got the Comet browser.  You'll have that box, the option to use the Assistant.  You can click it or not as you wish.

THE COURT:  So, what, like Fire Fox, something like that or something different?

MR. QUINN:  Well, that's another browser.

THE COURT:  Okay.

MR. QUINN:  Comet's a browser.

THE COURT:  Okay.

MR. QUINN:  It's a Chrome based.  It's based on the -- the Chrome system, which is very common.  I don't know if Fire Fox is.

57

THE COURT:  Well --

MR. QUINN:  Like any -- like any other browser.

THE COURT:  Okay.

MR. QUINN:  Browser that makes it possible --

THE COURT:  Chrome?

MR. QUINN:  Exactly.

THE COURT:  Okay.  So, they -- they download it.  Now they've got Comet, and Comet doesn't show up immediately on Amazon, then, I would guess, but Mr. Posner, for example, as a sort of generic user has to then select that it wants to go to Amazon?

MR. QUINN:  Yes, it does, like any other browser.  You'd have to type in Amazon.com.

THE COURT:  All right.  Otherwise, you'd go look it up and --

MR. QUINN:  Oh, yeah, whatever.

THE COURT:  -- on the chart, Target, or wherever he wants to go, Best Buy, what have you.

MR. QUINN:  Exactly.

THE COURT:  Okay.  And, so, anyway, but he ends up on Amazon, and then he gets to that first screen.

MR. QUINN:  You get to that first screen.

THE COURT:  That --

MR. QUINN:  He's deciding he's using the Comet browser.  He types in Amazon.com.

58

THE COURT:  Right.

MR. QUINN:  You see he's got the Assistant.

THE COURT:  Okay.

MR. QUINN:  He wants to use the Assistant to help him find some afternoon tea.

THE COURT:  Let's -- otherwise, he just uses it like a regular browser.  He's on Amazon?

MR. QUINN:  Exactly.

THE COURT:  All right.

MR. QUINN:  Exactly the same.

THE COURT:  But he wants to get this special service Perplexity.  Then he says, okay, Assistant.  Has he in some fashion given Comet his password that -- and he goes, fine, I want the Assistant.  How does the Assistant actually get in there?

MR. QUINN:  Well, I mean, he has to type in -- he has to type in Amazon if he wants to get to Amazon.

THE COURT:  Right.  He first gets to Amazon.

MR. QUINN:  Right.

THE COURT:  Now he's got this screen that looks pretty much like the Amazon screen except it's got this other option, the Assistant.

MR. QUINN:  Yes.

THE COURT:  So, he can either use -- essentially use this just like he could let's say Google Chrome or he

59

could get the special attention that Comet could provide for shopping for him.  He doesn't have to do anything here, just going to give an instruction, well, here's the shopping list, buy this stuff, deliver them to me.  Okay.

But how is he enabling -- in other words, he -- he just clicks on Assistant, and somehow then Comet is able to get into his private account that otherwise would be password protected.  Has he in some fashion digitally conveyed his password to Comet?

MR. QUINN:  I mean, he's going to have to log in. He's going to have to log in if he wants to get to his own information, his own private information, and we'll get to that.

THE COURT:  Oh, okay.  Fine.

MR. QUINN:  All right.

THE COURT:  I jumped ahead.

MR. QUINN:  So, I -- I assume that he's just accessed the site.  He's decided, I want the Assistant to do this.  He gives the Assistant some instructions.  The Assistant comes up with some options on Amazon based on the information that Amazon provides, and you'll see there on page seven it's asking him, do you want this?  If you want this, you have to, you know, either purchase or cancel.

THE COURT:  Okay.

MR. QUINN:  That's the user's decision.

60

THE COURT:  Okay.  Hang on.  So, he's actually interacting with it at this point?  He hasn't just turned the whole process over to Comet.  He has then in some way had to acknowledge that --

MR. QUINN:  And this all --

THE COURT:  Well, hold on -- acknowledge that he wants what they've come up with?

MR. QUINN:  If he wants to purchase it, the Assistant stops.  And you'll see there either authorize the purchase or cancel.

THE COURT:  All right.  I'm on seven, which -- wait a minute.  Did you want me to keep going maybe eight -- from seven to eight?

MR. QUINN:  Yeah.  So, it's actually page seven -- it's page eight at the bottom.

THE COURT:  All right.

MR. QUINN:  It says option, purchase or cancel.

THE COURT:  Okay.  Where does he select then, go ahead and buy?  Is that on seven or eight?

MR. QUINN:  That is on page eight.  You'll see it there at the bottom in the right-hand corner.

THE COURT:  Just purchased?

MR. QUINN:  There's two boxes, purchase or cancel.

THE COURT:  Okay.

MR. QUINN:  Your decision.

61

THE COURT: All right. So, he actually has to be staying with this in some way. He can't just originally click Assistant, tell him what he wants and then go do something?

MR. QUINN: Exactly. And this is invariably -- this is all of the cases.

THE COURT: Okay.

MR. QUINN: He can go make a cup of coffee while the Assistant does whatever it does. He comes back, oh, the Assistant has served this up. I need to make a decision. And then he can decide if he wants it, he clicks on purchase.

THE COURT: Okay.

MR. QUINN: And then, we get to page nine, and at this point, it says it's been added to your cart. To complete the purchase, this is where he has to actually log in. Please sign into your Amazon account at the current page and proceed.

So, he actually has to log in now. And this is where he's accessing -- they call it private information. Amazon at this point understands this is the person who's using it.

THE COURT: Okay.

MR. QUINN: So, he's logs in at that point, and then it goes to checkout. That's page 10.

THE COURT: Okay.

62

MR. QUINN:  And, again, it says, place order now. You see it in his cart.  Place order, and you can complete the order or, again, he can cancel.  That's -- that's the process that happens.

THE COURT:  Okay.  Now, Comet is in it some way, isn't it?

MR. QUINN:  I'm sorry?

THE COURT:  Comet is in his account?

MR. QUINN:  Comet is on the browser.  Comet is on his device.

THE COURT:  Okay.

MR. QUINN:  It's local.

THE COURT:  Okay.

MR. QUINN:  Okay.  So, this is not -- this is not Perplexity's service.

THE COURT:  Okay.  So, the argument that's been made in the papers is that somehow there's a distinction between being in just his account, which is kind of his, is separate in some manner from the Amazon computer, if you will?

MR. QUINN:  Or from the Perplexity computers, and this -- this is really the key point.

THE COURT:  All right.

MR. QUINN:  Who is accessing Amazon?  Is it Perplexity or is it the user.  And like any other --

63

THE COURT: But just give me a chance to --

MR. QUINN: Sorry.

THE COURT: -- scroll through it for a second because if you lose me in your argument along the way, I get kind of lost.

MR. QUINN: Got it.

THE COURT: So, you know, if I'm getting promoted to the next frame, first I have to get past whatever is in this one.

So, your argument has been that the AI Agent has -- Comet has gotten into the user's account. I call it Mr. Posner. It's just easier to use him. But, in any event, it got into his account, and he's taking it to maybe not particularly a tea, and -- and from whatever's happened there, isn't really involving Amazon's computer or say Perplexity's server. So, everything's fine. In your view, you haven't done anything to Amazon. He's just -- he's in a safety deposit box, and Amazon is saying, well, how'd you get in there? And the box is really part of a hard system. It isn't just sitting there on the sidewalk. And, so, that's really the issue that we've got here is a technological matter which I -- you know, I can understand if the issue, quite frankly, were (indiscernible) happens most exactly, and if he can -- you know, you can continue now and we'll see where we get.

64

MR. QUINN:  All right.

THE COURT:  Okay.

MR. QUINN:  So, the Comet browser, like any browser, is resident -- it's local on the user's device.

THE COURT:  Um-hmm.

MR. QUINN:  And, yes, the user is obviously interacting with Amazon.  The user -- the Perplexity servers are not interacting with Amazon.  It's the user through this browser and this AI Agent which is resident on the local device.

THE COURT:  So, you're saying Comet is backed off at this point, and it's not engaged in any way when the purchase is made?

MR. QUINN:  No.  The Assistant is a feature of the Comet browser.  So, yes, that browser session is still open.  What the AI is doing and what it's serving up is done in the context of that authorized browser session, using the AI Agent, which is part of the browser.

THE COURT:  Well, let's go back.  In other words, if we went back to nine for a moment and the AI Assistant is telling Mr. Posner, look, if you really want this stuff, you're going to have to sign into your account.  And then, once he does that, does he turn it back over to the Assistant to make a purchase?

MR. QUINN:  Well, the Assistant asks him, you

65

know, it's added to your cart.  We saw that.

THE COURT:  They're giving permission.  They're not --

MR. QUINN:  Yeah.

THE COURT:  -- running contrary to what he wants, but it sounds like the Assistant is taking the order.

MR. QUINN:  Well, he has to say, I want to do --

THE COURT:  Yes.

MR. QUINN:  He has to check the box ordered.

THE COURT:  Well, he's telling the Assistant, yes, go ahead and place the --

MR. QUINN:  Yeah.

THE COURT:  -- order, though?

MR. QUINN:  Yes.

THE COURT:  Okay.  All right.  Okay.  So, let's keep going wherever you want to go with this.

MR. QUINN:  Well, that's -- that's kind of how a purchase happens.

THE COURT:  Yes.

MR. QUINN:  And it's all -- it does not -- it's all happening between the browser and the Amazon site.

THE COURT:  Well, to the point that maybe they're just talking amongst themselves and haven't gotten into the private account yet, in other words, is still hanging out on the public account in some way until they get into the

66

private one, maybe that is just operating pretty much in the public realm.  But then at some point, the -- he, I'll just say Mr. Posner.  Okay.  Do you want me to get into the safe deposit box or don't you, because I can't really get back in there and deliver it to you because you're somewhere else and can't get it himself unless you let me, and if you let me purchase it, you're going to have to open in some way the safe deposit box, and you'll have to give -- or give me the key in some fashion.  I can get in there, and I can get whatever it is, get out, and give it to you.  I'm kind of in there, but I think interacting with Amazon's wallet in a private area somehow I got --

MR. QUINN:  Once he's logged in, he's on his account.  Amazon knows that it's him.  But it's all --

THE COURT:  They think it's him.

MR. QUINN:  Yeah, they think it's him.

THE COURT:  All right.

MR. QUINN:  But it's -- it's still interacting between the browser, the user and Amazon.

THE COURT:  Um-hmm.  Okay.  Now, there's an allegation that essentially it's based on what they think is essentially an acknowledgment by your client that they take some snapshots and send them back to I guess Perplexity, and do you want to tell me about that?

MR. QUINN:  Yes.  Yes.  Exactly.  The Comet

Assistant sends screen -- screenshots and MTL codes back to Perplexity's servers.  That's where -- that's the reasoning layer that -- so, the Comet Assistant receives this information from Amazon, and it sends screenshots back to Perplexity's computers.

THE COURT:  Why are they doing that, by the way?

MR. QUINN:  Because the reasoning layer about what images are being shown, served up, which are consistent with what the user says they want, that reasoning layer says, this is what you should click on.

There's an illustration here.

THE COURT:  Yes.  Thank you.

MR. QUINN:  It's -- yes, that's on page 12.

THE COURT:  Yes.  So, okay, I'm there.  So, I'm there, and it's a screenshot with some instructions as to that that's Amazon.

MR. QUINN:  All right.  So, the Comet Assistant on the browser sends screenshots, and this is interaction with Perplexity at this point.  You have the browser there sending screenshots of what the user sees, an HTML code and JPEG, back to the servers.  No other information, other than those screenshots, get sent back -- is sent back to Perplexity's servers.

THE COURT:  Okay.  And they're doing this for some reason --

68

MR. QUINN:  Yes, because that -- that's -- Sorry.

THE COURT:  If we both talk, it won't work.  So, if I can just complete the thought here for a minute.  Is it so that they can -- it can then serve Mr. Posner in the future, kind of keep some record of what he's doing or why is the thing sent on as opposed to just, okay.  You did that thing and that's kind of it?

MR. QUINN:  That's where the engineering is, the -- the reasoning layer I've referred to it, as the Perplexity computers that said, oh, Mr. Posner asked for this.  This has been served up.  Is this consistent with what Mr. Posner has asked for?  So, the --

THE COURT:  Okay.  And cross-checking --

MR. QUINN:  It's not really a cross-check because that reasoning -- once you click on it, the Perplexity computers having been sent this by the browser, looks at it and tells them this is what you should print out.

THE COURT:  Okay.

MR. QUINN:  So, the -- the communication here is always between, on the one hand, the browser, Comet and Amazon and Amazon and Perplexity.

THE COURT:  Okay.

MR. QUINN:  Perplexity provides that reasoning layer.  It says, oh, you sent me the screenshot.  This is it.  This is consistent with what Mr. Posner wants, and

69

that's what you should serve up.

THE COURT:  Okay.  So, it actually is how it's activated, so to speak, so that the past can be complete.

MR. QUINN:  Exactly.

THE COURT:  Okay.

MR. QUINN:  So, at no point is there a communication between Perplexity's servers and Amazon. Perplexity is never accessing Amazon.  Perplexity is accessing information which is on the browser that Amazon accessed, that Amazon has sent and has rendered.  Okay.  So, it's already there.  So, this -- this brings us -- this is what in grant total the Court called reactive data collection.  If you're -- if another computer is merely reacting to data that the platform has already served up, there's no issue.  There's no issue.  It's not accessing the computer itself.  It's accessing the browser.  And this is the (indiscernible) case, and it -- they don't really have a response to this case, this notion of reactive data collection.

THE COURT:  Okay.

MR. QUINN:  No communications directly between Perplexity and Amazon, only with the browser.

THE COURT:  Okay.  All right.  Let's -- unfortunately, I'm trying to find my other copy, but that's okay.

Even if material wasn't sent to Perplexity, isn't Perplexity responsible for its AI Agent, Comet, and should Comet be (indiscernible)?  Really, isn't it Perplexity that's sending it there and allowing it to be there?

MR. QUINN:  No.  It's the user, your Honor, the user who has given instructions, and --

THE COURT:  I know, but somebody somewhere -- and you say, oh, gee, it's not Perplexity.  It's Comet. Whatever thing does it, Comet -- and Comet's not doing anything wrong, but Comet -- you never even get to Perplexity.

And then my question is, well, whatever Comet's doing, isn't it doing it as an agent of Perplexity?

MR. QUINN:  It's doing it as an agent of the user. It's not using -- it's something that's a resident of the browser, but it's chosen to use the Chrome browser that has this feature.  And, like, the key from --

THE COURT:  Comet --

MR. QUINN:  No.  Comet is a process of Perplexity. But if something -- what would be illegal, what would be a problem, we can at least get over the first element of access if it's Perplexity was accessing Amazon's computers. And my point here is the Plaintiff's case here fails on the first element.  Perplexity does not access Amazon's computers.

71

THE COURT:  Well, Comet can, let's say --

MR. QUINN:  Comet --

THE COURT:  Comet on behalf of Perplexity because Comet is just a thing.  In other words, if somebody buys a car and it blows up in their face, they don't sue the car, right?  They sue the company that made it.  Okay.

So, all right.  But, in any event, either way, what you're saying is whether it's Comet or Perplexity that should be responsible for Comet, that what happened in the private area of the Amazon website stayed there being run by the user, not by Comet in some way.  Comet didn't do anything, that it interacted with Amazon in some fashion. Okay.

MR. QUINN:  Well, Comet, like any other browser, did interact with Amazon.

THE COURT:  Well --

MR. QUINN:  And user --

THE COURT:  Then what -- if it did in a way that interacted to the protected access with Amazon, why wouldn't Perplexity be responsible for their crime so to speak?

MR. QUINN:  Well, I mean, it's the user that's logged in and has accessed what they call the protected area.  That's something I think we can drill down on and talk about exactly what that is.  But it's the user that's decided, I want -- I've logged in.  I'm accessing my private

72

areas.  And now I'm enabling the Assistant to help me there.

THE COURT:  Right.

MR. QUINN:  But, I mean, the -- I think that the crucial point here is there is no access by Perplexity to Amazon's computer.  What's happening is software that the user has chosen to download and use on its own device, locally stored there, is interacting with the Amazon website.

THE COURT:  Right.  And I think the whole dispute is coming down to if the user said it's okay, is it okay.  And that's what Amazon disputes.  In other words, they say, all right, even if you thought it was okay, based on what the user said was okay, once we weighed in and told you we didn't agree, then you can't do it, and Perplexity's position is, yes, we can.  You can't tell us we can't do it when the user says it's okay.  And then that's a question of how the law comes out on that point.

And I just want to make sure -- I've got various cases.  So, I have some that I have pulled out just to have handy over the loss issue because there was a number there.  And then I have a big stack with it that I have been going through when various (indiscernible) have been tied.  But, I was very organized when I came out here, but now I'm not so organized.  First on the list -- and let me see if I can find that, looking for it there.

73

(Pause.)

THE COURT:  I want to just find the particular phrase in the case that we're relying on --

MR. SCOTTEN:  I think it's Reactive -- reactive data collection, Brand Total.

THE COURT:  Yes, the --

MR. SCOTTEN:  There the other service that was accessing the data was acting on it, operating on data that Facebook had sent to the user.  So, it was information that Facebook had sent to the user.  The user had that information, and the Defendant they are Brand Total, like another social media network was reactive -- interacting with that data.

THE COURT:  Right.

MR. SCOTTEN:  Facebook said, you're violating the law.  You're accessing our computer, and the Court said, no.  That's reactive data collecting.

THE COURT:  Okay.  And that's where -- I should have that here, but, no.  Let me find it.  So, I just wanted to check that before we went too much further, and I want to take a little break to grab -- just a moment or two, and to just -- to make a check again where I might have it.

Why don't you just give me the cite, so that I make sure that I'm --

(Pause.)

74

THE COURT:  Just give me the whole title and the language.  I'm pretty sure that I have it, though.

UNIDENTIFIED SPEAKER:  The full name of the case, your Honor, is Meta Platforms --

THE COURT:  Um-hmm.

UNIDENTIFIED SPEAKER:  -- vs. Brand Total.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  605 F.Supp.3d, 1218.  It's a case from this District.

THE COURT:  Right.  If we can go back for a second, and, as I said -- but I want to check both.  That's the only one that --

(Pause.)

THE COURT:  Aha.  In a separate stack of super important cases that I should -- I was looking at it in great part for the loss question.  So, take me to the page that you want me look at, and I will just double check that because this was Chips Bureau, and it's fairly recently --

UNIDENTIFIED SPEAKER:  I think at least one package to look at is at 1260 to 61, 1261.

THE COURT:  A long case.  So, this is getting toward the latter part of it.  Yes, okay. Thank you.  Okay. And just give me a second here.  I've got -- I was going to say I thought I had it, and I did and I thought it was so interesting that the -- Okay.  One second.

75

(Pause.)

THE COURT:  Yeah, here we have the reactive data collection phrase and (indiscernible).

So, in this instance, though, and I thought when I searched Meta was that our situation was somewhat different, and I'll give counsel a -- I'll give the attorney the last word since it's your motion.  I'll give him a chance to explain why they think it's different.

You think it's the same because?

MR. QUINN:  The Court found that Meta was sending information to the user, and the Defendant was only operating on that information that the user had.  It was accessing and engaging and working with that information that Meta had already sent to the user.

(Pause.)

THE COURT:  I'm not sure they were in the -- the private area.  It was more like the user was distributing once the user got the information, sending it out to Brand Total, but that Brand Total hadn't dropped by itself into the private area.  At least that's how I was reading it at the time, and if I'm wrong in any respect in that regard, please correct me in that.

MR. SCOTTEN:  Well, I mean, by hypothesis, let's assume that some private information was pushed out by Meta, and that was in this repository of information that the

76

Defendant was operating with.  The Court says that's not accessing Meta's computer.

THE COURT:  Right.

MR. SCOTTEN:  And, so, here.  And, again, we should talk about private data and what they mean by that, private section.

THE COURT:  Okay.

MR. SCOTTEN:  But so here if -- where we -- Perplexity is only interacting with what Amazon has already sent, and it exists locally on the browser.

THE COURT:  I get it.

MR. SCOTTEN:  Perplexity is never interacting with Amazon.  So --

THE COURT:  Perplexity (indiscernible) Perplexity and Comet --

MR. SCOTTEN:  Yes.

THE COURT:  I'm not sure you can do that because Comet is acting on behalf of Perplexity.  If not, they should get a different --

MR. SCOTTEN:  We -- so, no question that the browser, Comet, is a Perplexity product, but it's the user that's deploying the browser, and it's interacting with Amazon.

THE COURT:  Okay.

MR. SCOTTEN:  And it's a -- it makes a fundamental

77

difference here.  The server -- the Perplexity servers are not accessing Amazon.  They're accessing only what Amazon has already sent to the user.

And the -- there isn't -- so far as we're aware, your Honor, there's no case that has found that information that's already been sent, it's off the reservation, is accessed by some third party, that that's a violation, that that's access.  That -- that satisfies the first --

THE COURT:  Well, I agree with that.  It's just a question of whether that's all that's being done here or not, and it would seem to me that it was different, but in any event, okay.

All right.  Now, how about whatever else --

MR. SCOTTEN:  Yeah.  I mean the last word on that, your Honor, is that if the -- if the browser -- if the AI Assistant is an agent of anyone, it's an agent of the user. It's not -- Perplexity is not the one who has told the agent what to do.  It's a product we put out in the marketplace. That's true.

THE COURT:  Right.

MR. SCOTTEN:  But we're not the one that told them -- gave instructions, or told them to go into Amazon and to decide to use this.  The user's done all that.

THE COURT:  Well --

MR. SCOTTEN:  And, your Honor, if -- if Amazon has

78

an issue with that, I would submit they have terms of service which don't bind Perplexity.  Now, they -- they don't dispute that.  There's no contractual relation.

THE COURT:  Yes.

MR. SCOTTEN:  The terms of service are with their user.  And, as I understand it, their view is their terms of service prevent users from using this AI Agent.

THE COURT:  Yes.

MR. SCOTTEN:  Their beef ends with their users.  Their beef isn't with us because we created the product.

THE COURT:  Okay.  Thank you.  Perhaps -- The chances of (indiscernible) their own customer with --

MR. SCOTTEN:  I think pretty remote.  I -- I agree with that, your Honor.  I mean, their users -- this is a product that people are finding useful and want to use.  But that's -- so, that's the first element of access, and for the reasons I've said, I think their -- their claim fails at the first element.

The second element is that it has to be done -- access has to be done without authorization.  And here they rely on the Power Ventures case, and if you recall, in the Power Ventures case, Power Ventures was a competing social media site that somehow got a fake access -- got some Facebook user to share credentials so they could then go in, and what they did is they spammed all the user's terms.  They

79

pretended they were Facebook.  They said, you know, we're Facebook, invited them to join their competing site, took information from inside of the Facebook site.  It was completely -- in fact, this was a time when I think the case was 2005, 2007, when the entire Facebook setting was password protected.  You couldn't get on -- you couldn't log on without that, completely different circumstance that the Power Ventures solicited the Facebook user's login credentials, entered those credentials, logged in, scraped Facebook, misrepresented themselves to third parties, and Facebook -- used Facebook data to solicit Facebook users to join their social media site.

The Court said this is unauthorized.  It doesn't matter if you got one person on the front end to share their credentials so that you get in and do all these things.  The Court said that that was unauthorized.  And Power Ventures was doing that for their own purposes, and this -- and I think that is -- that's a very important point here.  In hiQ, the Court interpreted that rule, that there was no authorization as meaning you have to understand authorization in terms of the platform's purposes.

Facebook wasn't giving authorization for a competing social media site to go in and scrape all the data and take everything.

THE COURT:  No.  They say there's -- there's

80

nobody in the middle like you have here.  All right.  That makes an intermediate authorization which is Mr. Posner or his equivalent.  But the question comes back to again whether that counts, all right, and what the Plaintiff's arguing is, fine.  You got one authorization, but you didn't get our authorization, and then they cite case law to say you need ours, and you can say that Power -- you know, Power Venture is different because there was (indiscernible) and their motivation was different, and et cetera.  So, it may be yours, but it doesn't mean that -- a little better.  They still lost.  So, that's the -- yeah.

MR. SCOTTEN:  Well, I think what the hiQ court said --

THE COURT:  Oh, we're on hiQ now?

MR. SCOTTEN:  Yeah.  It says --

THE COURT:  I'll get that.

MR. SCOTTEN:  And just to jump to my --

THE COURT:  I mentioned that -- I think I need to pull that out.  Keep going.

MR. SCOTTEN:  Just to jump, my point here is, your Honor --

THE COURT:  Right.

MR. SCOTTEN:  -- that "authorization" has to be understood in terms of the purpose of the access.  That's what the hiQ -- that's how the hiQ court interpreted Power

81

Ventures.  The Court said there:

"We specifically recognize that Facebook has tried to limit and control access to its website as to the purposes for which the Defendant sought to use it."

In other words, our purposes of accessing our site don't include scraping and supporting and enhancing a competing website.  You have to understand what is the purpose of --

THE COURT:  I understand, but motive isn't part of the law.  You know, somebody could do it for charitable purposes, saying, gee, you know, we're just trying to help out.  This is for the poor, and it still would not necessarily make it legal.

MR. SCOTTEN:  I understand that, your Honor.  But what I'm suggesting is that authorization is an element of purpose that's embedded in the concept of authorization, and that's what the hiQ court said.

For example, if we can go back to the bank and the safety box analogy --

THE COURT:  Okay.

MR. SCOTTEN:  -- if somebody goes into the bank premises with the purposes of legitimately going to their safety deposit box, that's authorized.  You don't even have

82

to ask the bank's permission.  That's the reason the bank exists.

THE COURT:  Okay.

MR. SCOTTEN:  If somebody -- and it was cited in the case -- if somebody walked in with a shotgun, there isn't authorization to do that.  There isn't authorization to go in with a weapon and make the prospect that you're going to conduct a robbery.  That's not authorized.

THE COURT:  Okay.  And how about somebody who is authorized brings their friend in and tries to bring him into the locked room?

MR. SCOTTEN:  Well, what's the purpose?  I mean, just to gloss over the friend, this isn't a person, it's a piece of software that somebody's chosen to enable.

But, your Honor, what's the purpose?  The purpose is to buy product from the Amazon website.

THE COURT:  No, no.  I understand you can say, what are you complaining about?  We're helping you make sales.  They say they want to make -- All right.  Then --

MR. SCOTTEN:  Yeah.

THE COURT:  -- they either entitled them to go up and stand by that position or they're not.

MR. SCOTTEN:  Yeah, they -- they can tell they're users if they want to establish that rule.  My point -- my only point here --

83

THE COURT:  Okay.  All right.  Go ahead.

MR. SCOTTEN:  My only point here is the hiQ court recognized that authorization must be understood in terms of the purpose of the access, and here the purpose is exactly the reason Amazon exists, to buy Amazon products.

THE COURT:  Okay.

MR. SCOTTEN:  So --

THE COURT:  All right.  Okay.

MR. SCOTTEN:  -- we submit --

THE COURT:  I understand that you are drawing contention that (indiscernible) would be made between what's going on here, which is not necessarily nefarious in any way or unreasonable, you could say.  Between what's going on here and maybe in other cases on which the Plaintiffs are aligned, that these distinctions do exist, and their position is, nevertheless, what's going on is still coming under the statute.  We're not accusing you of being horrible people necessarily.  Maybe they are, but they may back off after a little bit.  And let's perhaps -- pejoratives in that regard and are just saying, look, this isn't meaning what we want to do, and you -- you just told us that you figured that we're -- we're not bad guys and we should be able to keep doing it and serve the clientele, and it sounds like that's what we come down to, and I have to really look at the statutory language.

84

Do you want to do loss at all or do you want to stay on access?

MR. SCOTTEN:  Well, I -- I do want to.  I did -- I'm past access now.  I'm now to the second element of authorization.

THE COURT:  Okay.  But we did talk about that.  In other words, it's -- it's perfectly clear that the user has given authorization --

MR. SCOTTEN:  Right.

THE COURT:  -- to come into their space so to speak.  Sit down.  They're getting around there too, then turn it over.  So, my original kind of example was -- with the safe deposit box is the user didn't even show up.  They just gave the key, if you will, to their buddy because the more convenient was to let them go in and get whatever it was, and any cash they needed, and they weren't able to do it themselves.  The buddy volunteered.  And that's a little different.  Let's say that they both go in together, for whatever reason, and then get lunch, you know, have lunch after.  Come on in with me and then you'll find this interesting.

Anyway, the main thing is they go in together, and they're saying -- so, they aren't really just turning it over without any kind of control.  The user is telling the agent what it can do and can't do and everybody recognizes

85

that.  And, so, the question is do you still need authorization to be there, and the Plaintiff says, sorry, and our position is you do need our authorization to be there.  And I don't even think at this point they're willing to say if you just stay with Comet instead of Mr. Posner, that we would give you authorization to be there.  It was originally a considerable concern just the idea of not identifying one's self as being something other than just a regular person.

So, that they're not focusing on for this particular claim, except on a loss where they do say that their advertisers had to pay them when a person, real person, clicked on the ad and that it doesn't count if it's a search engine like Comet.  And, therefore, because they're trying to be honest, even though you say, hey, I can get more money on this, they say, well, no, but we don't pay to do that and that we have to go back and figure out whether it was Comet and whether it was Mr. Posner and the individual, and then refund them, which they say takes time and effort.  So, there is that concern, but we're not relying on it.  Okay.  In other words, you're saying your only problem is if you just (indiscernible) you would be fine, you could all go off then to do your business together.

So, at this point, it's just getting the authorization or at least I feel they have and they also feel that that's

86

important.

So, let's say you have authorization, in other words, the dispute here is do we need this or not.  They say yes.  You say no, and that they have loss, right.

MR. SCOTTEN:  And -- and the third element is that we have to obtain information --

THE COURT:  No.

MR. SCOTTEN:  -- from the computer.

THE COURT:  Let's go back.  I want to go back to the statute, and we'll look at it.  Let's start with 1030, and that's with --

Okay.  So, Section (a)(2) -- well, (2) and potentially access the computer without authorization or achieved authorized access.  That second alternative is what was before Van Buren.  And thereby obtained.  And then if you go down past (a) and (b) to (c), (c) says information from any protected computer.

Now, are you saying that Comet is not getting any information when it shows up with permission for Mr. Posner to be in his password protected area of Amazon?

MR. SCOTTEN:  If the user goes to log on and -- and accesses their private information, then, yes, the browser -- Amazon sends to that browser those Web pages which are interpreted.  So, the -- that's on the browser.  The browser has that, and you an see it on the screen.

87

There's no question about that.

THE COURT:  So, Comet sees it?

MR. SCOTTEN:  Comet sees what the user sees.  But, your Honor, Perplexity doesn't obtain that.  All Perplexity gets --

THE COURT:  Well, okay.  But I -- this is an argument that we'll have to -- I hadn't really realized that is exactly what you were saying, that Comet's some kind of free agent that has nothing to do with Perplexity.  If Perplexity didn't get anything but Comet did and Comet is let's say an agent doing what Mr. Posner tells it to do but it's also there as a product of or an agent of Perplexity, it's not just there to (indiscernible), because it's duplicative.  And, so, it does exist in some way, sure.  And if you're right that Perplexity is totally out of the picture, then Perplexity should belong in the lawsuit, unless one wants to say that they got information by the screenshots.  Okay.

So, I want to see if Plaintiff is saying I need both or if they're saying, even if we never have the screenshots. We still have liability, access and fits under you know what's going on and okay.

So, that's the main one.  To the extent there's any indication under (a)(4) as opposed to (2), I don't think they've made out a likelihood on (a)(4), which is the

88

fraudulent. We don't need to get into that or -- and then we get to whether then there can be a civil suit, and then we get into the loss (indiscernible) that this Court is pretty small given the nature -- the endeavor.

But, all right. So, you think they would have to do more than just Comet. They'd have to do more than just seeing on the screen what Mr. Posner or the user is seeing?

MR. SCOTTEN: What we're talking about now is the third element about obtaining information.

THE COURT: Yeah.

MR. SCOTTEN: So, you have to access the computer, and the defendant would have to obtain information from that computer.

THE COURT: Yes.

MR. SCOTTEN: And in shorthand, your Honor, yes, there are screenshots that go to the Perplexity servers. Perplexity servers get that from the agent that's on the browser. They don't get -- they don't act -- I've already made my argument about how we don't access the computer, but we don't get information from Perplexity's computer. We have to access it -- to be liable, we'd have to access the computer, and we'd have to get information from the computer. Perplexity only gets information from the user's computer, the information Amazon has sent, the periodic screenshots that were sent by the user's computer to

89

Perplexity's computer.

THE COURT:  Okay.  I'm showing Perplexity as the recipient in and of itself out for a minute and just look at what Comet is doing.

On the possibility that I find that Comet -- that Perplexity is responsible and what Comet did violates, can't -- okay.  So, they're there, and they're seeing what -- in a protected access of Amazon.

Are you suggesting that they didn't bother with some of the things that Amazon might be particularly concerned about when they're just looking at things that could be seen anyway on the public website or are you not making that distinction?

MR. SCOTTEN:  Well, I'm reluctant to -- I'm very reluctant to abandon the position that there's a difference between the browser and the AI enabled browser which sits on the user's computer and Perplexity's computer.

THE COURT:  Okay.  But you don't have to abandon it.  I'm just saying let's say we stop there for a minute, and you don't have to concede the point.  I'm just saying that if you didn't use it, go further.  Perplexity is -- maybe you don't want to address that.  I mean, it's fine. We can just look at it as the idea that what went to Perplexity is just something that the user handed it.  Okay. All right.  But they did hand it first to Comet, who sent

90

it, if they did, to Perplexity, because the user can't send it directly to Perplexity.

MR. SCOTTEN: The user's computer did. The user's computer on which the Comet and the AI Agent have an enabled resides, but the user's computer sent screenshots. No information screenshots went from -- from Amazon to Perplexity. All that Perplexity got, its servers got, came from the user's computer.

THE COURT: Well, where in -- where the screenshot comes from?

MR. SCOTTEN: That comes from the -- the -- so, the AI Agent sends the -- the user's computer, including the browser, the AI, sends the screenshots to Perplexity.

THE COURT: Yes, but first the screenshots had to come from somewhere.

MR. SCOTTEN: That's -- that's a yes. They are screenshots of information that Amazon had sent to the user.

THE COURT: Okay.

MR. SCOTTEN: Or the HTML code --

THE COURT: Okay.

MR. SCOTTEN: -- in the browser session, and screenshots are sent to Perplexity.

THE COURT: Okay.

MR. SCOTTEN: Now, the information that's sent, the -- Amazon is -- makes a big point about the fact that

this can be private information, and I think it's important we drill down on there's no claim with his credit card information, payment information.  They were able to -- their expert describes how he constructed a test where he could navigate and, you know, go to Amazon, go to my browsing history, do a summary of my browsing history, and could cause it to take a screenshot and send that to a -- a sort of a faux Perplexity that he had set up.  But all that information, private information they referred to, is the user's information, your Honor.  I mean, you get -- I get the impression if you read their papers as if this agent is roaming around in the Amazon website and extracting private information.  There is no extracting that goes on here.  The user logs on.  Amazon knows who the user is.  It will serve up things which are similar to, you know, what you've shown interest in in the past.  They would regard that as private information.  And when you log on as somebody, Amazon knows who you are, and they would say, oh, that's private, you know.

            THE COURT:  Okay.

            MR. SCOTTEN:  But the point is it's the user's information.  Amazon doesn't own the user's information.

            THE COURT:  No.  Okay.

            MR. SCOTTEN:  It's all the individual -- and I don't think there's any case where there's a violation

92

that's been found where it's the user authorizing the sharing of its own information.

THE COURT:  Okay.  And I'll get back to counsel for Amazon on this, but what I think is very interesting is you've picked Mr. Kim as the account holder on screenshot 10, so it relates to Jonathan Kim.  And, so, using the account, I think Mr. Posner and -- is this your office address that you have here?

Anyway, so, that's Mr. Kim.  I'm not sure what address that is.

Okay.  So, now, do you want to -- question for time, I need to check just to see if anybody needs a break.  If they don't, we'll just keep going.  Let me check with the court --

(Pause to confer.)

THE COURT:  We're doing fine because today I don't have any case management conferences.  So, we'll come back and -- why don't we just say 15 minutes, come back in 15 minutes.  Thank you.

THE CLERK:  We're in recess.

(Proceedings recessed briefly.)

THE CLERK:  We're back on the record.

THE COURT:  All right.  So, what do you want to start with?

MR. QUINN:  Your Honor, just to wrap up, we've

93

talked about the first element, access.  We've talked about the second element, authorization.  We've talked about the third element, obtain information.

My first point on that it had to come from the computer rather than from the user.  My Second point is -- and I don't think Amazon disputes this -- the information we're talking about is the user's own information.  They used this term "private information".  It's the user's own information.

THE COURT:  Okay.

MR. QUINN:  And I don't think that Amazon even contends that the user is not free to do whatever they want with their own information.  I mean, I think arguably, this doesn't come under the act-- it's like somebody hacking themselves.

THE COURT:  Sure.  Well, then --

MR. QUINN:  Arguably, I don't think this even comes under the act at all.

In the BrandTotal case, they somewhat similarly in granting summary judgment on the issue of access, the Court in BrandTotal noted that the data at issue is "information that Meta has never argued users are not free to share as they see fit".

THE COURT:  Right.

MR. QUINN:  My browsing history, I can share it

94

with Perplexity.  I can share it with whoever I want.  That is the only information we're talking about is the user's own information.

So, we don't think they've satisfied obtain -- the obtain information element.  This is not private information in the sense used in the statute or used in the case law.  There's no case law that says somebody can hack their own information.

And, also, the law is clear in Van Buren and the Nusaw (phonetic) case this statute is not a misappropriation statute.  It's a -- call it hacking or improper access, what you will.  Amazon doesn't have the ability to control what happens to the data, its data, after it releases it, after it returns it to the user.

THE COURT:  Well, I'll accept that -- that to a certain extent, but aren't they getting information -- like, again, it's not necessarily information that the user wants to keep from Comet or Perplexity or anybody else that it wants to kind of engage with.  But they're getting some information about the user's buying habits.  They know that until you get into the actual private part, if you will, you know, the password protected, if you want to use that instead, probably feels better -- the password protected part, it isn't until you're in there that they know that Mr. Posner has -- you know liked this product enough that he's

95

actually went and bought it.  Up until then, it can be I'm interested.  I want to buy it, but then he may change his mind.  Something -- something came up in the interim and he's decided he didn't want it.  He's got something from Target.  He's going to do something else.

But they -- they do find out that he's willing to buy and does buy because they're there when he buys it, and that's a little different than just making this personal information to have helping maybe with his shopping, if you will.  It's a little bit different, but okay.

MR. QUINN:  Yeah, we're not -- we're not talking about credit card information or information like that.

THE COURT:  But when he buys -- let me ask you this question.  Let's say somebody does find something on Amazon and it says, How you going to pay for it?  Now, you could say if you got PayPal, I want to buy it with PayPal.  Then they know you get somebody who knows how to use that PayPal account, but they don't know the credit card.  But they may have a credit card on file or they may have to put one in, in which case it may just show ultimately the last four numbers, but they would get those if the -- the user has a credit card.  That shows on the screen, doesn't it?  I think it does.

MR. QUINN:  Let' suppose it does.  That's the user's information.

96

THE COURT:  No, I understand.

MR. QUINN:  And, so, the user has activated the agent.  It's doing this.

THE COURT:  No, no, I --

MR. QUINN:  And -- and I think the record -- the record's undisputed let's say that if there's a screenshot, sends that kind of information like, Hey, you have this screenshot.  It's deleted after 30 days.

THE COURT:  Okay.

MR. QUINN:  But the user is not objecting to that.

THE COURT:  Fine.  Okay.

MR. QUINN:  So, this is --

THE COURT:  I agree.  That's --

MR. QUINN:  This is not like any of the cases we've discussed.

THE COURT:  Okay.  Let's assume that they have to piece together bits of each case that's not the same and make one that looks like this one and have it, nonetheless, come under that is able to do that.  I get your point.  They're not really stealing something, all right, from the user, okay.  There is an argument perhaps that Comet's stealing something from Amazon, and we'll see what they say about that.  But it's not the idea that they are getting something that the user doesn't want them to have.  They concede that.

97

MR. QUINN:  Right.  And that's -- that's an important concession.  They're -- they're --

THE COURT:  Yes, I know, but we're back to the same point of if the user doesn't care, can Amazon nonetheless say that they do, and that's kind of what it keeps coming down to, and we'll see if that pans out when I hear the final remarks from Plaintiff's counsel.

Okay.  Now, we have gone through the elements up to the idea of loss.

MR. QUINN:  I -- we're up to -- we're on loss. We're up to that.

THE COURT:  Okay.

MR. QUINN:  Up to that issue on the underlying -- we acknowledge that there is some tension in the case law post the Van Buren case that the Ninth Circuit hasn't fully sorted out yet.  You know, we -- we rely, of course, on the X court case, Judge Breyer's opinion in the internal investigations of an unauthorized access don't qualify as damages.

I think the language in the Van Buren opinion about the technological harm, that what we should be looking at here is that the Court, just as Judge Breyer says in that case, was the kind of harm that results from hacking.  I mean, this is -- this is basically -- that that's the kind of activity --

98

THE COURT:  What?

MR. QUINN:  -- the statute is intended to address, the kind of harm that results from hacking.  And I think he mentioned the case of example of corrupted files is another case that talks about software patches and the like.

And the cases that Amazon relies on here, the -- the Apple v. NCO and TK Global, neither of those cases came to terms with or contended with the -- the Van Buren Court's limitation of SGAA damages to those arising from hacking. That really -- that really wasn't disputed.

And in the Apple case, Apple went to the damages that arise from actual technological harm such as the cost of the developing and deploying security patches and software upgrades in response to malware attacks.

And we don't have anything like that here.  And then the new authority that was lodged this week out of the 10th Circuit we think, of course -- we think it helps us, surprise, surprise, because there the 10th Circuit said:

> "Expenses related to business harms
> such as the cost of investigating our
> competitive use protective information
> obtained as the result of the TFAAA
> violation would not qualify."

QED.  So, I mean, that's -- that's exactly our position.  And the 10th Circuit based its decision on its

99

conclusions that the technological harm in Van Buren was dicta -- that it was dicta, but they acknowledged that the Ninth Circuit reached the opposite conclusion in hiQ Labs, that it was not dicta.  So --

THE COURT:  In dicta.

MR. QUINN:  Huh?

THE COURT:  In dicta they -- in dicta they described what the Supreme Court said in dicta.

MR. QUINN:  Yeah.  So --

THE COURT:  The Supreme Court is like double dicta.

MR. QUINN:  That's -- the point is that they acknowledged that the Ninth Circuit reached the opposite conclusion.

THE COURT:  Yeah.

MR. QUINN:  The Ninth Circuit said that wasn't dicta.  So --

THE COURT:  Well, they certainly are clear that the Ninth Circuit had said that in footnote somewhere of one of the opinions, but it was dicta because they had already gotten -- it was in a footnote because it was dicta in that particular case, although that's not a specific case.  But in this particular, since it -- the packet was in a footnote made it even clearer that it was just kind of a comment and not really even acknowledging that they have considerable

100

case law to the contrary, although that case law indicated Van Buren.  Van Buren created this whole problem, if you will, of what loss counts.  Up until then, the other kinds of losses were considered cognizable under Section 1030, and all of a sudden, in trying to make a point about why this police officer shouldn't be considered a criminal for going beyond what he was authorized to do, they decided to make the promise that this is so remote from what the statute is designed to do, specifically, keep out hackers and any damage that -- of the type that hackers create, and then all of a sudden, we've got now this whole issue that were they just going a little farther than they had to or otherwise. But, yes, and I was very -- kind of circled -- kind of underlined a part that you had said in your response to their perhaps totally -- not totally encapsulated noticed recent decision, and then he said, Look, you guys said a little bit about it, and that goes beyond the Local Rules. So, we get to say something too, and what we say is -- and they pointed out, one, that according to 10th Circuit, there's law in the Ninth Circuit, and we're in the Ninth Circuit, not the 10th, and also the language about what expenses would not qualify, and then you would put what the Plaintiff is saying is the expenditure that they made into that kind of related to this is harm such as the cost of investigating our competitive use information.

I'm not sure if they were thinking that was a little more remote than what we have here, but we did hear from Plaintiff's counsel on that.  This was more or less at a minimum they're saying our loss was his to responding to that they're not checking out what they're doing later and whether or not they've managed to get some competitive edge out there once they have this information.  But, yes, they didn't solve the problem at all.  It's just one more commentary after Van Buren and, you know, some law that -- authority that's precedential is in that contiguous circuit, albeit not this one.  (Indiscernible) sort of close to what I think your thoughts were.

MR. QUINN:  If we -- if we drill down on the particular elements of the claimed damages, the damages of reopening customers' accounts that were -- were blocked, it was their decision to try to do a block, which turned out to be ineffectual, not because of anything we did.  In fact, we didn't try to dodge that, contrary to what they say.  That story is laid out in the papers.  It was their decision to try to do that.  As a result, it was predictable that some of their customers' accounts which had a problem, they had to spend money to do that.  That was their own decision.  They didn't call us up and ask us, you know, We're going to be blocked, and we're going to hold you accountable for it.  Entirely it was their decision.

102

They have to reimburse advertisers because agents don't have eyeballs for something like that.

THE COURT: Don't they --

MR. QUINN: That's their business model. That's -- we had nothing to do with that. They -- we weren't -- they didn't consult us about that. That's -- that's something they have to deal with. They say it's like -- it's telling us that, you know, a doctor has to -- you know, somebody has to pay for a broken leg because somebody (indiscernible). Well, that kind of assumes the conclusion. That argument assumes the conclusion that we violated the act. So, I don't think they've identified any compensable harm here at all. None of it rises to the level of technological, as -- as your Honor knows, at least as we interpret the cases.

I'll turn now to irreparable harm, and I think this is maybe their weakest case of all, of all the elements for an injunction. They have an expert who's submitted mostly in a reply brief a parade of horribles of technical things about why agents and the -- you know, Perplexity's AI Assistant in particular, are riskier, are bad things, are prone to calamities and the like. But, your Honor, it is all utter speculation.

Under the case law that we've cited on page 19 of our opposition brief, they have to show more than that there's

103

actually a risk.  They have to show more than something -- this could go wrong or a vulnerability to your -- you have to show that it is likely, it's actually likely, and you have to identify specific facts that show why -- why it's likely.

Experts can look at this, and, you know, we can get a parade of experts who can come here and say, you know, this technology, this software, this agent, this one's more dangerous to that and rank them.  But the fact of the matter is in the real world, it hasn't happened.  They've had all kinds of engineers.  One of their experts tried to replicate one of these vulnerabilities and failures and said that he couldn't do it.  I mean, there had been a problem in the past.  We've had -- we fixed it.  There is no showing whatsoever that there's -- that in the real world those vulnerabilities have played out, and they want an injunction on a criminal statute that's a criminal statute where the Rule of Lenity applies?  I think their -- their case on irreparable harm doesn't get out of the starting gates.

Now, they had another argument.  They said, Well, accessing our computers, that in itself is irreparable harm, and they cite these cases where -- totally different scenarios like the -- you know, the case where they spammed the Facebook account and all the friends.

We did not take control of their computers.  We did not

104

-- there's -- there was no changes to their systems, monkeying with their systems, no changes to their cyber security measures, activity monitors, access controls, logins.  We did none of those things under -- under any view of the facts here.

So, and -- and on the -- I just -- I don't see it.  This is an easy way out here I think.  I don't see a case for irreparable harm.

I'll turn now to balance of the hardships.  And this AI Agent for our browser, I mean, we're kind of a first mover there.  This is a big advantage to us.  We all know first mover advantages are important.  I mean, to enjoin us, still a company that's had some success, when it's still an early stage company, to deprive us of that first move -- mover advantage right out of the box is an -- is a very significant hardship for us.  And it's -- it's something we have -- obviously, you know, people appreciate it.  It's something that attracts users to Perplexity.  It would be a very significant hardship for us to use this -- lose this Assistant, which is discriminating for us.

Amazon is the biggest marketplace -- maybe the biggest marketplace online in the world.  I don't know.  I think they get something like it's the ninth most visited website. And to tell us -- us and our employees and et cetera that we can't go there, return all this data and all this browsing

history, I mean, it's an extraordinary hardship that we'd be apprised with.

I don't see the hardship to Amazon at all.  I heard -- I listened carefully when counsel was describing what the hardship would be to them, and I'm really not -- I'm not understanding.  I -- I would have thought a case could be made that actually this is good for Amazon because it's easier to use Amazon and people -- they'll sell more products, but on that Amazon side where of the scales, I just don't see the case.

In terms of public interest, it's a public interest in innovation.  The next new thing in artificial intelligence now is Agentic AI.  We're all hearing that.  Now, I am, maybe the Court too, learning something about that.

But there is an enormous public interest in advancing AI and new AI tools.  And there's a public interest in consumer choice.  They say that, you know, the use of AI degrades their customer experience.  Well, wait a minute.  Customers have decided to use the AI.  They've decided that is the kind of experience they want.  So, maybe they won't have the opportunity to be upsold, offered new products and all the other things that you get when you log in as you and are watching the screen and making the purchases themselves.  They may regret that.  But that's the customer choice.  And, so, consumer choice, innovation, advancing the latest

106

technology I think all weigh in the interest of the public interest against entering an -- an injunction here.

And I'm going to end my remarks now unless the Court has some questions for me.

(Pause.)

THE COURT:  Well, I did give counsel for Plaintiff an opportunity to discuss the question of a bond.  I don't know if you want to get to that point since, of course, your argument is you should never be there.  Mr. Scotten did talk about it, and if -- if you -- you know, on the chance that I might order an injunction, do you want to say anything about the bond?

MR. QUINN:  I think -- maybe I'll defer to my partner.

THE COURT:  Mr. --

MR. QUINN:  I haven't honestly focused on that, your Honor.

THE COURT:  All right.  Well, I didn't spend a lot of time on it, but it is something that came up, and the concern -- oh, state your appearance.

MR. POSNER:  This is Dan Posner for the Defendant Perplexity.

THE COURT:  Thank you.  The Amazon account --

MR. POSNER:  I think I -- my shopping history, everything has been utterly exposed today.

THE COURT:  So, Mr. Posner, one of the concerns the Court has was if it -- it was a situation where a bond might be appropriate or it's needed, that essentially Amazon is saying if -- if we have to cut out this part of our business, we are going to lose a very very large sum of money.  But it wasn't like tied to how much business Perplexity is essentially doing in terms of funds by having the Comet, the agent.

MR. POSNER:  Well -- well, I think that's in large part because that's not really how Perplexity's business operates.  And the way that we justify the bond that we seek, which was a large significant number, was based on the valuation of the company and our product offering and the significance to a recent valuation of our introduction of the -- the Comet Assistant, the Agentic AI Program.

And I think it's, you know, intuitive that if a browser or an agent that part of the benefit of which -- a large part of the benefit of which is to do shopping, if that agent and browser could not access the largest online retailer that exists, people just aren't going to use it. They're certainly not going to use it for their shopping. They might not use it for anything.  So, it would be devastating for this browser and the Assistant to be unable to access Amazon.com for what could be a year, two years, the length of the case.  We all know how things work.

108

So, it -- it's not directly tied to some source of revenue stream that we'd be losing.  It's really reputation.  As Mr. Quinn argued about, the first mover advantage, the fact that we're still a growing company, and that we've got this product that's basically doing quite well.  If all the sudden we weren't able to access Amazon, that would -- it would obviously have severe consequences because I think that's fair to say.

I -- I will comment, and I hope we don't need to get here.  You know, Amazon didn't raise the issue of a bond in its motion.  We spent I believe all of a paragraph talking about it.  This is a significant case.  There would be significant consequences of an injunction.  If your Honor were, in fact, inclined to issue the injunction, it might make sense to entertain further briefing on the issue of the bond because of the amounts that we're taking -- talking about and the stakes here.  I don't know that this issue's been fully explored before the Court based on what we had the opportunity to submit to this point.  So --

THE COURT:  And let me just look for a second at all of the statements your file -- I should say you may be right that the -- let me just go here.  You addressed the -- Perplexity then toward the end of the brief regarding the bond, and I'm just double checking something here, and I think you are correct that that was the first time it came

up, and then in their reply, just to double check that, then at that point, Amazon then weighed in on the bond.

Okay. I just wanted to double -- double check that chronology.

MR. POSNER: Yes. And, so, I do think there's more detail that we could provide, including about the competitive landscape and what our competition is doing and -- and could and would be doing during the period during which we would be enjoined and the significance that that might have on our -- on our company's existence and value.

THE COURT: Well, okay. I'm not sure I want to get more briefing. That was one problem here. Okay. Well, I appreciate that further elaboration, and then I guess I'm going to go back to Plaintiff's counsel since they're the ones trying to (indiscernible).

MR. POSNER: Thank you, your Honor.

THE COURT: All right. Thank you, Counsel.

MR. KABA: Thank you, your Honor. Moez Kaba again, for Plaintiff.

The Court's already given us a lot of time. It's very obvious the Court is quite familiar with the case law in the record. So, if the Court will indulge me, I'd like to make just a few points in response, and obviously will answer any additional questions the Court has.

THE COURT: All right.

110

MR. KABA:  We could start with the accessing information.  I think the Court's really just honed in on the issue with Perplexity's argument here, but I would like to remind the Court of the record, and I think it answers the questions pretty definitively about Perplexity accessing information on Amazon.com's password protected area.  So, if we could just go to slide 52 of our deck.

And, your Honor, I would call out for the record the declaration.  These are not Amazon's words.  These are Perplexity's words.

THE COURT:  (Indiscernible.)

MR. KABA:  Yeah.  So, the words we are all now eagerly awaiting.

THE COURT:  Well, alternatively --

MR. KABA:  Yes.

THE COURT:  So, otherwise, I was going to say I can go to what engaged me as to --

MR. KABA:  Yes.

THE COURT:  (Indiscernible).

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

THE COURT:  Okay.

MR. KABA:  Here is how Perplexity described what its Comet AI Agent does, and it's -- it's quite clear that Comet is just their product.  I mean, your Honor's point, you don't -- you don't sue a product.  You sue the entity

111

that owns and is responsible for the product.  That's why they're here, to argue for what they want Comet to be allowed to do.  We -- Mr. Posner just came up and said Comet is a big deal for us.

Obviously, they are (indiscernible) over what Comet is doing.  And what Perplexity's CTO, the cofounder said, is that here is all the things our agent does.  It navigates purposely through the site here, Amazon.  It automates clicks within Amazon's use of interface, including on our secure web pages.  It browses for you.  This is how Perplexity advertises Comet.  It's clicking.  It's scrolling.  It's interacting with the site.

So, this whole notion that, Oh, there's nothing going on back here.  It's just -- it's just the user sitting around deciding what to do, that's not what their own CTO and cofounder admitted under oath, your Honor.

Let's turn then to the next slide and this whole idea of Magistrate Judge Spero's language -- I'm violating the rule of too many words on a slide, your Honor, but I'll go through it briefly.

This is, again, Perplexity's own declaration, this time by the Chief Business Officer, Mr. Shevelinko (phonetic), Docket 35.  Perplexity says, Oh, your Honor, this is like BrandTotal.  We are just reactively collecting information.

Now, your Honor already pointed out, as Magistrate

112

Judge Spero indicated in <u>BrandTotal</u>, that page, there was actually a violation on one part of BrandTotal's conduct and no violation of the other, and when <u>BrandTotal</u> talked about reactively collecting information, it said specifically during the user's normal operation of the (indiscernible). There was no intermediate party here, the AI Agent, in the middle clicking, scrolling, filtering information -- these are Perplexity's about what Comet AI does -- processing that information and providing information to the user.

In <u>BrandTotal</u>, the user was just getting information while they were normally operating the website, and then the user was deciding to send that information on to the Defendant, and that wasn't enough for a TFAAA violation in that case.

This is not that case.  In this case, again, critically, Perplexity's own description of what it does, it says, as Mr. Shevelinko says in paragraph six, instead of passively displaying whatever content websites throw at a person, Comet works on the user's behalf, filtering noise, surfacing what matters, and handling routine tasks.  He goes on to say Comet -- what sets Comet apart is its Agentic capability, the ability to find information and act on it intelligently and autonomously.  This is Perplexity's agent accessing information by their own terms from Amazon's secure servers, and I thought this slide was actually -- I

113

understand it -- and I'm pointing to slide 12 -- Perplexity's presentation.  I think this gives away the game.  They -- they're trying to draw an artificial distinction.  They are admitting Comet is accessing Amazon and obtaining information from Amazon.  But then they're saying, Oh, but Perplexity is sort of this other thing. Well, no, Comet is not an entity.  Comet is Perplexity.  So, the fact that Perplexity is going through its agent, Comet, to do so, does not immunize Perplexity from liability under the CFAA.

But they still -- and nothing we talked about for the last hour plus even touched on the California version of this statute, the CDAFA, which defines access even more broadly.  The CDAFA also defines access to cause input to or cause output from a computer.

So, even if you take everything else Perplexity said about, Oh, Comet's just operating there in the background, it is causing input to Amazon's computer and causing output from Amazon's computer.  That can also satisfy the access harm of this CDAFA.

I want to turn then, your Honor, to obtaining information.  And here again, the Court need not take our word for it.  We can look at Perplexity's own admissions in its declaration.  In the Yarats declaration, your Honor -- again, this is Docket 35-02, Exhibit 3, which is the Yarats

114

declaration -- it says when the Assistant requires contextual information, it may temporarily store a JPEG or HTML snapshot of the web page currently displayed on the user's device on a Perplexity server.

Your Honor, as you said, Okay. So, you're storing this snapshot. Where are you getting it from? They tell us they're getting it from the secure part of Amazon.com. It then says, Yeah, we have the rule. We won't keep it for more than 30 days and, you know, we'll use it for, in their words, "debugging potential errors". No idea what that means. But as your Honor pointed out, it doesn't matter under the text of the CFAA. 1030(a)(2) speaks only to obtaining information. It doesn't say for what purpose you're going to use it. It doesn't say what your motive is. It doesn't say if your motive's good or bad. That -- besides whether or not the law has been violated, the Court's got to just look at the text of the statute, and the statute directs us on all of these elements which have been met here.

So, what do we actually -- what is it actually coming down to? And the Court commented about very early (indiscernible) and in my esteemed colleague's argument here, which is isn't this just about Perplexity saying, The user told us to do this and Amazon saying, That's not enough? And I think that's exactly right, your Honor. And

115

I think the case of the <u>Power Ventures</u> is actually far more on point than Perplexity would like this Court to believe.

In <u>Power Ventures</u>, your Honor, it -- the users were giving consent.  In <u>Power Ventures</u>, the Ninth Circuit says, frankly, the consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computer after Facebook's express revocation of permission.  And that's 844 F.3rd at 1058.

THE COURT:  Give me just a second just to follow that --

MR. KABA:  Yes, your Honor.

THE COURT:  -- comment.  All right.  And we're dealing with the Ninth Circuit opinion?

MR. KABA:  We are dealing with the Ninth Circuit opinion.

THE COURT:  Which page were you on?

MR. KABA:  I was on page 1058, your Honor.

THE COURT:  Okay.  And if you'd just give me a moment to catch up --

MR. KABA:  Sure.

THE COURT:  -- with that.  All right.  Where were you quoting or what would you like to emphasize on that page?

MR. KABA:  I -- I'd like to emphasize, your Honor, the portion -- it's the beginning of the paragraph, that

116

first full paragraph on 1058.  It says:

> "The consent that Power had
> received from Facebook users was not
> sufficient to grant continuing
> authorization to access Facebook's
> computers after Facebook's express
> revocation of permission."

And then the Ninth Circuit answered the very question that your Honor asked.  It says, Well, okay, if Amazon's saying you need both, at the end of that paragraph, your Honor, we'll see.  It says:

> "For Power to continue a campaign
> using Facebook's computers, it needed
> authorization from -- it needed
> authorization both from individual
> Facebook users who control their data"

-- same argument, their data -- "and personal

> pages and from Facebook which stored this
> data on its physical servers."

Permission from the users alone was not sufficient to constitute authorization after Facebook issued its cease and desist letter.

But, your Honor, I want to point you to another part of the Power Ventures opinion which again squarely rejects the theory of Perplexity's defense here.  And that's on page

117

1067, your Honor.

THE COURT:  Okay.  I'm there.

MR. KABA:  And the Ninth Circuit goes through the case law, and it says in the first full paragraph after, again, the beginning of that page, it says, Once permission has been revoked -- and, your Honor, it's sort of in the middle of that paragraph.

THE COURT:  I see it.

MR. KABA:  -- technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability.

So, the enlisting of a Amazon user to aid in Comet's access does not excuse Comet's liability.

So, in Power Ventures, you have users' consent.  You have access to users' email addresses.  That's all that was being taken, users' email addresses.  No argument there that Facebook owned some -- some of the parties' email addresses. And the Ninth Circuit says, No.  That is still a CFAA violation, and that's because, your Honor, as you said, you look at the statute.  1030(a)(2) says obtained information. It doesn't say obtains information that exclusively belongs to the Plaintiff.  It says obtains information from any protected computer.  And we have hit every single one of those elements, and we can rely on Perplexity's CTO and cofounder and Chief Business Officer's own admission to get

118

us there.

I'll touch briefly -- unless your Honor has further questions on the merits, I'll just touch briefly on the other elements that we talked about.

THE COURT:  What were they?

MR. KABA:  Oh, just on -- on -- we had heard some argument on irreparable harm, public interest.  I -- Mr. Scotten's made those arguments.  We -- we -- I would just -- I just want to emphasize --

THE COURT:  You're leaving the loss part aside then. Just go to the other elements of I guess at that point we're on the preliminary injunction element.

MR. KABA:  Yeah, well, I'll mention -- I'll mention loss because --

THE COURT:  Well, that too.

MR. KABA:  Yeah.  I --

THE COURT:  We talked about --

MR. KABA:  We've talked about it at length.  I would say -- I would say on loss, your Honor, we aren't -- you're -- you're absolutely right.  I mean, the -- the declaration that details the 260,000 top loss at that point, it wasn't the -- the Moxy investigate what your competitor did with the data.  That -- that's not what that amount was expended for.  That amount was expended to put up a block, to investigate the intermission of the block, to restore

119

accounts, to correct the harm that occurred to Amazon as a result of Perplexity's unauthorized access.

I do -- I will just touch on your other point, your Honor, because you -- you made it, which is, Well, you obtained information kind of a couple of ways, you know. These are -- you're sending stuff back to your server. They're admitting they do that.  They're also admitting in their -- in their declarations that they're getting instructions from Perplexity.

But all of this is a distraction because just the viewing of the information, your Honor, by Comet AI, the Perplexity AI Agent, is enough under the law, and -- and we note that your Honor in our reply brief at footnote three, we cite case law.  We say Perplexity says that obtaining the information requires more than viewing it, but that's not what the law actually is.  In the United States v. Strude (phonetic) case, which is a 3d Cal. case, it says:

"Obtaining information from a computer can be described as including inherently mere observation of the data. Actual application need not be proved."

There's another case we cite, Shamrock Foods from the District of Arizona 535 F.Supp.2d, 962, which says the statute confirms -- the legislative history confirms that the CFAA was intended to prohibit electronic trespassing,

120

not the substantive abuse of misuse of information.

And here the information that they are not only viewing -- did you have a question, your Honor?

THE COURT:  No.

MR. KABA:  Okay.

THE COURT:  Just that wasn't actually a part I was thinking about.  I was thinking more about the Van Buren issue that was raised.

MR. KABA:  Yes, on loss.  Is that right, your Honor?

THE COURT:  Yes.

MR. KABA:  Yeah.

THE COURT:  In other words, assuming arguendo that whatever your client did once they found out that this was going on, would, at least in great part if not in totality cover -- or be covered as a loss under the statutory definition before Van Buren, which then created an issue in that regard.

I was just wondering if you wanted to say anything more about Van Buren.  I don't think you need to --

MR. KABA:  I --

THE COURT:  -- because we have the -- whatever we've got and that created -- that was created there.

But I do want to ask you about 502 because let's assume for a moment that there is a problem under 1030 in light of

121

Van Buren.  In 502 they define damages, all right.  And in (e)(1) -- let's see.  I guess it's the only one that says that -- if you want to get it in front of you first, I'll read you the part that I'm looking at.

MR. KABA:  Yeah.  I believe it's -- well, your Honor --

THE COURT:  So, this is the Penal Code for Section 502.

MR. KABA:  I -- I have it.  I have it in front of me.

THE COURT:  All right.  So, if you're looking at (e)(1) and then you say compensatory damages shall include, and I -- I really don't like it when anybody uses that word because you never know if they mean it to say it includes but it isn't limited to or they're really saying consists of, and then particularly when it used shall, right.  So, anyway, shall include.

Now it says any expenditure reasonably and necessary incurred to verify that a computer was or was not altered, damaged or deleted by the access.

All right.  Now, it's what your -- because this doesn't have a problem as far as Van Buren goes, but if any of what you are saying your client had to do covered by the idea of checking to see if there was any alteration and damages to which --

122

MR. KABA:  Yeah, I think the -- the nature of the investigation and the response included and include whether or not this unintended intermediary has done something to the account, has engaged in transactions that should not have been engaged in, that's the part of the whole reason for the investigation that --

THE COURT:  Not later but while it's being --

MR. KABA:  Correct.  Correct.

THE COURT: -- competitive.  Defendants lay out -- and to me the Moxy case, for example -- which, again, it's not a Ninth Circuit case, but essentially saying, but you can't keep going on there.

For example, if you had patent infringement, you could check to see if there was infringement but not once somebody infringed what they did with it and what they made --

MR. KABA:  Yeah.

THE COURT:  -- and how they competed with you. That may be too far off.

MR. KABA:  Right.  And this --

THE COURT:  -- they accuse excuse you.

MR. KABA:  Yes.

THE COURT:  Not essentially approximate loss if you want to do it that way.

MR. KABA:  Okay.  I mean, it's a fair characterization of their argument, and I think that you are

123

absolutely right, that the losses of which we have -- that we have identified are not the "and then what did they do with our information?"

THE COURT:  No.

MR. KABA:  I do want to, if I may, your Honor, point out another part of -- of (e)(1).  So, your Honor's, looking to the definition of compensatory damages under (e)(1).  I would say if you look at (e)(1), it says in addition to any other civil remedy, the owner of the system, et cetera, who suffered damage or loss -- that's broader -- may bring a civil --

THE COURT:  Shall include.  I'm just saying, unilaterally, they didn't have a definition of damages.

MR. KABA:  That's right.

THE COURT:  And, so, that probably just means that you have to first start with you suffered damage or loss.  Then you could start arguing again, Okay.  We had a loss.  It wasn't damaged.  1030 you've got loss or damage or --

MR. KABA:  That's right.

THE COURT:  -- and now you may independently apprise.  They didn't bother to say what loss would include.  They have a definition of injury that's not included in any of the statutes you're relying on.  So, again, I'm just saying maybe these things weren't written as well.

MR. KABA:  Yeah.  I mean, it's fair.  And, of

124

course, your Honor, 502(e)(1) says in addition to compensatory damages, we can seek injunctive relief. That -- that's what the --

THE COURT: Well, yes, but you first have to have I think a loss.

MR. KABA: That's where --

THE COURT: That's why I say you're not even (indiscernible).

MR. KABA: That's right. And -- and that is the point I think that where we're going, the dialogue that your Honor started with me the first time and continuing now is --

THE COURT: Okay.

MR. KABA: -- whatever the CFAA says, the California version doesn't seem to have a <u>Van Buren</u> issue so to speak.

THE COURT: All right. So, you wanted to talk a little more about public interest. What should know?

MR. KABA: Only to -- only to -- to reemphasize just two narrow points, your Honor. One is the harm from the loss of the access and control over one's access password protection system is recognized by the law as sufficient case after case as a violation of the statute CFAA or the California statute is enough.

But the second point I would make, your Honor, is all

125

of this talk about public interest and consequences and innovation and -- and the need to have first mover advantage, all of that may be something Perplexity likes, but there is not a case out there that says you are allowed to do that while violating the statute.

So, yes, you can be as innovative as you want, and you ought to be innovative, and you ought to go out there and find as many customers as you want, but you don't get to keep and maintain your first mover advantage by going into password protected areas once we told you not to.  And there is no public interest or competitive interest in violating the law.

And here we are just talking about limiting access to Amazon's password protective area.

THE COURT:  Yes.  I do see Power Ventures as the -- well, courts have consistently held in CFAA cases that the public interest solution favors an injunction.  They then cite one case --

MR. KABA:  Yes.

THE COURT:  -- one case that says, so, consistently and in any event --

MR. KABA:  Well, I guess with Power Ventures no issue.

THE COURT:  As I was saying before you jumped in enthusiastically --

126

MR. KABA:  Sorry.

THE COURT:  -- nonetheless, it does appear that one can say at least that there's always an interest against people violating the law.  All right.  But then, again, that's almost a given in any case in which anybody is getting an injunction because you couldn't enjoin someone from doing something that's legal.  So, I'm not sure where that goes exactly, but I do understand that at a minimum, if you have a right to keep people out and that if somebody says I -- I don't think I have to stay out, that you could enjoin them then from doing that, and then, if they keep doing it, then it's harmful to you, and the public interest has an interest in people not being harmed.

It's not the strongest public interest, but at least it -- it could be found to be that way.  In other words, yes, certain users would like people to come in.  Other users may think, no, they read this and they should stay out, that it's too much of this stuff going on.  Who knows?

But, all right.  It's a factor.  It certainly doesn't weigh against, as far as I can tell, whether we're -- it's something I could find weighed in your client's favor if everything else goes along.

So, okay.  I think you've covered --

MR. KABA:  I've -- yes, I'm happy to -- we're at -- we're at past the lunch hour, but I'm happy -- or at

127

least into it, but --

THE COURT:  Yes.

MR. KABA:  -- I'm happy --

THE COURT:  No.  I think we've covered -- okay.  Why don't you go ahead and have a seat.

MR. KABA:  Okay.  Thank you, your Honor.

THE COURT:  All right.  And I'll wait till he gets back there.

Okay.  This is a case that required me to familiarize myself with areas that I've not been very familiar with, frankly.  I do think it was interesting and that the various points that you've made are the best points that each of you can make for your perspective clients.

A little bit more has been said today to help clarify matters which I think is important, and -- and I think it was worth going through everything that we've gone through today, although, I thought that I had a pretty good handle on it before you came in.  I do feel it's important to hear again if both of you are receptive to (indiscernible) on this.

I am inclined to make the following order, and if I do -- I may do a fairly brief order if I do what I'm inclined to do.  If I do something different, then it would be longer and more descriptive with why I decided I want to do something differently than I'm expressing now.  But I do

128

want to get myself a final opportunity, and don't -- don't worry, just make a ruling right now.

Now, I -- I understand where the Defendant is coming from and that they feel -- and I think they've made a pretty good showing that what their client does is helpful, that it's being done at the request of the account holder at Amazon, that there is not the traditional egregious behavior that often is covered by a criminal statute.

In the same light, what Comet and thereby Perplexity appears to be doing seems to fall under the statutes, which are quite broadly worded.  If someone gained access under 1030 and essentially under those circumstances doesn't have permission from someone who is entitled to keep someone out, in other words, that you do need their authorization, if they just get access, then that's the start of being liable, and then you have a question of whether there is any damage or loss that has occurred as a result.

Really, I guess I could say this.  It's a little bit broader under 502 than it is under 1030.  So, even though they can get kind of discussed together because they overlap quite a bit, but you do have to gain information under 1030 in order to have some kind of okay, not just show up and kind of sit there and -- I don't know, or blindfolded.  I don't know, anyway, to get any kind of information because now you're seeing things, some of which may be duplicated on

129

the public area and much of which is not.

We talked a bit about the information that can be gained here.  At a minimum, somebody's shopping preferences, what they're going to buy, again, with authorization from the account holder.

And then 502 you really just have to show up there and have access.  And then the damages or loss is written a little broader in some respects under 1030, and maybe a little narrower -- it's hard to tell because of the way it was written -- under (e)(1).  But in either case, it looks like on the statutes that the Plaintiff has shown that they have suffered a cognizable loss.

Then a question I -- I guess is how that then fits in to go from there, because under 1030, we may have a more narrower interpretation of the language in 1030 by Van Buren, and, so, they do -- if I just go back for a second to -- just a moment.  I just want to check one thing here.

(Pause.)

THE COURT:  All right.  In (g) of 1030, it says any person who suffers damage or loss.  And then when you go to Van Buren, I don't know if they really may have lost so much or they were really looking at damage.  My feeling is if the -- the Supreme Court really had to look at this issue, that they may then analyze it a little differently than they did when (indiscernible) has to do it and that

130

under 1030 that I would say that in all likelihood, the losses that are alleged here would not necessarily be excluded and be not compensable under Van Buren, but even if ultimately one were to be limited in the way that Van Buren is in order to bring a viable claim under 1030, you do have 502, and the Supreme Court hasn't weighed in on that at all. And I think that then at a minimum, that although I'm inclined to find that the Plaintiffs have shown a likelihood to prevail on 1030, if not because of Van Buren, then because of 502, that they still have shown a likelihood, and I realize there are issues here that the Defendant has raised about coverage.  In a way, it's almost as if what they're doing shouldn't be covered.  And one could say it's a public consent or maybe it's -- people ought to be allowed to bring these kinds of shopping assistants in and have them talk.  But it -- it does seem like both statutes are very broad on this, probably internal, probably internal and that's just typical.

So, then we would get to -- to the preliminary injunction, and so -- all right.  We've talked about likelihood.  The next one would be injury.  They have a right to keep people out who keep doing it, like Comet, then that's irreparable until they're told to stop.

Then -- so, then going to those elements -- and let me go back and -- I have a (indiscernible) out there.  Okay.

We have a balance, and, according to Plaintiffs, there's no balance because you can't do something that's unlawful.  If I look at what the defendant is arguing, which is essentially providing a service that they won't -- they may be edged out of market if they came to amount if they got it early and others don't take over, but if, in fact, they can't raise that argument, if it's not lawful -- I don't know.  Again, as I say, you can't get an injunction against someone who's doing something lawful.  So, that would be always the case.

All right.  So, it's not a -- in my view, it's not initially a strong tip in favor of the Plaintiff if we were only looking into this question, but I do think it does tip in their favor.  And, so, we have that.

And then -- so, then the public interest, again, I think they get broad with that, and, although one could say that, again, just the argument you can't do something that's unlawful seems like it comes up pretty much all the time.  Okay.

Because you have to have a claim before you get an injunction on it.  You can't have a claim on something when you don't think it's contrary to either statutory or constitutional or common law.  That covers that range.

If I do make this finding and have to consider a bond, I understand what was being said by Mr. Posner and in the

132

papers by the Defendant, but this could be a significant loss of position in the market if it turns out that I am totally wrong and to win this case, it has to be decided on its merits, but the Plaintiff's case has not been proved up, and the same -- I can't just pull a number out of the air and put it on a bond, and I just have no idea at the moment what that particular segment of Perplexity's business is -- is worth either now or in the future as this case moves forward.  I know that a request was made to -- to get a chance to elaborate on the bond, but I guess -- and that request perhaps could have been made earlier.  If, for example, Perplexity wanted to say, okay, you've got a couple of issues here that are coming up really in the first instance in the reply  and things weren't fleshed out before and we really want to come in and have a chance to do a supplemental declaration.  We think -- and I'm like, Well, I've granted it, but I -- I really don't want to start expanding this matter now.  I -- well, I recognize though that if -- if I am wrong, that Perplexity at the end of the day will have lost substantially some money, and they won't necessarily be able to recover it by saying Chen sued me. But I don't really quite know how to deal with that, I'm sorry to say.

So, this is -- this is a tentative.  I think the presentation by the Defendant was very well presented on

133

this.  You've done -- their position is very well presented in their opposing papers, and I think that the presentations here today made their position even clearer to me.  I think that I have the view that the statute is so broad and covers people who may be performing a beneficial act that I'm kind of stuck with it.  So, that is my tentative ruling.

I'd like to get an order out fairly quickly if I stick with that.  And, so, it may be more abbreviated than some of the other decisions that you've seen cited to in Plaintiff's papers.  I do want to thank you all for the time you've spent on it in the --

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  -- over the night and today.  That will conclude the matter.  Mr. Posner?

MR. POSNER:  Well, may I have a brief word, your Honor?

THE COURT:  Well --

MR. POSNER:  You can tell me if --

THE COURT:  -- the matter is submitted.

MR. POSNER:  Understood.  The issue I was going to raise, your Honor, if you're inclined to consider at all the issue of stay pending the appeal, if you're inclined to follow through on your tentative, we would ask for a stay pending the appeal, and I'll just note here we -- we could brief it, but on the issue of harm, to the extent that

134

they're relying on sort of a legal presumption on the basis of the violation to show harm, I think that's telling that there really wouldn't be, you know, some catastrophic harm to them.  They haven't really identified actual harm. They're -- they rely on essentially on violation.

So, we would say that it would -- it would be prudent to issue a stay pending the appeal whereas you've acknowledged that I believe it's the case that we would be suffering harm while the injunction is in place.

THE COURT:  I can hear from Plaintiff's counsel in a minute, but I -- I'm kind of concerned about that because it isn't just that you're doing it.  It's not quite as clean as, oh, the example I gave where there's too many (indiscernible) operating that it's fenced in.  They're saying that as long as this goes on, they have to keep going at it and making adjustments and checking on things.

My initial response to that would be, No, you don't really have to do it because they're not doing anything wrong.  But I -- I think that this appeal could go on for a long time, you know, that -- because whoever gets it is going to have to deal with the general liability as far as coming under the statute.  Then they're going to have to deal with Van Buren and whatever the Ninth Circuit says in their footnote.  Then it would just be quite lengthy and -- let me see what the opposition says, and I do want to

135

understand.

MR. POSNER:  I'll just do -- if there's a -- if there's an option for a stay pending appeal which we might request in writing.  There's also an option to stay the injunction for I believe seven days so that we could file a request for stay in the Ninth Circuit.  And at a minimum, if your Honor falls through on the tentative, we would ask for that stay.

THE COURT:  Well, I might consider that, all right, to give you the -- the limited time to see if you could get something from a higher authority.  Okay.  I will consider that.

MR. POSNER:  Thank you.

THE COURT:  Let's just get the opposition up here.

UNIDENTIFIED SPEAKER:  Sure.  Your Honor, we would -- we would oppose a request for a stay pending the appeal.  Their violations your Honor states is the tentative.  Your Honor will have concluded that.  We have the likelihood of success on the merits that there is, in fact, a violation here.  And the other factors, as your Honor has already described, there is an ongoing harm to -- to us.  We do have to continuously look at, investigate, determine what actions to take, particularly given that Perplexity, as your Honor knows in the record, disguises that it's there in the first place.

136

So, we would oppose.  If they -- if they want to file a motion, then, of course, your Honor would rule on it in due course, but preliminary injunctions get -- get appealed and say you're not -- you're not entitled to a stay in any sense of the matter of right.  But if they file papers, your Honor, we will -- we'll file our opposition and make sure the Court has a full record.

THE COURT:  Well, I'm wondering do we need papers filed on it, but I guess that -- well, let me get both the options, and I didn't go over this like for the Plaintiff and I'll hear from the Defendant.

If the Ninth Circuit, particularly in light of the -- the case they had most recently after <u>Van Buren</u>, was really interested in taking a look at this and has a real question about it, maybe they should be taking a look at it early, but that still doesn't deal with 502.

Now, let's see.  Let's say I did grant a limited stay that would give the Defendant an opportunity to seek a stay of my order.  All right.  (Indiscernible).  And, so, they would file whatever they file.  Then you would respond.  And how long are they taking to -- if you know?

UNIDENTIFIED SPEAKER:  In other cases I have before the Ninth Circuit it's been taking the completion of briefing plus about a month.  And they don't do -- the motions now is just once a month.

137

THE COURT:  So, maybe out to about what then?

UNIDENTIFIED SPEAKER:  Well, five to eight weeks depending on when the papers get out.

THE COURT:  Okay.  All right.  So, not extraordinarily long, but just -- just so the tape recorder would know, that was just to -- don't know who was adding the -- that information.

Well, I'll tell you, if I -- and, critically, if I took the time to do a very long detailed order, perhaps it would take that much time while there wouldn't be decision anyway, and they would continue to do what they did during that time.  So, we're not really losing that much time if I do a pretty short version and then the possibility of getting it stayed from the Ninth Circuit comes up.  At that point, if they really think there's a -- a significant question here, maybe they should look at it.  As I was saying, the behavior that's occurring, I wasn't blown away by the cyber security document.  All right.  That would be a particularly stronger reason not to have this data out there because -- I don't know how many of you keep getting notices that -- but if I have together all of the three services I get on credit reporting now because of people telling me that whatever I've got information that is in the app, I think cyber security is -- it's important, but I wasn't sure that that really was as strong a reason here for a lawsuit.

138

So, all right.  I'm going to grant your request, your oral request.  I will -- once I issue -- and I may issue in your favor, then maybe --

MR. POSNER:  We'll hold out hope, and if your Honor's inclined to do the longer order that takes more time, we would welcome the Court's reasoning.

THE COURT:  Okay.  I think you've got the -- you know, like we've spent a number of hours here, and I've tried to make clear where I'm coming from, and I think I have.  If there's any gap in that reasoning, you can tell me now, not the agreement but just the -- like if I'm not covering something, then I -- I would endeavor to do that.  So, I -- what I'm going to do is I -- I'm going to grant you the request, all right.  Yes?

UNIDENTIFIED SPEAKER:  Your Honor, just to clarity, the request to grant the temporary stay so --

THE COURT:  Yes.

UNIDENTIFIED SPEAKER:  Not -- not the whole stay.

THE COURT:  Not the whole stay.

UNIDENTIFIED SPEAKER:  Thank you.

THE COURT:  The mini stay.

UNIDENTIFIED SPEAKER:  The mini -- so, the seven-day stay so they could seek relief.

MR. POSNER:  And that stay would presumably run from the date of any order that the Court issues?

139

THE COURT: Exactly, because I haven't ruled yet. I just want to go back one more time. I've seen the Plaintiff's very impressive job making their point for your client and you have also, and then, you know, the papers there aren't something that somebody could just say this is all malarkey and sit down. And, so, I really want to just make sure I haven't overlooked anything. And, so, I feel confident that I have considered this to the best of my ability, I haven't overlooked something, and I'm going to give it my best shot on the rulings, and I'm going to issue an order that's relatively brief, incorporates by reference what I've said today and possibly has a few highlights just to give you and idea. Then, at that point, I will include in it the stay pending your request to get a stay from the Ninth Circuit, in other words, a seven-day stay basically.

UNIDENTIFIED SPEAKER: Thank you, your Honor.

THE COURT: All right.

UNIDENTIFIED SPEAKER: And, your Honor, we think you -- you've got it all right.

THE COURT: All right. And --

UNIDENTIFIED SPEAKER: And with that --

THE COURT: -- they think I've got it all wrong. So, we will see when this comes down, but thank, you all. We are in recess at this time.

(Proceedings adjourned at 12:36 p.m.)

140

141

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Wednesday, March 11, 2026

*Echo Reporting, Inc.*